the Internet with easy access for the public.  One of Rodgers' goals in life was to pass on his knowledge and expertise to others so they could continue to destroy property and intimidate the government and the civilian population in the name of ALF/ELF.

Rodgers spoke to several of the cell members about escalating their tactics to include the assassination of certain business leaders.  During one meeting between Rodgers and Jacob Ferguson, Rodgers stated he would not show as much mercy as he had in the past.  He also talked of doing something larger than had previously been done.

A search warrant was served on Rodgers' business/residence in Prescott, Arizona, on December 7, 2005.  Items seized included timing devices, anarchist books, and numerous images of child pornography on his computer.  He was arrested during the service of the search warrant and taken to jail in Flagstaff, Arizona, for holding until he could be removed to Oregon.  On December 22, 2005, he was found unresponsive in his jail cell and was pronounced dead at the scene.  The cause of death, according to the official autopsy, was "asphyxia due to suffocation by plastic bags," and the manner of death was deemed suicide.

2.    **Stanislas Gregory Meyerhoff**



a.    **Background**

Born June 20, 1977, Stanislas Gregory Meyerhoff was known throughout the conspiracy as "Jack" and "Country Boy."  Beginning in October 1998 and continuing for nearly three years, Meyerhoff was involved in 21 criminal acts which ranged from road vandalism and plant destruction to arsons and conspiracy to commit murder.  His crime spree resulted in the loss of thousands of hours of scientific research, millions of dollars in property damage and jobs and family incomes of the personnel of affected businesses and government facilities.

During the years 1999 through 2001, Meyerhoff became a troubled and violent individual, and a career anarchist.  He began to research and develop newer and more effective destructive devices as well as participate in writing manuals which carefully described how to make homemade incendiary devices for use against businesses and government.  He also spent many hours traveling across the United States to teach others how to use such devices to destroy university research facilities.

During the final year of his criminal activity, he became frustrated with the lack of success resulting from his arsons and believed radical activists' efforts were not effectively

changing government policies or commercial endeavors.  He, along with William Rodgers, Joseph Dibee, Daniel McGowan and others, discussed escalating their level of violence.

Meyerhoff was also involved with a select group of ELF activists who met secretly to learn enhanced techniques of arson and sabotage, attending groups referred to as Book Club meetings.  As mentioned earlier, during these meetings the participants were trained in building timing devices to be used during arsons and security procedures to avoid detection by law enforcement authorities.  The group was also trained in the use of codes to communicate with each other without being detected.

Meyerhoff attended three of the Book Club meetings.  The final meeting he attended was in Sisters, Oregon.  It was there when Meyerhoff discussed the failure of the movement through its arsons.  He questioned whether more radical tactics should be employed, and urged it was time for the movement to take the next step and to escalate the violence.

As early as 2001, Meyerhoff began teaching others how to make timers for incendiary devices and assisted Rodgers in writing the how-to book for ELF arsonists titled *Setting Fires With Electrical Timers:  An Earth Liberation Front Guide.*  Meyerhoff's contributions to the manual were largely derived from his own research and his testing of incendiary device timers.

In the Spring of 2001, Meyerhoff had conversations with William Rodgers about assassinations.  Rodgers and Meyerhoff discussed the tactic of two riders on a motorcycle being able to weave in and out of traffic, shooting someone and then fleeing the scene and dumping the gun.

Meyerhoff and Chelsea Gerlach had earlier become interested in firearms and had purchased two MAK 91s.  Meyerhoff described these firearms as AK47 semi-automatic rifles

with a modified pistol grip.  The MAK 91s were greased, wrapped in plastic, placed in a box and buried by Meyerhoff and Gerlach at their Livewood residence near Eugene.

In September 2001, Tubbs and Rodgers gave Meyerhoff $1,000 and a police scanner and directed him to travel to the Midwest to instruct others in how to build incendiary devices and to plan other "direct actions."  Meyerhoff did as he was told, traveled to the Midwest and trained another person in committing arsons.

Meyerhoff returned from the Midwest unemployed and out of money.  Kevin Tubbs put Meyerhoff in contact with Joseph Dibee, and Meyerhoff was paid by Dibee to perform some engine work on a vehicle.  While together, Dibee and Meyerhoff discussed Dibee's hatred for Jonathan Paul and discussed a plan to kill Paul.  They dressed in black clothing, obtained a police scanner and a semi-automatic hand gun and drove in Meyerhoff's vehicle from Seattle to Southern Oregon.

The map they had was inadequate and they became lost in the rural area near Paul's residence.  While stopped at a closed store to assess their situation, they were contacted by a local police officer and questioned about their presence in the parking lot.  They told the officer that they were traveling from Seattle to San Francisco and had become lost.  After the police contact, they decided to discontinue looking for Paul and return to Seattle.

In January 2005, Meyerhoff admitted to Lacey Phillabaum that he and Dibee had driven to Southern Oregon to shoot Jonathan Paul.  When later asked about the incident by investigators, Meyerhoff stated that he and Dibee had only gone to do a "reconnaissance" of Paul and that the firearm was simply for self-defense because Paul was known to have firearms.

**b.      Charges**

Meyerhoff entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 51

counts of arson in violation of 18 U.S.C.§ 844(i), in connection with the following sites:

>           Childers Meat Company (1)
>
>           Boise Cascade Corporation (1)
>
>           Eugene Police Substation (1)
>
>           Superior Lumber Company (1)
>
>           Joe Romania Chevrolet Truck Center (35)
>
>           Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for the Jefferson Poplar Farm

arson.  He has also entered a guilty plea to one count of destruction of an energy facility in

violation of 18 U.S.C. § 1366(a).

Finally, he entered guilty pleas to an indictment from the District of Colorado which has

been transferred via Rule 20 to the District of Oregon charging him with eight counts of arson in

violation of 18 U.S.C. § 844(i), for the Vail Ski Resort arson in Case Number CR 06-60122-AA.

**c.      Role in the Offense**

Meyerhoff's roles in the crimes of conviction vary from being the technical "go-to guy"

in the design and manufacture of the incendiary devices to being a leader and organizer of

arsons.  The following briefly describes Meyerhoff's role in each offense:

10/19/98        Vail, CO  – $24,500,485.28 loss

> Meyerhoff obtained the components and constructed the incendiary
> devices to be used, and helped carry the fuel to the stash site on the
> mountain.

05/09/99        Childers Meat Company, Eugene, OR – $1,177,000 loss

> Meyerhoff participated in the initial surveillance of this target and served
> as a lookout during the arson.

12/25/99        Boise Cascade Corporate Offices, Monmouth, OR. – $1,689,593 loss

> Meyerhoff constructed the incendiary devices and personally set one of
> them.

12/30/99        BPA High Voltage Tower, Bend, OR – $126,000 loss

> Meyerhoff researched the vulnerability and location of the transmission
> lines and stated that the purpose for the attack was to destabilize the
> government.  Meyerhoff believed the United States was "not going in the
> right direction."

09/09/00        EPD West Eugene Substation, Eugene, OR – $1,750 loss

> Meyerhoff chose the location for this arson believing that the police
> station would be a popular target with the Eugene "activist community."
> Having manufactured the incendiary devices, Meyerhoff wanted to test his
> new innovations in those devices.  He and Gerlach drove to Salem, rented
> a motel room under a false name, and carefully assembled timing devices
> using a "clean room" technique.  Meyerhoff personally placed a device on
> a bicycle next to the police station.

01/02/01        Superior Lumber Company – $1,041,696 loss

> Meyerhoff and others researched the company and determined that
> Superior Lumber had been involved in logging old growth timber. He
> manufactured the destructive devices and personally placed one of them
> next to the building.

Page 81  -  **Government's Sentencing Memorandum**

03/30/01          Romania II – $959,000 loss

> Meyerhoff and Rodgers selected this target.  Meyerhoff characterized this arson as the "big one" for him and that it was to be a "statement of defiance" honoring Jeffery Luers who was about to go to trial for the first arson committed at Romania.  Meyerhoff later described the arson as foolishly taking on the government, but admitted he meant to frighten and terrify the victims of the arson.  Meyerhoff personally recruited the co-conspirators and placed the devices beneath the vehicles with the help of Block.

05/21/01          Jefferson Poplar Farm, Clatskanie, OR – $994,412.42 loss

> Meyerhoff was the leader in this arson.  The Jefferson Poplar Farm and the University of Washington arsons were coordinated to occur simultaneously.  Meyerhoff participated in the surveillance and a "dry run."  He personally selected his crew and directed Savoie, Block, Zacher and McGowan while they worked at the target site.  Meyerhoff planned the arson, manufactured the incendiary devices, and personally placed several of the devices at or near buildings or structures, including placing a timing device on one of the buckets of fuel near the gas meter of a large liquid propane tank.

**d.    Restitution**

The estimated loss resulting from Meyerhoff's substantive counts of arson and destruction of an energy facility is approximately $30,489,936.42.

**e.    Aggravating Factors**

Meyerhoff was a leader and organizer during his tenure with his co-conspirators.  He specifically planned, organized and led the arsons at the Joe Romania Chevrolet Truck Center and at the Jefferson Poplar Farm.  He also recruited and directed the other participants involved in those arsons.

**f.    Mitigating Factors**

None

**g.    Cooperation**

Page 82  -  **Government's Sentencing Memorandum**

For safety and other reasons, each defendant's cooperation, if any, needs to remain undisclosed to the public.  Because of this, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

**h.    Specific Advisory Guidelines Calculations**

As stated in section III.B.2 above, Meyerhoff's base offense level is 38VI.  To that, the following adjustments should be made:  Five levels should be added for combined offense level (multiple offenses) under § 3D1.4, three levels should be added for aggravating role under § 3B1.1(b), and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for a total adjusted offense level of 43VI (life).

**i.    Sentence Recommendation**

Meyerhoff and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 12-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 31VI (188 - 235).  The government recommends a sentence at the low end of the advisory guideline range, **188 months imprisonment**.  Meyerhoff is free to request other adjustments or departures, but the government will oppose any such request.

The United States Attorney's Office for the District of Colorado is in agreement with the anticipated 188-month sentence recommendation and recommends a sentence in Case Number

CR 06-60122 (former District of Colorado Case No. 06-CR-00191-REB) of 188 months, to run

concurrently with the anticipated 188-month sentence in the District of Oregon.

**3.**     **Kevin Tubbs**



**a.**     **Background**

Kevin Tubbs was born on January 18, 1969, and was known throughout the conspiracy as

"Bob" and "Dog."  Beginning in December 1995 and continuing for nearly six years, Tubbs was

involved in multiple felonies ranging from burglary and animal thefts to arsons.  His five-year

criminal career resulted in the loss of thousands of hours of scientific research, millions of

dollars in property damage, and untold jobs and family incomes of personnel of the affected

businesses and government facilities.

During his early years, Tubbs was considered an introvert.  His father wanted him to

become involved in ROTC but Tubbs instead studied fine arts, and graduated from Humboldt

State University with a bachelor's degree in fine arts and theatre arts.  While at Humboldt State,

Tubbs began using marijuana on a regular basis, which continued until his arrest in this case, 15

years later.

After graduation, Tubbs became involved with People for the Ethical Treatment of

Animals (PETA).  While working with PETA, he wore animal costumes and engaged in

Page 84  -  **Government's Sentencing Memorandum**

confrontational protest activities.  He was arrested by police during some of the protests.  On one

occasion he was convicted of simple assault for throwing urine at police officers, and another

time he was convicted of criminal nuisance for throwing cat excrement at police.

In July 1995, Tubbs became involved with a group protesting logging at the Warner

Creek timber sale near Oakridge, Oregon.  It was there that Tubbs met some of his co-

conspirators.

In December 1995, he was successful in his first solo arson.  On Christmas Day, he

manufactured three incendiary devices and placed them about the delivery trucks of Dutch Girl

Dairy in Eugene.  He also wrote graffiti on the trucks, including "Dairy = Death, ALF."

In the fall of 1996, Tubbs and others burglarized a mink farm in Lebanon, Oregon, and

released approximately 2000 mink.  Seven days later, he participated in the destruction of the

Oakridge Ranger Station.

In September 2001, Tubbs and Rodgers gave Meyerhoff $1,000 and a police scanner and

directed him to travel to the Midwest to instruct others in how to build incendiary devices and to

plan other "direct actions."  As a result of this, Meyerhoff trained another person which resulted

in the commission of additional arsons.

The roles assumed by Tubbs during the arsons included researching and selecting

targets, recruiting others to participate, providing support for the training of others, and

transporting others during the commission of arsons.  Throughout his criminal activities and until

his arrest, Tubbs used intense security measures to avoid detection by law enforcement.  After

2000, he maintained contact with many of his co-conspirators and arranged to assist those

involved in the conspiracy to evade capture by law enforcement authorities.

Page 85  -  **Government's Sentencing Memorandum**

At the conclusion of his active life as an arsonist, Tubbs had participated in the destruction of more than $20,000,000 in real and personal property as well as obliterating irreplaceable scientific research materials.  His reign of destruction resulted in the loss of jobs and family income for those put out of work because of his criminal acts.

Notwithstanding the violent nature of his crimes, Tubbs professes to be a non-violent and peaceful person.  He ignores the fact that destruction of property constitutes violence and denies that during his years as an arsonist, he and his co-conspirators placed hundreds of people in harm's way.

**b.    Charges**

Tubbs entered pleas of guilty to conspiracy, in violation of 18 U.S.C. § 371, 53 counts of arson in violation of 18 U.S.C. § 844(i), in connection with the following sites:

Oakridge Ranger Station (1)

Cavel West (1)

BLM Wild Horse Facility, Burns, Oregon (1)

Childers Meat Company (1)

Eugene Police Substation (1)

Superior Lumber Company (1)

Joe Romania Chevrolet Truck Center (35)

Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i), for the U.S. Forest Industries arson, and one count of attempted arson for the Jefferson Poplar Farm arson.

     **c.**    **Role in the Offense**

Tubbs' roles in the crimes of conviction vary from designing and manufacturing

incendiary devices to researching and organizing the crimes, and serving as a driver and lookout.

The following briefly describes Tubbs' role in each offense:

10/30/96      Oakridge Ranger Station  – $5,074,189 loss

              Tubbs assisted in selection of the target, made the incendiary devices, drove the transport vehicle and served as a lookout.

07/21/97      Cavel West, Redmond, Oregon – $1,211,388.76 loss

              Tubbs researched the target, performed surveillance on the facility and recruited others to participate in the arson.  He drove the transport vehicle and served as a lookout.

11/30/97      BLM Wild Horse Corrals, Burns, Oregon – $193,098.30 loss

              Tubbs drove the transport vehicle to and from the arson and served as a lookout.

12/20/98      U.S. Forest Industries, Medford, Oregon – $990,220 loss

              Tubbs and others conducted a "dry run" of the arson.  He recruited Rebecca Rubin to participate, and drove the transport vehicle to and from the arson.

05/09/99      Childers Meat Company, Eugene, OR – $1,177,000 loss

              Tubbs selected the target, did the initial reconnaissance, drove the transport vehicle and as a lookout during the arson.

09/09/00      EPD West Eugene Substation, Eugene, OR – $1,750 loss

              Tubbs served as the lookout and maintained radio contact as Gerlach and Meyerhoff placed the devices.

01/02/01        Superior Lumber Company – $1,041,696 loss

                         Tubbs participated in the dry run and the arson.  He drove the transport vehicle and served as a lookout.

03/30/01        Romania II – $959,000 loss

                         Tubbs was one of the lookouts for this arson.

05/21/01        Jefferson Poplar Farm, Clatskanie, OR – $994,412.42 loss

                         Tubbs participated in the reconnaissance of this arson.

### d.    Restitution

The total estimated loss resulting from Tubbs' conspiratorial actions exceeds $20,000,000. The actual loss resulting from the substantive counts of arson and attempted arson for which he pleaded guilty is approximately $11,642,754.18.

### e.    Aggravating Factors

Tubbs was a leader and organizer during the conspiracy.  He planned and organized the arson at the Cavel West plant. He recruited others for the Burns BLM Horse Corrals and U.S. Forest Industries arsons.  Tubbs also induced Meyerhoff to travel across the country to teach others the techniques involved in committing arson.

### f.    Mitigating Factors

None.

### g.    Cooperation

As stated earlier, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

### h.      Specific Advisory Guidelines Calculations

As stated in section III.B.2 above, Tubbs' base offense level is 38VI.  To that, the following adjustments should be made:  Five levels should be added for combined offense level (multiple offenses) under § 3D1.4, two levels should be added for aggravating role under § 3B1.1(b), and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for a total adjusted offense level of 42VI (360 - life).

### i.      Sentence Recommendation

Tubbs and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 12-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities, in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 30VI (168 - 210).  The government recommends a sentence at the low end of the advisory guideline range, **168 months imprisonment**.  Tubbs is free to request other adjustments or departures, but the government will oppose any such request.

4.    <u>**Chelsea Dawn Gerlach**</u>



a.    **Background**

 In 1993, at age 16, Gerlach received from her father a copy of *Earth First! Journal*, which introduced her to the radical environmental movement.  With her parents' permission, she spent the summer of 1993 in Idaho at the Cove Mallard gathering of Earth First! activists. Among the 150 people there, she met William Rodgers, aka Avalon, who was an instructor.  At the end of the summer, she was arrested at Cove Mallard for blockading a road.

Her involvement with Earth First! continued while she attended South Eugene High School.  At the March 1994 E-Law Conference in Eugene, she met again with Cove Mallard participants, including Rodgers.  Notwithstanding their age differences, she developed a teenager's crush on him.

In the spring of 1994, she met Stanislas Meyerhoff at South Eugene High School, and they moved into an apartment that fall.  After graduation, they moved to Olympia in the summer of 1996.  After traveling together in Europe, they attended Evergreen State College in Olympia. She continued her involvement with Earth First! as Meyerhoff also became interested in extreme

environmentalism.   In the spring of 1997 Gerlach took part in a blockade in the Olympic National Forest and later visited the protest encampments at Warner Creek in Oregon.

Frustrated with her civil disobedience activities, Gerlach became more radical, dropped out of school and lived with anarchists.  She became immersed in Rodgers' writings, which included instructions on sabotage and incendiary devices.  In the fall of 1997 Rodgers told her about an ALF cell that engaged in sabotage, but she was not yet invited to join.

In 1998 Gerlach and Rodgers went to the University of Arizona's Mount Graham Observatory, which had been built in a forest clearcut.  Their attempt to damage the telescope with a gun was aborted when they spotted a security guard.  After that, Gerlach became fully involved with the ALF/ELF cell, as described below in the specific crime summaries.

Gerlach participated in numerous Book Club meetings at which clandestine strategies, tactics and methods were discussed.  The Tucson meeting is particularly noteworthy in that Gerlach, with the guidance of convicted arsonist Rodney Coronado, took part in the reconnaissance of potential genetic engineering (GE) targets at the University of Arizona, specifically experimental crop sites and greenhouses.  At the Olympia meeting, the group discussed abusive sexual relationships among the members, particularly the activities of Rodgers.

In addition to the arsons, Gerlach joined in criminal activity at various sites in the group's campaign against genetic research.  She helped destroy experimental crops in Eastern Washington.  After serving as the driver for a similar action near Boardman, Oregon, and the tree-girdling at Oregon State University in Corvallis, Gerlach wrote the communiques covering both.

Page 91  -  **Government's Sentencing Memorandum**

Gerlach actively participated in the crimes at the BLM Wild Horse Facility near Rock Springs, Wyoming, in October 1998. She drove her truck, helped in the reconnaissance, and released horses prior to the premature termination of the attempted arson.

In August 1999, Gerlach assisted in the burglary and theft of dogs at Bio Devices in Orange, California. In 2000, Gerlach, along with Coronado and others, took part in a similar action at a primate research center in New Mexico. She assisted as a driver for the tree-spiking at the Judie timber sale near Oakridge, Oregon, in February 2001.

In August 2001, Gerlach assisted Joseph Dibee in a reconnaissance of the future BLM target in Litchfield, California. She performed another reconnaissance at the University of Arizona in September 2001. In 2002, Dibee gave Gerlach $10,000 in cash, which she used for reconnaissance at nanotechnology and oil company sites in various U.S. locations.

From 2001 until her arrest in December 2005, Gerlach supported herself primarily by selling marijuana and ecstasy. She became romantically involved with Darren Thurston, who assisted her in the drug trade. They lived together in Portland prior to their arrest. Searches revealed false identity evidence for both of them, and it is clear they were planning an escape to Canada if the need arose.

In cooperation with authorities, Gerlach took agents to the Siuslaw National Forest where she and Thurston had buried weapons, ammunition and other items. The guns included two AK47s, a mini 14, two Glock 9mm handguns, and a Kel-tech. Gerlach purchased the Kel-tech for Thurston (an illegal alien with felony convictions) at a Las Vegas gun show in 2003. (See discussion of Thurston below for further information on their activities.)

      **b.**     **Charges**

Gerlach pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, 15 counts of arson

in the District of Oregon in violation of 18 U.S.C. § 844(i), in connection with the following

sites:

            Childers Meat Company (1)

            Boise Cascade Corporation (1)

            Eugene Police Substation (1)

            Jefferson Poplar Farm (12), and

one count of attempted arson in violation of 18 U.S.C. § 844(i) for the Jefferson Poplar Farm

arson.  She also pleaded guilty to one count of destruction of an energy facility in violation of 18

U.S.C. § 1366(a).  Finally, she pleaded guilty to an indictment from the District of Colorado,

transferred to the District of Oregon, encompassing eight counts of arson in violation of 18

U.S.C. § 844(i) for the Vail Ski Resort arson in Case Number CR 06-60122-AA.

      **c.**     **Role in the Offense**

Gerlach's roles in the crimes of conviction ran the gamut and included research,

reconnaissance, lookout, device-assembler, driver, and communique-writer.

10/19/98       Vail, Colorado – $24,500,485.28 loss

                Gerlach used her own truck to transport Meyerhoff and herself.  She
                helped obtain supplies and took part in the assembly of devices in a Utah
                motel room.  She drove her truck up the mountain as far as possible and
                hid the fuel containers.  After others left, she remained with Rodgers and
                helped him complete the crime.  In Denver she and Rodgers composed the
                communique, which she distributed to the media via a library computer.

05/09/99          Childers Meat Company, Eugene – $1,177,000 loss

Gerlach performed a pre-arson reconnaissance and, using two-way radios, acted as a lookout during the actual crime.  She typed the communique and distributed it to the media.

12/25/99          Boise Cascade Corporate Offices, Monmouth, Oregon – $1,689,593 loss

Gerlach researched Boise Cascade and discovered it was involved in a logging controversy.  She stayed in the van and acted as a lookout while the devices were set, and later sent the communique from an internet coffee shop in Portland.

12/30/99          BPA High Voltage Tower, Bend – $126,000 loss

Gerlach went to the University of Oregon and researched the state's power grids and located maps.  She found sites with good road access.  She and Meyerhoff surveilled the location.  She and the others traveled in her truck the night of the crime.  While others felled the tower, Gerlach waited in her truck and served as a lookout.  She flashed the truck's lights to assist the others to return to the truck. All four returned to Eugene in her truck.  Afraid she might have left tire tracks, Gerlach bought new tires for the truck.

09/09/00          EPD West Eugene Substation, Eugene – $1,750 losss

Gerlach helped choose the target.  She and Meyerhoff drove to Salem, rented a motel room under a false name, and carefully assembled timing devices using a "clean room" technique.  With Meyerhoff and Tubbs, Gerlach dressed in dark clothes at an offsite location in Eugene.  She gave the "all-clear" signal and assisted in placing devices at the substation.  She carried an incendiary device in her backpack.

05/21/01          Jefferson Poplar Farm, Clatskanie, Oregon – $994,412.42 loss

Gerlach did research on both the Jefferson Poplar Farm and the University of Washington targets.  She attended meetings discussing why these were good targets and how the arsons should be performed.  With  Meyerhoff and McGowan, Gerlach conducted reconnaissance at Jefferson Poplar Farm.  Although not present when the crimes occurred, she sent a communique that tied the arsons together as anti-genetic engineering actions and warned the governments of Oregon and Washington.

**d.    Restitution**

Page 95  -  **Government's Sentencing Memorandum**

The estimated total loss resulting from Gerlach's substantive counts of arson and destruction of an energy facility is $27,429,940.70.

### e.    Aggravating Factors

Gerlach engaged in a large array of criminal activities from her teenage years through her arrest in December 2005 at age 29.   She was a dedicated and loyal member of the ELF/ALF cell, followed directions carefully, assisted in any way she could, and encouraged others to do the same.  After the breakup of the cell, she remained an active drug dealer until her arrest.  She harbored an illegal criminal alien, purchased a firearm for him, hid several firearms for illegal purposes, and engaged in identity theft.

### f.    Mitigating Factors

None.

### g.    Cooperation

As stated earlier, a separate letter is being sent to the court setting forth in detail the extent and value of each defendant's cooperation.

### h.    Specific Advisory Guidelines Calculations

As stated in section III.B.2 above, Gerlach's base offense level is 38VI.  To that, the following adjustments should be made:  Five levels should be added for combined offense level (multiple offenses) under § 3D1.4, and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for a total adjusted offense level of 40VI (360 - life).

### i.    Sentence Recommendation

Gerlach and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 26VI (120 - 150).  The government recommends a sentence at the low end of the advisory guideline range, **120 months imprisonment**.  Gerlach is free to request other adjustments or departures, but the government will oppose any such request.

The United States Attorney for the District of Colorado is in agreement with the anticipated 120-month sentence recommendation and recommends a sentence in Case Number CR 06-60122 (former District of Colorado Case No. 06-CR-00191-REB) of 120 months, to run concurrently with the anticipated 120-month sentence in the District of Oregon.

5.    **Daniel Gerard McGowan**



a.    **Background**

McGowan, 33, born and raised in Brooklyn, New York, graduated from the State University of New York at Buffalo.  Over the years he has gone by several monikers: Djenni, Dylan Kay, Jamie Moran, Rabid, and Sorrell.  His activism began in the animal rights ideology and evolved into extreme environmentalism, anti-genetic engineering and anarchism.

His criminal activities date from 1997 when, acting alone, he broke out windows at a store in New York City that reportedly sold parts from endangered animals.   The same year, again acting alone, McGowan broke out windows and spray-painted graffiti (including "ALF") at a Macy's store in Brooklyn because it sold fur products.  He was the only participant in a similar attack a little later at Zamir Furs in Manhattan.

In 1998 McGowan moved to the Bay Area in California to engage in environmentally motivated crimes  On November 10, 1998, he performed his first action with the underground "Biotic Baking Brigade," when, in San Francisco, he assaulted the President of the Sierra Club by throwing a cream pie in his face at a board of directors meeting.  Several days later he did the

same thing to the CEO of Novartis Seeds at the University of California (UC)–Berkeley.  He was arrested for this incident, which a communique attributed to the Biotic Baking Brigade.

Again in 1998, McGowan and others targeted Fidelity Investments in San Francisco because that company traded Occidental Petroleum stock. A nighttime effort to ruin windows with etching fluid was called off after limited damage when one of the participants got it on his skin.  On December 8, 1998, during a power blackout, McGowan was in a group that threw paint-filled balloons at a Bank of America in San Francisco.   They targeted it merely because it was a financial institution.  No one was arrested.  On April 30, 1999, in an action linked to the Biotic Baking Brigade, McGowan targeted for damage an animal researcher at UC-Berkeley. Again, no one was arrested.

In July 1999 McGowan, as part of the "California Croppers" underground group, performed reconnaissance at a UC–Berkeley research facility that worked with genetically modified plants.  He and others jumped a fence and, for about 45 minutes, located experimental corn which others later destroyed.  McGowan supplied them with a diagram specifying the targets.

McGowan did not take part in the UC–Berkeley destruction itself because on the same night he and a small group were busy attacking Eureka Seeds in Lodi, California.  Using scythes and loppers, they destroyed DeKalb corn fields on a private farm.  McGowan typed up a communique attributing it to the "Lodi Loppers" and distributed it to media.

 A similar destructive action occurred on September 15, 1999, at a UC-Berkeley professor's corn research tract.  McGowan did the reconnaissance.  He and others spent 30

minutes pulling up young plants and causing other damage.  McGowan helped write and e-
mailed the communique which attributed the action to "Reclaim the Seeds."

In the summer of 1999 McGowan moved to Seattle to take part in advance planning for
the upcoming violent disruption of the World Trade Organization (WTO) meetings scheduled in
December.  Before that occurred, he and others (including Suzanne Savoie) traveled to
Washington State University (WSU) in Pullman, where they hoped to target potato research
sites.  Their reconnaissance of the WSU sites ended abruptly when their vehicle broke down.

On November 27, 1999, a group calling itself the "Washington Tree Improvement
Association" damaged a tree research site run by WSU at Puyallup.  McGowan participated in an
hour-long reconnaissance of the site but did not take part in the action itself because he became
sick.

From November 30 through December 2, 1999, McGowan and many others engaged in
lawless, violent conduct in the streets of Seattle during the WTO events. They sought to disrupt
meetings attended by President Clinton and other world leaders.  The public safety threat was
substantial, and it incurred large expense to local and federal law enforcement.  McGowan,
closely attached to the anarchist element, helped organize the activities and arranged
accommodations for the many like-minded associates.

On November 30, McGowan and others planned to occupy and destroy property in the
waterfront offices of the Cargill company.  Despite many reconnaissance trips to the site, it was
called off, primarily because they decided not to tangle with longshoremen at the location.
Instead, McGowan was part of the "Black Bloc" that went into the street and broke out windows,
including those at Banana Republic, GAP, and Old Navy stores.  Using a tire iron, McGowan