1

FILED'07 AUG 10 15:18 USDC-ORE

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF OREGON

 3

 4            THE HON. ANN L. AIKEN, JUDGE PRESIDING

 5

 6    UNITED STATES OF AMERICA,        )
                                       )
 7                     Government,      )
                                       )
 8              v.                      )  No. 06-60069
                                       )      06-60120
 9    DARREN TODD THURSTON,            )
                                       )
10                     Defendant.      )
      _____)
11    UNITED STATES OF AMERICA,        )
                                       )
12                     Government,      )
                                       )
13              v.                      )  No. 06-60070
                                       )
14    KEVIN TUBBS,                     )
                                       )
15                     Defendant.      )
      _____)
16    UNITED STATES OF AMERICA,        )
                                       )
17                     Government,      )
                                       )
18              v.                      )  No. 06-60071 ✓
                                       )
19    KENDALL TANKERSLEY,              )
                                       )
20                     Defendant.      )
      _____)
21    UNITED STATES OF AMERICA,        )
                                       )
22                     Government,      )
                                       )
23              v.                      )  No. 06-60078
                                       )      06-60122
24    STANISLAS GREGORY MEYERHOFF,     )
                                       )
25                     Defendant.      )
                                       )
```

38

```
 1   UNITED STATES OF AMERICA,          )
                                        )
 2                    Government,       )
                                        )
 3            v.                        )  No. 06-60079
                                        )     06-60122
 4   CHELSEA DAWN GERLACH,              )
                                        )
 5                    Defendant.        )
                                        )
 6   UNITED STATES OF AMERICA,          )
                                        )
 7                    Government,       )
                                        )
 8            v.                        )  No. 06-60080
                                        )
 9   SUZANNE SAVOIE,                    )
                                        )
10                    Defendant.        )
                                        )
11   UNITED STATES OF AMERICA,          )
                                        )
12                    Government,       )
                                        )
13            v.                        )  No. 06-60123
                                        )
14   NATHAN FRASER BLOCK,               )
                                        )
15                    Defendant.        )
                                        )
16   UNITED STATES OF AMERICA,          )
                                        )
17                    Government,       )
                                        )
18            v.                        )  No. 06-60124
                                        )
19   DANIEL GERARD MCGOWAN,             )
                                        )
20                    Defendant.        )
                                        )
21   UNITED STATES OF AMERICA,          )
                                        )
22                    Government,       )
                                        )
23            v.                        )  No. 06-60125
                                        )
24   JONATHAN CHRISTOPHER MARK PAUL,    )
                                        )
25                    Defendant.        )
                                        )
```

1    UNITED STATES OF AMERICA,                    )
                                                  )
2                          Government,            )
                                                  )
3              v.                                 )  No. 06-60126
                                                  )
4    JOYANNA L. ZACHER,                           )
                                                  )
5                          Defendant.             )
                                                  )
6    _____)

7

8              REPORTER'S TRANSCRIPT OF PROCEEDINGS

9                        EUGENE, OREGON

10

11                    TUESDAY, MAY 15, 2007

12                        PAGES 1 - 158

13

14

15

16

17

18

19

20

21

22                              Kristi L. Anderson
                                Official Federal Reporter
23                              United States Courthouse
                                405 East Eighth Avenue
24                              Eugene, Oregon 97401
                                (541) 431-4112
25                              Kristi_Anderson@ord.uscourts.gov

4

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
                           BY:  KIRK ENGDALL, ESQ.
 3                         kirk.engdal@usdoj.gov
                           and  JOHN RAY, ESQ.
 4                         john.ray@usdoj.gov
                           405 East Eighth Avenue
 5                         Eugene, Oregon 97401
                           (541)465-6771
 6
     FOR THE GOVERNMENT:    UNITED STATES ATTORNEY
 7                         BY:  STEPHEN PEIFER, ESQ.
                           1000 SW Third Avenue, Suite 600
 8                         Portland, Oregon 97204-2902
                           (503)727-1044
 9                         steve.peifer@usdoj.gov

10   FOR THE DEFENDANT THURSTON:
                           BY:  DANIEL FEINER, ESQ.
11                         1030 NW 12th, Unit 5
                           Portland, Oregon 97209
12                         (503)228-2822
                           dan@danfeiner.com
13
     FOR THE DEFENDANT TUBBS:
14                         BY:  MARC P. FRIEDMAN, ESQ.
                           245 West 13th Avenue
15                         P.O. Box 11167
                           Eugene, Oregon 97440
16                         (541)686-4890
                           mpfriedma@yahoo.com
17
     FOR THE DEFENDANT TANKERSLEY:
18                         HADDON, MORGAN, MUELLER, JORDAN,
                           MACKEY & FOREMAN, P.C.
19                         BY:  Lee D. Foreman, Esq.
                           150 E. 10th Avenue
20                         Denver, CO 80203
                           (303) 831-7364
21                         ldforeman@hmflaw.com

22   FOR THE DEFENDANT TANKERSLEY:
                           MCCREA PC
23                         BY:  SHAUN MCCREA, ESQ.
                           1147 High Street
24                         Eugene, Oregon 97401
                           (541)485-1182
25                         smcrea@callatg.com
```

```
 1   FOR THE DEFENDANT MEYERHOFF:
                         LAW OFFICE OF TERRI WOOD
 2                       BY:   TERRI WOOD, ESQ.
                         730 Van Buren Street
 3                       Eugene, Oregon 97402
                         (541)484-4171
 4                       twood@callatg.com

 5   FOR THE DEFENDANT MEYERHOFF:
                         RICHARD L. FREDERICKS, P.C.
 6                       BY:   RICHARD L. FREDERICKS, ESQ.
                         750 Lawrence, Suite 2
 7                       Eugene, Oregon 97401
                         (541)683-9240
 8                       rlfred@comcast.net

 9   FOR THE DEFENDANT GERLACH:
                         FEDERAL PUBLIC DEFENDER
10                       BY:   CRAIG WEINERMAN, ESQ.
                         151 West Seventh Avenue, Suite 510
11                       Eugene, Oregon 97401
                         (541)465-6937
12                       craig_weinerman@fd.org

13   FOR THE DEFENDANT SAVOIE:
                         BY:   JOHN J. KOLEGO, ESQ.
14                       804 Pearl Street
                         Eugene, Oregon 97401
15                       (541)484-1066
                         johnkolego@yahoo.com
16
     FOR THE DEFENDANT BLOCK:
17                       JOHN E. STORKEL, PC
                         BY:   JOHN E. STORKEL, ESQ.
18                       1415 Liberty Street, SE
                         Salem, Oregon 97302
19                       (503)363-6625
                         oceanpoet@comcast.net
20
     FOR THE DEFENDANT MCGOWAN:
21                       SCHROETER GOLDMARK & BENDER
                         BY:   AMANDA E. LEE, ESQ.
22                       lee@sgb-law.com
                         and   JEFFERY P. ROBINSON, ESQ.
23                       robinson@sgb-law.com
                         500 Central Building
24                       810 Third Avenue
                         Seattle, WA 98204
25                       (206)622-8000
```

1  FOR THE DEFENDANT PAUL:
                RANSON BLACKMAN, LLP
2                BY:   MARC BLACKMAN, ESQ.
                1001 SW Fifth Avenue, Suite 1400
3                Portland, Oregon 97204
                (503)228-0487
4                marc@ransomblackman.com

5  FOR THE DEFENDANT ZACHER:
                BY:   WILLIAM R. SHARP, ESQ.
6                1342 High Street, 2nd floor
                Eugene, Oregon 97401
7                (541)345-2002
                sharp3223@comcast.net
8

9

10                    I N D E X

11           CHRONOLOGICAL INDEX OF WITNESSES

12                                                VOIR
   WITNESS            DIRECT CROSS REDIRECT RECROSS DIRE VOL
13
   ZELDA ZIEGLER       103    115                        1
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS

 2                   TUESDAY, MAY 15, 2007

 3          THE COURT:  Good morning.  Please be seated.

 4          THE CLERK:  This is the time set for oral argument

 5   on the terrorism enhancement sentencing guideline in

 6   Criminal Cases 06-60069 through 06-60071, 06-60078 through

 7   06-60080, 06-60120, 06-60122 through 06-60126.

 8          THE COURT:  Good morning.  If I could ask each of

 9   the lawyers to introduce themselves for the record, I would

10   appreciate it.

11          MR. PEIFER:  Stephen Peifer for the United States.

12          MR. ENGDALL:  Kirk Engdall for the United States.

13          MR. RAY:  John Ray for the United States.

14          MR. SHARP:  Bill Sharp for defendant Zacher.

15          MR. STORKEL:  John Storkel for defendant Nathan

16   Block.

17          MR. FEINER:  Dan Feiner.  I represent Darren

18   Thurston.

19          MR. WEINERMAN:  Craig Weinerman with Chelsea

20   Gerlach, and Ms. Gerlach is present in the jury box.

21          MR. FRIEDMAN:  Marc Friedman on behalf Kevin

22   Tubbs.  He's here.

23          MS. MCCREA:  Shaun McCrea and Lee Foreman on

24   behalf of Kendall Tankersley.

25          MS. WOOD:  Terri Wood on behalf of Stan Meyerhoff.
```

1          MR. FREDERICKS:  Rick Fredericks, cocounsel with
2   Mr. Meyerhoff.
3          MR. KOLEGO:  John Kolego on behalf of Ms. Suzanne
4   Savoie.
5          MS. LEE:  Amanda Lee on behalf of Daniel McGowan.
6          MR. ROBINSON:  Jeff Robinson on behalf of Daniel
7   McGowan.
8          MR. BLACKMAN:  Marc Blackman on behalf of Jonathan
9   Paul.
10          THE COURT:  Counsel, I thank you very much for
11   your extensive briefing.  I think we have covered and read
12   absolutely everything that's been filed.
13          Is there anything we need to take up before we
14   begin argument at this time?  Any other outstanding issues?
15
16          On behalf of the government, you are going to
17   argue, Mr. Peifer?
18          MR. PFEIFER:  May I use the podium, Your Honor?
19          THE COURT:  You may use wherever you need to be.
20          MR. PEIFER:  May it please the court, before
21   dealing with legal arguments, I'd like to use my opening
22   remarks to set the record straight on certain points.
23          The defendants have made both broad and specific
24   claims that they don't deserve the terrorism enhancement and
25   that they don't deserve the label "terrorist."

1      We should look first at the language of the
2  information in the original indictment.  It's the same in
3  every defendant's case.  Page 3 of each information sets out
4  the manner and means of the conspiracy, and it says for each
5  defendant, quote:

6          "The general purposes of the conspiracy were
7       to influence and affect the conduct of government,
8       commerce, private business, and others in the
9       civilian population, by means of force, violence,
10      sabotage, mass destruction, intimidation, and
11      coercion, and, by similar means, to retaliate
12      against the conduct of government, commerce, and
13      private business.  To achieve these purposes, the
14      conspirators committed and attempted to commit
15      acts dangerous to human life and property that
16      constituted violations of the criminal laws of the
17      United States and of individual states.

18      That is their conspiracy.  That is their family.
19  They can quibble over legal arguments, try to sanitize their
20  conduct with noble motives, but that paragraph is what their
21  family was all about.

22      Defendants' acts spanned five years, five western
23  states, and were wholly intended to intimidate, coerce,
24  frighten, punish, and demoralize people, not buildings.
25  People.  People in government, people in business, people in

1   private and public life. Directed at people, not buildings,
2   for the purpose of changing or paying for, in the sense of
3   retaliation, lawful public policy by government and lawful
4   activity by business.

5        This is a classic case of terrorism, despite their
6   proclamation of lofty humane goals. They attempt to
7   soft-pedal their criminal conduct as somehow admirable
8   because it was aimed at property, not people. They are
9   wrong. It was aimed directly at people. It was aimed at
10  people who research, as at the Oakridge Ranger Station;
11  people who study, as at the University of Washington
12  Horticultural Center; people who make and apply policy,
13  government policy, at the U.S. Forest Service, Bureau of
14  Land Management, Bonneville Power Administration.

15       Their acts were aimed at a variety of other
16  people, people who construct, people who sell, people who
17  serve the public, people who contract with the government,
18  people who grow trees, people who operate the criminal
19  justice system, people who provide jobs, people who support
20  the local and regional economy, people who engage in
21  national and international trade, people who actually work,
22  people who support their families.

23       The defendants' conduct was aimed to punish people
24  in government and civilian life for having the right to live
25  lawful lives and to disagree with the defendants' radical

1    ideology.  And defendants' conduct was aimed, by force, to

2    frighten and coerce people in government and private life to

3    change their lawful conduct, the essence of terrorism, and

4    the dictionary definition of terrorism and the statutory

5    definition of terrorism that we are operating under here.

6              And in every arson and every attempted arson, each

7    defendant knew that there would be firefighters responding

8    to the risk, responding to risk their lives to put out the

9    fire and minimize the danger.  The defendants knew that they

10   created this danger to the firefighters or anyone else

11   responding, but they did it anyway.

12             So it's totally disingenuous to claim that they

13   cared for human life when the facts speak otherwise.  For

14   example, at Jefferson Poplar Farm, one of the destructive

15   devices was placed right next to a large propane tank, a

16   propane tank about twice as big as one of the tables here.

17   At Childers Meat, one of the destructive devices was placed

18   next to a natural gas meter and pipeline.  At Romania

19   Chevrolet, 35 Suburbans and Tahoes burst into flames.  There

20   will be videotapes of that fire for the court to see during

21   the sentencing.

22             Fortunately, our infallible and prescient

23   defendants didn't miss anyone who might have been inside a

24   building.  What they didn't know was that at Oakridge,

25   frequently a forest service employee did spend the night at

1   that building at the ranger station, and, of course, they
2   didn't check to make sure that no one was inside. It was
3   pure luck that no one was killed or injured by their
4   actions.

5          The defendants' argument is there was no injury to
6   human beings, no danger to humans, and therefore, there was
7   no terrorism. If that's the standard, the Ku Klux Klan did
8   not commit terrorism when they traveled in the dark of
9   night, three, four o'clock in the morning, burning black
10  churches in Mississippi. No one was inside the churches, no
11  one was there to be injured. They may not have wanted to
12  injure anybody. They just burned buildings. So according
13  to the defense theory, that's not a terroristic act.

14         If the same standard were applied today, then
15  white supremacist organizations could burn synagogues and
16  churches at night with nobody inside and it wouldn't be a
17  terrorist act. If that's the standard, a group of tax
18  protestors could make sure the IRS building is empty of all
19  people, pay off the guards, make sure they weren't around,
20  burn the building in the heart of the Washington, D.C., and
21  it wouldn't be an act of terrorism. But that simply is not
22  the standard for terrorism. It's not the law. It's not the
23  general conception of terrorism.

24         The defendants say they aren't terrorists because
25  they aren't Timothy McVeigh, they are not Ramzi Yousef, they

1    are not Terry Nichols, they are not Eric Rudolph. According
2    to them, that's the standard of terrorism. That's like
3    saying you are not an armed bank robber if you are not
4    Willie Sutton or you are not Bonnie and Clyde. It's the
5    gold standard. We haven't met the gold standard; therefore,
6    they are not terrorists. Well, prisons are full of a lot of
7    bank robbers who are not Bonnie and Clyde and they are not
8    Willie Sutton, that's for sure.

9            The defendants make proportionality arguments,
10   saying they don't deserve to be lumped with the big-name
11   terrorists. What they failed to note is the other
12   defendants who were serving terrorism-related sentences who
13   had been found, who had received the enhancement for
14   terrorism.

15           They compare themselves to the wrong people,
16   frankly. They should be comparing themselves to Jack
17   Dowell. He is in one of our cases we cite in the
18   memorandum. Jack Dowell is serving a sentence of 30 years
19   in prison for burning a building, one building, the IRS
20   building in Colorado Springs, Colorado, a private building
21   that was rented or leased by the IRS.

22           Judge Matsch sentenced Jack Dowell to 360 months
23   in prison. Judge Matsch knows terrorism when he sees it.
24   He was the Oklahoma City bombing judge. He sentenced Terry
25   Nichols. He sentenced Timothy McVeigh after the jury

1    verdict.

2          Jack Dowell was acting as a lookout with his
3    drinking buddies, frankly. They had been to the bar
4    beforehand and decided to burn the building in Colorado
5    Springs, members of the so-called Constitutional Law Group.
6    Jack Dowell was the lookout. He stayed outside, same as
7    many of these defendants. Just stayed outside as a lookout.
8    They burned the building in Colorado Springs; then spray
9    painted AAR, for Army of the American Republic, on the
10   outside of the building, much as our defendants here painted
11   ELF or ALF.

12         One arson. 30 years in prison for promoting a
13   federal crime of terrorism, just as these defendants did.
14   Serving as a lookout. No one was injured. Just property
15   damage. That's who they should be comparing themselves
16   with.

17         Then there's Travis James Harris. The *Harris* case
18   is also cited. Mr. Harris was mad at the police in
19   Monahans, Texas. Small town, obviously. Monahans, Texas
20   had a municipal building where the police were housed.
21   Mr. Harris threw a Molotov cocktail and burned the municipal
22   building. Harris received 30 years in prison, one arson,
23   because he promoted a federal crime of terrorism.

24         There's Imran Mandhai. We cite his case. He
25   received 140 months for conspiracy to blow up power

1   transformers to retaliate against U.S. policy or U.S.
2   support of Israel.  The court said the terrorism enhancement
3   applied there, even though it was a conspiracy.  No property
4   damage.  No one injured.  140 months in prison.

5        Stephen John Jordi, we cite his case.  He has a
6   current release date of 2012.  He was sentenced for
7   attempted arson of an abortion clinic.  No one injured.  No
8   property damage actually occurred.  And the court
9   specifically approved an upward departure for terrorism.
10   Because the government was involved, the upward departure
11   applied.

12        And while we are discussing proportionality, let's
13   not forget the case of Rachelle "Shelley" Shannon, a case I
14   prosecuted in the mid-1990s.  Shelley Shannon is serving a
15   20-year sentence, 240 months, for six arsons and attempted
16   arsons in Oregon, California, and Nevada.  She wanted to
17   save unborn babies.  These defendants wanted to save animals
18   and trees.  The only person hurt in any of Shelley Shannon's
19   arsons was a firefighter in Sacramento, and it was a minor
20   injury.  We sought the upward departure for terrorism in
21   that case.  Judge Redden avoided the issue, frankly, didn't
22   decide it because he decided that he would still reach the
23   maximum 20-year sentence using the extreme conduct departure
24   instead.  And she got the maximum sentence possible under
25   the plea agreement of 20 years.  That's who they should be

1    comparing themselves with.

2         Now, defendants raise the specter that anyone with

3    a terrorism enhancement is automatically doomed to a

4    dungeon, so to speak, at the U.S. penitentiary in Terre

5    Haute, Indiana.  It's a very emotional argument, but nothing

6    more, because it's not supported by the facts.  We live in

7    the Twenty-first century, so we can find, in a matter of

8    seconds, where these individuals are serving their

9    sentences.

10        Jack Dowell, who burned the IRS building in

11   Colorado Springs, is at FCI Jessup in Georgia.  It's a

12   medium security facility similar to FCI Sheridan.

13        Travis Harris, who burned the municipal building

14   in Monahans, Texas, is at FCI Forrest City, Arkansas, a

15   minimum -- excuse me -- a medium security facility.  He's

16   serving a 30-year sentence.

17        Stephen Jordi, who attempted to burn an abortion

18   clinic, is at FCI Terre Haute, not the penitentiary, but at

19   the FCI medium security facility.

20        Imran Mandhai is at the FCI Terre Haute, the FCI,

21   not the USP.

22        Shelley Shannon is serving her 20-year sentence at

23   FCI Dublin in California.

24        So it's simply not true that every terrorist

25   serves sentences at USP Terre Haute.

Case 6:06-cr-60120-AA   Document 29-1   Filed 08/10/07   Page 17 of 158

1     Another point raised by the defendants is that it
2   really doesn't make any difference to the government, since
3   we can get the same recommended sentence, regardless of the
4   enhancement, with the reduction for substantial assistance.
5   Maybe.  Maybe not.  It depends on the individual defendant.
6   But more important, it's the government's position here, as
7   we advocate in every case, that there should be honest
8   application of the sentencing guidelines.  Truth in
9   sentencing is the standard policy of the 1984 Sentencing
10  Reform Act, and that's the policy we are asking the court to
11  apply here.

12     The guidelines are now advisory, of course, but
13  the sentence -- the system depends on honest application of
14  them.  And we can't hide the facts from the court, cannot
15  ignore the application of those facts to the guidelines
16  prior to final sentencing, regardless of what that final
17  sentencing will be.

18     Can I get my water, Your Honor?  I'm feeling a
19  little dry.

20     THE COURT:  Absolutely.

21     MR. PEIFER:  Thank you.

22     Another point raised by the defendants is that
23  there are two other defendants who are getting separate
24  treatment, they say.  Jennifer Kolar and Lacey Phillabaum.
25  Both of them have pled guilty in the Western District of the

1  Washington and are facing sentencing there.

2  Lacey Phillabaum did not commit a crime within the District

3  of Oregon. Jennifer Kolar did. And her case involving the

4  Cavel West fire has been transferred to the Western District

5  of Washington where she's pleading guilty.

6         Her plea agreement states specifically that she is

7  facing the terrorism enhancement. It's the same government

8  written and negotiated plea agreement applicable to other

9  defendants in that regard in this case. So Jennifer Kolar

10  is facing that enhancement specifically.

11         Now, Lacey Phillabaum's plea agreement does not

12  specifically refer to the terrorism guideline, but it

13  doesn't provide that she won't receive it. It's an open

14  sentencing issue, as are other guidelines issues, so

15  Lacey Phillabaum more than likely will be facing the

16  terrorism enhancement as well. She pled guilty in

17  connection with the University of Washington fire.

18         So they are simply wrong when they say that these

19  two defendants, Kolar and Phillabaum, are getting different

20  treatment.

21         One last preliminary point, Your Honor, and that

22  is the defendants make political arguments which we hope to

23  avoid in this case. I think we have to respond to them

24  here. I can say, and I think Mr. Engdall and Mr. Ray can

25  say too, that it's been literally months, many months, since

1  we have had contact with anybody in the main justice
2  department about this case. I have never spoken to anybody
3  in the main justice department about whether or not to seek
4  the terrorism enhancement, period.

5  This is an Oregon prosecution handled by the U.S.
6  Attorney's Office for the District of Oregon. The
7  investigation started in a previous administration in which
8  the same terminology was applied to the same activities.
9  Most of the crimes in this case occurred in the previous
10 administration.

11 Mr. Engdall and I have been involved from the
12 start, and we have characterized this the same way the FBI
13 and other agencies have characterized it, as being an act of
14 terrorism that started in 1996 with the Oakridge fire, in
15 1997 with the Cavel West fire. And we would be seeking the
16 same enhancement if this case had been prosecuted under the
17 previous administration. This is not a political
18 prosecution.

19 Now, all of this preliminary discussion leads to
20 consideration of the history, the interpretation, and the
21 application of one guideline, § 3A1.4.

22 By specific agreement of all the defendants, the
23 version in effect as of November the 1st, 2006 [sic], is
24 applicable here, and that includes Mr. Thurston, who has a
25 separate argument about that, why it would affect him, and

1   we deal with that in the memorandum why he's bound by the
2   same agreement as all the other defendants.

3        Why is the history of this guideline important?
4   Because it answers some of the defendants' complaints.
5   Prior to 1995, and this was involved in the Shelley Shannon
6   case, we had § 5K2.1, which was a policy statement -- 2.15,
7   rather.  A policy statement which existed since 1989.  And
8   it provided for a departure for terroristic action.
9   Terroristic action wasn't defined.  There were no
10  limitations, foreign versus domestic, and no limitations to
11  certain crimes.  That changed in 1995, when § 3A1.4 was
12  enacted.  Then it became not a departure, it became an
13  enhancement and was limited to international terrorism as
14  defined in Title 18.

15       In 1996, after the Oklahoma City bombing case,
16  congress and the sentencing commission, on the direction of
17  congress, broadened international terrorism to encompass a
18  new term, the federal crime of terrorism, which replaced
19  international terrorism as the operative term.  There's no
20  requirement for crossing international borders in that
21  provision.  And the whole purpose of it was to broaden it to
22  include domestic terrorism.

23       And that's, of course, contrary to the defense
24  argument.  Therefore, we have a whole series of cases that
25  have involved purely domestic terrorism.  The *Harris* case in

1   the Fifth Circuit involving a municipal building.  The
2   *Dowell* case in the Tenth Circuit involving the IRS building.
3   The *Graham* case in the Sixth Circuit involving a host of
4   domestic sites.  The *Hale* case in the Seventh Circuit
5   involving an attempt to kill a federal judge.  No
6   international connection.  And in the *Terry Nichols* case,
7   even though, because of the ex post facto clause, he wasn't
8   eligible for the terrorism enhancement under the new
9   provision, the Tenth Circuit said he would have been if that
10  had been in effect when he took part in the Oklahoma City
11  bombing.

12          The only case holding that § 3A1.4 may not apply
13  to domestic crimes is the *Salim* case out of the Southern
14  District of New York, a case that never went up on appeal
15  because it was settled, and Mr. Salim is now serving his
16  sentence at USP Florence, I believe, at the maximum security
17  facility there.

18          That case never went up, and that's why there's no
19  circuit case involving this.  But we have the other
20  circuits, Fifth, Tenth, Sixth and Seventh, all applying it,
21  and the Tenth with Mr. Nichols would apply it to domestic
22  terrorism, domestic crimes.

23          So the practice and the precedent from four
24  circuits says that no international connection is necessary,
25  and that, of course, is fully consistent with the history of

1    the provision.

2            The next question is what crimes qualify for the

3    enhancement.  The answer is simple.  It's in the guideline

4    manual.  It says the crime must have either, A, involved,

5    or, B, have intended to promote one of the numerous crimes

6    listed in 18 U.S.C. Section -- and I will say this one time

7    and I won't repeat it -- 2332b(g)(5)(B).

8            Now, that does not require actual commission of

9    the listed crimes, just promotion of them, at the very

10   least.  Promotion of them.  But in our case, we have actual

11   commission of them, so it's not really an issue.

12           But we do have the applicability of the sentencing

13   enhancement to § 371 conspiracies, which is important in

14   this case because the conspiracy was broad and included the

15   promotion of a number of crimes that are federal crimes of

16   terrorism.

17           The applicability of the sentencing enhancement to

18   conspiracies under § 371 is the precise holding of the Sixth

19   Circuit in the *Graham* case, the Eleventh Circuit's case

20   *Mandhai*, the *Arnaout* case, and the *Hale* case out of the

21   Seventh Circuit.  And there's no contrary case.  I think

22   that the law is overwhelming that 371 conspiracies do

23   receive terrorism treatment if the conspiracy promoted a

24   federal crime of terrorism.

25           Now, the other requirement, and this is the most

1  contentious one here, I'm sure, eventually, in the case of

2  each individual defendant's sentence, is that the crime must

3  be calculated to influence or affect the conduct of

4  government by intimidation or coercion, or to retaliate

5  against government conduct.  And there will be much

6  discussion about that under the individual crimes and

7  defendants as we go through the argument.

8       Another question is what does the term government

9  mean, because the government in the statute has a small "g."

10  Doesn't have a capital "G," and it doesn't say U.S. in front

11  of it.  And the one case that has decided this issue, the

12  *De Amaris* case out of the Southern District of Texas, gives

13  a very excellent and a very full discussion of why

14  government with a small "g" applies to more than the federal

15  government.  It applies to state, local, and even foreign

16  governments.

17       If congress wants to make something applicable

18  explicitly or expressly and exclusively to the federal

19  government, it says "United States government."  Gives some

20  other indication that it applies to the federal government

21  and not the states or local governments.  And that's

22  important in this case, because some of the crimes did

23  involve an attempt to retaliate and coerce and intimidate

24  not just the federal government, but state -- local

25  governments, as well.  As a result of that, the *Harris* case,

1   of course, applied to the municipal building and the *Graham*
2   case applied to a number of nonfederal sites.

3           On the standard of proof, the defendants all say
4   that we have the standard of clear and convincing evidence.
5   They fail to note that no U.S. Supreme Court has ever said
6   that in a sentencing guideline issue that clear and
7   convincing is the standard.

8           The latest word from the Ninth Circuit is a case
9   called *Pike* out of the District of Oregon, actually, that
10  says the test is not just the disparity of the sentence when
11  the enhancement is applied.  It's a whole array of factors
12  with disparity of the sentence or the increase in the
13  sentence, the degree of it, as being just one factor.

14          Here, the court should look at the overall or
15  final effect on these defendants as to what the standard
16  should be, because after the downward departure for
17  substantial assistance, after you have gone up for the
18  terrorism enhancement and then down for substantial
19  assistance, the discrepancy really is not that significant
20  between what they could get and what they end up getting if
21  the government's recommendation is followed.

22          Now, our position is that the proof will meet the
23  clear and convincing evidence standard nonetheless in these
24  cases, and as I go through them, I will explain how.

25          Other defense arguments are that the guidelines

1  should not apply to cases with only property damage.  I
2  mentioned this before, but now I'm going to discuss it
3  specifically as it relates to the language of the statute
4  and the guideline.

5          The defendants ask the court to apply, in every
6  case, a proof that there was a substantial risk of serious
7  bodily injury.  The simple answer to that is that that's not
8  what the statute says, and they acknowledge that the literal
9  statute does not have anything in it about proving
10  substantial risk of serious bodily injury.  And as I pointed
11  out, there are people serving very long sentences in prison
12  in which there was no serious bodily injury, and this is --
13  this is the case, as well.

14          They are asking the court basically to legislate,
15  to impose this standard, this requirement, when it's not in
16  the statute.  And their argument dwells only on the arson
17  statutes under the different subsections of the two arson
18  statutes, 844(f) for government buildings and 844(i) for
19  private buildings.

20          What they ignore is the long list of crimes
21  indicative of congressional intent, the long list of crimes
22  that includes crimes that deal exclusively with property
23  damage.  This offense can be -- or excuse me -- the
24  enhancement can apply if the crime promoted violation of
25  § 1361, damaging government property.  No requirement for

1    any serious bodily injury or risk of it.  It can apply, and
2    it did in this case, to violation of 1366, destruction of an
3    energy facility.  It can apply to § 32 of Title 18,
4    destruction of aircraft.  It can apply to § 1362,
5    destruction of communication lines.  And there are other
6    examples.  All property crimes with no requirement that
7    there be a substantial risk of serious bodily injury.

8             And then there's a question, I think it was raised
9    in Mr. McGowan's memorandum, it says that the Sixth
10   Amendment jury right applies here because it would be a
11   violation for the court to find the sentencing enhancement
12   factors because it increases his sentencing -- his sentence.

13            Well, what that argument ignores is that after the
14   *Booker* decision, the guidelines are advisory, and because
15   they are advisory, there is no Sixth Amendment violation
16   because the court can go inside or outside the guidelines up
17   to the statutory maximum.  We are certainly not asking the
18   court to impose a sentence outside the statutory maximum.
19   If that were the case, there would be a Sixth Amendment
20   violation, but that's not being requested here and would not
21   be applicable.

22            Before I go into the individual crimes and the
23   individual defendants, Your Honor, I want to point out that
24   there is an alternative argument that we are asking the
25   court to consider if, in any individual case, the court

1   finds there's insufficient evidence for the sentencing
2   enhancement for terrorism, and that alternative argument for
3   the government is the upward departure for terrorism, which
4   is allowed in any case, as in any departure, for
5   circumstances outside the heartland of the typical cases
6   this court sees.

7           This is not limited by the fact that the
8   commentary changed after the agreed date.  This is a
9   departure argument which is -- clearly was available prior
10  to that application note being added by the sentencing
11  commission.  So it's not an ex post facto issue since the
12  court had the authority prior to the amendment, which simply
13  recognized that authority.

14          And in this case, it would apply specifically to
15  one -- one of the arsons, the one at the Childers Meat
16  Company, since we are not contending that that involved any
17  governmental motivation on the part of the defendants.

18          Now, going into the individual crimes and the
19  individual defendants.  The first fire that we are speaking
20  of here was at the Oakridge Ranger Station in October 1996.
21  There will be evidence presented at Mr. Tubbs's sentencing
22  regarding that arson, a substantial amount of evidence that
23  will show how it was a massive fire, destroyed a major
24  government structure, a landmark in the community.  And
25  there will be testimony concerning what it destroyed.

1  People sometimes associate ranger stations with forest

2  rangers, and that's true.  The people who are involved in

3  day-to-day activities in running the forest.  But this

4  particular ranger station, when it burned, it destroyed

5  literally decades of valuable scientific research by forest

6  service employees and others.  It clearly was a violation of

7  one of the listed statutes, § 844(f), and it -- as I said,

8  it affects Mr. Tubbs here exclusively.

9        Now, that arson was motivated by years of

10 animosity against the U.S. Forest Service over the Warner

11 Creek timber sale.  Mr. Tubbs was an active player, an

12 active participant in that protest against the forest

13 service.  He lived at the Warner Creek site.  There's a

14 clear connection between him and the U.S. Forest Service,

15 and it motivated this particular fire.  And it was motivated

16 to retaliate against the forest service and to influence or

17 affect the forest service action in the future.

18        And as I noted, a forest service employee did

19 periodically spend the night there, and the arsonists

20 apparently didn't know that and certainly didn't try to find

21 out about it.

22        Secondly, there is the government structures

23 burned at the Burns BLM wild horse corral in 1997.  This

24 also involved, among these defendants, only Tubbs.  That

25 fire destroyed the government facility and therefore was an

1   applicable crime under 844(f).

2       Now, Mr. Tubbs wrote the communique in which he
3   condemned the BLM for rounding up horses, auctioning them,
4   sending them to slaughter. And the communique says, quote,
5   This must be stopped, unquote. The communique specifically
6   referred to a 1997 article, newspaper article that linked
7   the BLM to horse slaughter.

8       There's overwhelming indication, Your Honor, based
9   on that communique, what the motive was. The motive was to
10  retaliate against the government for rounding up wild horses
11  and sending them to slaughter by the very terms of that
12  communique. And it was coercive in nature. By force, they
13  were telling the government, stop doing this, don't do it,
14  you will be punished. Directly comes under the sentencing
15  enhancement for terrorism.

16      Now, related to that is a fire that actually
17  occurred a few months earlier, the fire at Cavel West in
18  Redmond, the horse slaughterhouse there. This affects
19  Jonathan Paul; it affects Tubbs; and, even though she's not
20  here, it affects Ms. Kolar, because we will be asking for
21  the same enhancement in her case in the Western District of
22  Washington.

23      Now, that fire completely destroyed a facility
24  that was owned by a Belgian company providing horse meat to
25  Europe.  The BLM horses, there were BLM horses that were

1    bought by Cavel, or Cavel, much to the dismay of animal
2    rights advocates and the defendants who took part in that
3    arson.

4         This was brought to national attention in January
5    of 1997 by a series of articles first published in the *LA*
6    *Times*, and we'll introduce these at Mr. Paul's sentencing,
7    in particular.

8         The articles didn't mince words about the fact
9    that BLM was rounding up wild horses and selling them for
10   slaughter.  And anybody reading those articles would know
11   the connection between Cavel West and BLM.  It was
12   specifically referred to more than once in the articles.

13        Now, I did a check through Westlaw of their
14   database, *All News Plus*, going back to 1997, in that period.
15   Those articles were picked up by virtually every major
16   newspaper in the country.  They were published across the
17   entire United States.

18        As if that weren't enough, and to prove this
19   connection, if the court looks at Page 13 of the Kevin Tubbs
20   sentencing memorandum, Mr. Tubbs acknowledges that he
21   researched Cavel West, and he chose that site as a target.
22   And he refers specifically to an article in the Eugene
23   *Register-Guard* where it says, quote, He learned this
24   facility purchased wild horses that were rounded up from
25   public lands, unquote.  Now, that can only mean one thing.

1 That the connection is clear between the Cavel West site and
2 BLM, a government agency.

3 Now, admittedly, the motive here was a mixed one,
4 and just because you have a mixed motive -- and I'm sure all
5 these defendants would say their motives were different at
6 times, it doesn't make any difference, because one of the
7 motives was to retaliate and continue to coerce a government
8 agency. To retaliate against the slaughterhouse and to
9 retaliate against BLM, a supplier of the horses. And this
10 is a conspiracy case, so under the *Pinkerton* liability
11 theory, the court can apply that motivation or purpose as a
12 foreseeable factor and apply it to Mr. Paul and, if she were
13 here, to Ms. Kolar.

14 And Mr. Paul cannot somehow withdraw his approval
15 of an arson which was clearly directed at both private and
16 governmental interests when it's so evident, from the
17 record, that that was the motivation and the purpose behind
18 it.

19 Then we have the Rock Springs BLM attempted arson,
20 actually two attempted arsons, in October 1998. This
21 affects Tubbs, Meyerhoff, and Gerlach. And, again, this is
22 under a 371 conspiracy since they didn't plead to a
23 substantive count for that fire.

24 But we have the same motivation as the BLM Burns
25 arson, retaliation and future coercion of a government. The

1  communique makes that very clear. It reiterates the same
2  motivation as at the Burns fire and the Cavel West fire.

3       And then we have, again, following in this order
4  of the BLM fires, the Litchfield BLM fire in October 2001
5  that involved Meyerhoff, Thurston, and Tubbs, plus
6  Ms. Kolar. And they promoted and they committed
7  specifically a violation of 844(f). So it's one of the
8  listed crimes.

9       And you go to the November 2000 version of the
10 guidelines, and this is important to Mr. Thurston, at that
11 time, the definition of the crime of terrorism under the
12 statute did not separate out subsections of 844(f). It just
13 says 844(f). So it applies to Subsection (1) and Subsection
14 (2). Mr. Thurston pled guilty to Subsection (1), and it's
15 subsumed within the entire statute 844(f) under the
16 statutory definition and, therefore, under the guidelines.

17      Now, Mr. Thurston wrote the communique in that
18 case, and the court has the text of that communique, and I
19 won't reread it. But it, like the other BLM communiques,
20 was directed directly against BLM, directly against the
21 policies. It spoke about sending horses to slaughter. It
22 was intended to retaliate against BLM and to attempt to
23 prevent any future activity by BLM through force and
24 coercion as a result of this -- of their own activity.
25      That leads us to the next government facility, and

1   that's the BPA high voltage transmission tower outside of
2   Bend that Meyerhoff and Gerlach hit in November -- excuse
3   me -- December of 1999.

4   Now, this is a completed crime, and that
5   particular section, destruction of an energy facility, is
6   listed under the definition of federal crimes of -- or
7   crimes of terrorism.

8   And the government, of course, is a victim.  The
9   motive there was not vandalism.  There's something in one of
10  the memorandum about how, after it happened, law enforcement
11  was stating that this appeared to be some random act of
12  vandalism, or words to that effect.  Well, there was no
13  communique after that crime.  There was no way of knowing at
14  that time that that was linked to this group, the family,
15  the ELF and ALF group.  That came later when the case broke
16  open during the investigation.

17  But clearly now we know, from the statements of
18  Mr. Meyerhoff and Ms. Gerlach, that the motive was not
19  vandalism.  The motive was retaliation against government
20  policy, an attempt, an attempt to coerce a change in that
21  policy.  Now, the intent here, and they researched this, was
22  to shut down power as far as Los Angeles, because the line
23  being the BPA power line, ends up in Los Angeles.  And but
24  for the fact that there were backup facilities available, it
25  would have shut down power, but it didn't.  But that was

1  their purpose, and that certainly was a motive against the
2  government, the Bonneville Power Administration, in
3  particular.

4         Then we come to the Vail ski resort.  The Vail ski
5  resort, of course, is not a government facility per se, but
6  it wouldn't exist but for the fact that it's on government
7  land, on forest service land.  It's in a national forest,
8  just the same as ski facilities in Oregon are in national
9  forests at Mt. Hood, Mt. Ashland, and places like that.  In
10 order for those facilities to operate, they have to comply
11 with strict requirements.  They have contracts with the
12 government, and they have strict permits with the
13 government.

14        That particular arson at Vail came after many
15 years of controversy, protests, and lawsuits over the
16 construction of that -- of that ski area.  The facility
17 existed because of the government.  If the government had
18 not permitted that facility to be built, it wouldn't have
19 been built.  It could not have expanded without government
20 permission.  The motivation in this case was to retaliate
21 against the facility, but the facility could not possibly
22 even be there but for the fact that the government had
23 permitted it.  It had gone through a long series -- a number
24 of years of litigation leading up to that construction.
25        Now, the communique in this case, the Vail case,

1     was written by Chelsea Gerlach, and it makes a future
2     threat.  It says essentially, don't expand any further or
3     else.  Now, that's directed, obviously, at Vail Associates,
4     the corporation, but Vail Associates can't expand without
5     government permission, more government contracts, more
6     government permits.  I'm sure that the defendants thought,
7     at the time, they were just motivated by their concern about
8     the lynx, the cats.  But that may have been their primary
9     motivating factor, just as horses were the primary
10    motivating factor at BLM facilities and at Cavel.

11           But you have to look at all the circumstances, and
12    they were very upset, obviously, that that facility had been
13    built and might be expanded in the future, and the only way
14    it could expand would be, as it had in the past, with
15    government involvement.  It indicates multiple motives.

16           It's comparable to a civil rights case in which
17    you may have a defendant who was motivated by racial animus
18    but, at the same time, hates, say, a black person as an
19    individual.  Well, that doesn't mean there's not a civil
20    rights violation just because he has personal hatred towards
21    that person, for some reason, as long as there's also the
22    racial motivation.

23           So you can have multiple motives, and it doesn't
24    cancel out the real motive here, the motive that is
25    applicable to the terrorism aspect of it.  The two are

1  intertwined, with a single motive to punish and stop the
2  development at Vail.

3      Then there is the West University Eugene Police
4  Department Substation, which was hit by an attempted arson
5  in September of 2000.  That involves Meyerhoff, Tubbs, and
6  Gerlach.  It's an attempt, but 844(i) has an attempt
7  provision, and so they have pled guilty to violation of
8  844(i), one of the listed crimes under the terrorism
9  statute.

10      And it is -- it was and is a government structure,
11  as in the *Harris* case.  The *Harris* case involved a municipal
12  building that housed the police.  Here we have a municipal
13  building that housed the Eugene Police Department.  And it
14  was directed against the government, obviously.  It's a
15  government building.

16      Here, the motive was twofold.  The evidence coming
17  from the statements by the defendants, that evidence is that
18  this was an experiment.  They were developing some new
19  devices that they would use later.  They kept ratcheting up
20  the technical aspect of their destructive devices, and they
21  were experimenting with it at the EPD station.

22      But it was also a reward to local activists and to
23  punish the police because there had been resistance to the
24  police during the so-called Seven Week of Revolt.  So it was
25  a retaliatory action, pure and simple, against the Eugene

1 Police Department, a governmental entity.

2 Then there are three other cases involved forest
3 products or timber companies. U.S. Forest Industries, that
4 involves Ms. Tankersley and Tubbs. There is the
5 Boise Cascade case. That involves Meyerhoff and Gerlach.
6 And the Superior Lumber case, involving Meyerhoff, Tubbs,
7 Savoie, and McGowan.

8 Now, all three of these companies were and are
9 well known for cutting timber. That's their business. All
10 three had substantial contracts with the U.S. Forest Service
11 and with BLM for timber sales. And this is not an
12 evidentiary hearing, but if it were, and at the actual
13 sentencing we will be putting on evidence from the
14 individual victim companies to explain to the court what
15 that means and the degree to which they were involved in
16 cutting government timber. And the controversy at that
17 time, of course, as it continues now, is over cutting old
18 growth timber. These companies did that by virtue of their
19 own private contracts with private landholders, as well as
20 with the government.

21 So the communiques speak generically about the
22 company's environmental actions, but the court has to look
23 at the full picture here to discern the overall motive. And
24 as I said, that will be developed at the individual
25 sentencings.

1      Then we come to the fire, the arson, huge arson at
2  Romania Chevrolet in March of 2001.  And this involves
3  Meyerhoff, Tubbs, Block, and Zacher.  This was an incredibly
4  dangerous fire.  It involved 35 SUVs, and the court will see
5  a video of that fire actually taking place, hear the audio,
6  hear the firefighters discussing it, and see the magnitude
7  of it.  Now, it clearly fits within the terrorism statute
8  for two reasons.  First, it's a violation of 844(i), so it's
9  one of the listed crimes.  And it has the required motive.
10  Now, in this case, it's a mixed motive, apparently.  They
11  had this perverted idea that burning 35 Suburbans and Tahoes
12  would help the environment.

13      But most of the communique discusses the other
14  governmental motive, because it's an overt, antigovernment
15  crime because of that.  The communique makes clear the crime
16  was retaliation, and it was retaliatory in nature and was
17  really an extortionate act against the local government,
18  especially the Lane County Circuit Court, where the trial of
19  Mr. Luers and Marshall was taking place.  It was directed
20  against the state explicitly.  It says that in the
21  communique, against the state, in the form of the local
22  court.  It might as well have said Judge Velure.  He was the
23  trial judge.  Everybody knew it at the time.  It may as well
24  have said lane County Circuit Court.  Everybody knew that's
25  where the trial was taking place.  And it may as well have

1   mentioned the Lane County District Attorney's Office

2   prosecuting the case.  Instead, it mentioned in general but

3   in nonetheless explicit enough terms that it was in

4   retaliation for that case.

5          After that was what is known as the double whammy.

6   The double whammy is a term used by the family members to

7   describe what they did on the same night at the Jefferson

8   Poplar farm in Clatskanie and at the University of

9   Washington Horticultural Center in Seattle.  It's a double

10  whammy because it occurred at the same night.  It was

11  designed to occur simultaneously, and the defendants knew

12  that, knew that there were going to be two actions at once,

13  two fires, two arsons at once, a private institution at

14  Jefferson Poplar Farm and a government institution at the

15  University of Washington.  Both of them were hit because the

16  defendants had this convoluted view that they could further

17  their objective by destroying property that was involved in

18  what they thought was genetic research or genetic

19  engineering.

20         Now, in the case of Jefferson Poplar Farm, they

21  were wrong.  Jefferson Poplar Farm had changed hands between

22  the time they first surveilled the location and when the

23  fire actually occurred.  When the fire actually occurred,

24  Jefferson Poplar Farm was not engaged in genetic engineering

25  of any kind.  It was involved in standard hybrid farming,

1   the same kind of hybrid farming that's gone on for centuries

2   that probably originated when Gregor Mendel discovered

3   genetics several hundred years ago.  Did not involve genetic

4   engineering.

5          Now, the genetic engineering that we are talking

6   about, of course, did occur, the research occurred at the

7   University of Washington, a state institution, a government

8   institution, and that's what motivated that particular fire,

9   as well.

10         Now, both of these actions were -- what they would

11   call actions, these fires, these arsons, these crimes were

12   both planned at the same location.  The defendants went to

13   Olympia, and they planned and prepared for the crimes there,

14   carefully coordinated between the two.  And that's evident

15   in the communiques that resulted.  And by their own

16   admission, McGowan and Gerlach wrote the communique

17   regarding Jefferson Poplar Farm.  But when you look at the

18   communiques, they are listed an Part 1 and Part 2, Part 1

19   being the University of Washington, Part 2 being the

20   Jefferson Poplar Farm.  So they cross-reference each other,

21   and the retaliation and the warning for future action is the

22   same in both.  It's a cross-reference to each other.

23         But they made an additional statement in there, in

24   the communique, directed against state governments of Oregon

25   and Washington and pending legislation, quote, criminalizing

1   direct action in defense of the wild, unquote.

2          Now, whether in retaliation -- whether you view

3   that as a retaliatory act that Oregon and Washington were

4   considering to do that, to legislate, and only state

5   governments legislate, or a warning for future retaliation

6   for state legislation, this clearly links the Jefferson

7   Poplar Farm to state governments, plural, both Oregon and

8   Washington, by the very terms of that communique.

9          Finally, Your Honor, I wanted to refer to the

10  Childers Meat Company. As we indicated, that's not

11  connected to government action or government -- retaliation

12  against government. It involves Meyerhoff, Tubbs, and

13  Gerlach. It's still a terroristic act, still a crime of

14  terrorism under the departure grounds. It was designed and

15  motivated to retaliate against and to coerce a private

16  business by force and, therefore, falls within what you

17  might call a catchall provision for the upward departure.

18         And one final note, Your Honor. I have gone

19  through these. I have stated them specifically in the

20  sentencing memorandum. If the court has any questions, I'd

21  be glad to answer them. The important thing, ultimately,

22  for application of the guidelines is that each defendant

23  does not have to be found part of a conspiracy to engage in

24  a crime of terrorism for each individual fire. All it takes

25  is one. For example, if one defendant involved in, say,

1  Romania, and the court finds the Romania Chevrolet fire was
2  a crime of terrorism, which we say clearly was by virtue of
3  what the communique says, then it's not necessary that that
4  defendant be found to have committed a federal crime of
5  terrorism for another fire. In other words, if the
6  guidelines go up, they go up with one crime.

7          And that's clear in the cases that I have cited.
8  All it takes is one crime. The mere fact that they may have
9  committed a multiplicity of them doesn't increase the
10 guidelines sentence substantially when it comes to the
11 terrorism enhancement, which applies with one fire. It --
12 other factors may increase it, but the terrorism guideline
13 goes up because of an individual fire, not because there
14 were multiple fires.

15         If the court has any questions, I'd be glad to
16 answer them.

17         Thank you.

18         THE COURT: No. I'm fine.

19         I'm assuming that you have structured the argument
20 on behalf of the defendants. If not, do you want to take a
21 minute to decide, or do you want to tell me the order?

22         MR. FRIEDMAN: I think, Your Honor, we have, and,
23 if I may, what we were intending to do is provide a very
24 brief overview, and then I think we have got an order
25 established for counsel.

```
 1              MR. WEINERMAN:  Judge, if I may suggest, since it
 2     may be helpful for counsel at some point before we begin to
 3     revisit where we are going, it may just be helpful for us to
 4     have a break at some point to discuss --
 5              THE COURT:  I'd just as soon take it now if you
 6     need to organize how you wish to present.  That might make
 7     some sense, as opposed to breaking in the middle.  Do you
 8     want to do that?
 9              MR. WEINERMAN:  I think a break would be good at
10     this time.
11              THE COURT:  Let's take a ten-minute break.
12              THE CLERK:  Court is in recess for ten minutes.
13                             (Recess.)
14              THE COURT:  Thank you.  I have an order of
15     presentation, but I understand we have sort of a technical
16     defect, so does that change our order?
17              MR. FRIEDMAN:  It does change it slightly.  Rather
18     than Ms. Wood coming in after Mr. Weinerman, what we'll
19     simply do is move Mr. Sharp up, and Ms. Wood will present
20     after lunch.  So I guess, depending upon where we are, I
21     understand that we are going to go until one o'clock, so
22     depending upon where we are, we'll just sort of change that
23     order slightly.
24              THE COURT:  All right.
25              MR. FRIEDMAN:  Your Honor, I just want to provide
```

1    the court with a brief overview.  Obviously, there are many,
2    many attorneys here representing multiple defendants in this
3    case.  It is our understanding that these proceedings today
4    were not intended as an evidentiary hearing, and therefore,
5    we are not going to -- other than perhaps making some
6    reference with regard to the specific incidents and
7    specifically to our individual clients, we are going to
8    address the law in this case.  But before we do that, I
9    think what the court has to understand and what counsel will
10   be addressing in this case is this is a political case.
11   There has been a political element that was introduced in
12   this case very early on, and whatever the government may
13   say, it's something that the court needs to be aware of as
14   part of this, specifically with regard to the application of
15   the enhancement under 3A1.4.

16          The other thing that this court needs to consider
17   and needs to consider at this point in time is how this
18   enhancement will impact these defendants.  As the court well
19   knows, BOP makes its own decisions, relying upon the
20   presentence report, certainly relying upon the
21   recommendations of the court.  But the impact of the
22   classification as a terrorist within the BOP system is
23   something that is substantial and quite, quite dire, and
24   counsel will be addressing that at length.

25          Furthermore, Your Honor, with regard to these

1    cases, it is critical that the court understand that this
2    case is unique.  One, it is a case of first impression
3    within this circuit; obviously, a case of first impression
4    here before this court in this district.

5          And it's critical to understand that perhaps
6    because of the political nature, just because of the nature
7    of the enhancement, this case does fall -- appears to fall
8    outside the range, and there is disparate treatment that's
9    been applied.

10          Furthermore, Your Honor, it is critical that this
11   court understand how this enhancement -- how we get to where
12   the government is claiming, the problems with that, the fact
13   that the law, it does not follow from the law, and that
14   specifically with regard to the multiple specific offenses
15   that are part of this case, whether or not they actually
16   apply.

17          And what we are talking about here is 18 U.S.C.
18   371, the conspiracy count; 18 U.S.C. 844(f)(1), which is the
19   destruction of government property; 18 U.S.C. 844(i), which
20   is the destruction of property in interstate commerce; and
21   then 18 U.S.C. 1366, the power lines.  Each one of those
22   represent a specific set of circumstances and a specific set
23   of conditions as to whether or not the enhancement applies.

24          And we will submit, Your Honor, that there's
25   argument that the enhancement does not apply to any of those

1   because those are not crimes of terrorism, because, as the
2   argument will go -- move forward in this case, a critical
3   element of that, and as, I think, counsel's alluded to, is
4   the motive. And, again, it has to be calculated to
5   influence or affect conduct of government by intimidation or
6   coercion, or to retaliate against government conduct. And
7   we submit that is not the case in any of these instances
8   among any of these defendants. And the notion that counsel
9   has put forward of some sort of mixed motive in this case is
10  just wrong, flat-out wrong, and that will be addressed.

11          The other part of this, in terms of addressing
12  this, and this deals, in part, with the way the statute that
13  we are dealing with today is written -- and just a point of
14  notice here, Your Honor. We are dealing with the sentencing
15  guidelines from November 2000. I think counsel may have
16  misstated that in his opening remarks. It is November 2000.

17          But specifically, the question is whether or not
18  there was serious bodily injury. And what you are going to
19  hear, Your Honor, this afternoon is not only the history of
20  the statute as it has evolved, but specifically what the
21  congressional intent was and the direction that was given to
22  the sentencing guidelines commission in applying this. It
23  appears that counsel has conceded this point that the
24  applicable standard to be applied in this case is clear and
25  convincing evidence. We ask the court to consider that and

1    ultimately consider whether or not, after everything has
2    been said and done, whether the government has been able to
3    reach that standard.

4         The other piece of this, in terms of the elements
5    of the case, we submit, Your Honor, that has to be
6    considered is whether the crimes in this case, under the
7    enhancement that we are dealing with today, is whether or
8    not the issue of transcending national boundaries.  In other
9    words, whether these acts transcended national boundaries.

10        Your Honor, there are multiple other issues that
11   are going to be presented to the court.  I mean, certainly
12   not all defendants in this case are exactly in the same
13   spot.  Some of them came into this -- these -- were involved
14   in acts early on and withdrew.  Some were involved in acts
15   that occurred much later on, not knowing about them.  And
16   that's something that individual counsel I know will be
17   addressing in this case.

18        Overall, Your Honor, it is so important that the
19   court understand that these are not the type of defendants,
20   these are not the types of individuals that this terrorism
21   enhancement was originally intended to address.  And I --
22   I -- on behalf of Mr. Tubbs, and I know on behalf of other
23   counsel, you are going to hear far more of this sort of the
24   argument.  But these are not your typical criminals.  These
25   people are not terrorists in any way, shape, or sense.

1      The other thing I would simply add, in reviewing
2   the government's memorandum in this case, it appears that
3   what they have done is used information that was derived
4   from the debriefings of these individual defendants against
5   them.  I mean, it certainly is apparent in the memorandum.
6   And we'll submit that under 1B1.8, that sort of evidence is
7   inadmissible.  And, again, I would anticipate that
8   individual counsel will bring that up and perhaps file
9   motions with regard to that.

10      Ultimately, Your Honor, we will submit that
11  these -- this case, these cases, these defendants are not
12  within the heartland of the terrorism enhancement statute.
13  That these are not individuals who need to be locked away
14  from society with lengthy sentences and under dire
15  conditions.  These are people that did commit some crimes,
16  serious crimes with substantial property damage, but that's
17  what it is.  These are arsons, Your Honor.

18      I believe that the first attorney that will be
19  addressing the court will be counsel Amanda Lee.

20          MS. LEE:  Good morning.

21          THE COURT:  Good morning.

22          MS. LEE:  Thank you, Your Honor.

23      Your Honor, in a line of cases beginning in the
24  year 2000 with *Apprendi* and culminating in 2005 with *Booker*
25  and *Fanfan*, the Supreme Court restored both judicial

1  discretion and the protections of the Sixth Amendment for
2  defendants in sentencing. I believe that what they did was
3  restore both honesty and integrity to the sentencing
4  process. And today, as a result, we all recognize that the
5  guidelines are no longer mandatory but are merely one factor
6  among several that the court will consider when imposing a
7  sentence.

8         But the guideline calculation that this court will
9  perform still carries significant weight, or we wouldn't be
10  here today. Not every issue was resolved by the *Booker*
11  case. When the court said in *Booker* that it would solve the
12  problem imposed by the guidelines, the mandatory nature of
13  the guidelines by severing out that provision of the
14  statutory scheme that made them mandatory, the court did not
15  solve every problem that was presented by the guidelines
16  scheme. There were still problems that remained. The court
17  recognized that in the decision, and the courts have been
18  wrestling, in the aftermath, with various components of the
19  guidelines. We have seen decisions about supervised release
20  guidelines. We have seen decisions about other provisions
21  of the guidelines since then. And I believe that 3A1.4
22  poses one of those problems that is unresolved.

23         The terrorism enhancement requires that the court
24  set the criminal history category at level VI. And this
25  involves fact-finding not done by a jury. And the teaching

1   of the Ninth Circuit in the *Kortgaard* case is that you can't
2   just give a defendant five extra criminal history category
3   levels for no particular reason.

4          When congress set up the guideline commission, it
5   told the commission to craft guidelines for offenders based
6   on two things. One was offense behavior categories. That
7   would be the offense level side of the sentencing grid that
8   we have now. And the other was called offense
9   characteristic -- I'm sorry -- offender characteristic
10  categories. And that's what gave rise to the criminal
11  history category columns on the table.

12          Congress specifically said that what the court
13  must have at the end of the guideline calculation process to
14  compare with all the other 3553(a) factors is a guideline
15  range that applies to the specific category of offenses
16  committed by that specific category of offenders.

17          What the terrorism enhancement does is eliminate
18  one half of this process by comparing the category -- where
19  you compare the category of the crime to the criminal
20  history of the offender.

21          The part where the court should examine the actual
22  criminal history of the defendant has been eliminated, and
23  it has been replaced by the arbitrary value imposed, not by
24  congress, but by the commission. And it was chosen by the
25  commission without any specific direction by congress to

1   accomplish a particular objective.

2           In addition to functionally overriding part of the

3   sentencing process, the enhancement necessarily entails

4   nonjury fact-finding that's prohibited after *Booker* and

5   *Fanfan*.

6           And what happens is this, Your Honor, and it's

7   happened in numerous cases: A court applies the Level VI

8   enhancement part, goes up to Criminal History Category VI,

9   and then recognizes that that's too high for the defendant.

10  So then the court departs downward to a criminal history

11  category that the court believes more accurately reflects

12  what the defendant should have. And that criminal history

13  category could be either, what I would call the true

14  criminal history category that's based on the actual

15  criminal history of the defendant, or a criminal history

16  category that's the actual criminal history category plus a

17  little bit more to account for something like the likelihood

18  that that defendant will reoffend or the particular

19  seriousness of the offenses at issue.

20          And this is precisely what the court did, for

21  example, in the *Meskini* case in the Second Circuit. And

22  what they said was the guidelines contemplate this process

23  of bumping up to Level VI and then moving back down, a very

24  result oriented process.

25          It was done recently again in New York in the

1   *Hossain* case just in March of this year. In that case, the
2   court departed up to VI under 3A1.4 and went all the way
3   back down to a level I, which was the defendant's true
4   criminal history category. *Booker* forbids this process for
5   the same reason that *Booker* prohibits upward departures
6   based on facts not found by the jury or not admitted by the
7   defendant other than prior criminal convictions. Starting
8   at a level VI and working your way down to a particular
9   result is functionally identical to starting at a level I
10  and working your way up to the level that reflects what the
11  court believes is the defendant's best estimate of true
12  criminal history category.

13          The defendant's criminal history category is
14  supposed to be based on his actual criminal history based on
15  only those additional facts, such as likelihood of risk or
16  seriousness of the offense that can be determined either by
17  a jury or by the defendant's admissions. This is exactly
18  what the Ninth Circuit said the court cannot do, itself,
19  after *Booker*.

20          And we are not talking about a small increase in
21  the numbers, as we noted in our brief. The increase from a
22  level I to a level VI roughly quadruples the sentencing
23  range that a defendant is exposed to.

24          Now, what happened with the terrorism enhancement,
25  Your Honor, is in stark contrast to other sentencing

1   guidelines that incorporate very large leaps in the criminal
2   history category. There are two of these in Chapter 4 of
3   the guidelines, and that's the chapter that deals
4   specifically with criminal history. Those two are the
5   adjustments for armed career criminals and for career
6   offenders. In both of those situations, there was a
7   specific congressional mandate to jack up the sentences of
8   the offenders to a very, very high level. And in both of
9   those situations, it was not feasible to make that
10  adjustment on the offense level side of the grid, because
11  the focus was on the repetitive nature of the crimes the
12  defendants were committing or the use of weapons repeatedly
13  in different types of crimes. So the commission correctly
14  focused on adjusting the criminal history category, and they
15  did it pursuant to a congressional mandate.

16              None of that is true in this case. There's no
17  mandate from congress to jack up the offender's scores, and
18  in fact, the more relevant congressional mandate is the one
19  that the terrorism enhancement actually requires this court
20  to ignore. And that's the mandate in 3553(a) that asks the
21  court to look at the defendant's true personal history, his
22  true -- his or her true personal criminal history. If what
23  the court does is move the criminal history up to a Level VI
24  and compute the guidelines range, the court will come up
25  with a guideline range that is so high, it will dwarf the

1   other factors that are built into § 3553(a). It's like --
2   the numbers just absolutely eclipse, in an astounding way,
3   all the other factors, making that balancing effectively a
4   meaningless process. That is not what congress intended.

5          Because the terrorism enhancement works in this
6   way to eliminate the court's ability to meaningfully
7   evaluate the defendant's true criminal history in the
8   statutory scheme and because it contemplates fact-finding
9   outside that that would ordinarily be done by the jury or be
10  based on the admissions of the defendant, it violates the
11  rules set forth in *Booker* and *Fanfan*, it violates the Sixth
12  Amendment, and it is inconsistent with what *Booker* did in
13  returning integrity and honesty to the sentencing scheme. I
14  don't think that this can be remedied by simply ignoring the
15  Level VI adjustment part of the -- of the -- of 3A1.4. I
16  think the entire guideline is unconstitutional as it's
17  written.

18         THE COURT: But I have to ask you, counsel, in
19  having handed up your own plea agreement, doesn't your plea
20  agreement waive this argument?

21         MS. LEE: I don't believe it does, Your Honor.
22  Under our plea agreement, if you agree that the guideline is
23  constitutional, we have waived -- we have waived
24  fact-finding. You may find facts in order to impose the
25  terrorism enhancement if you agree with the government that

1  the guideline is constitutional.

2          This is a facial challenge to the guideline.  We

3  did not waive any legal argument about the -- about whether

4  the guideline is -- is constitutional and lawfully imposed

5  on anyone.  That's my reading of the plea agreement.  We

6  intended to preserve level arguments about the terrorism

7  guideline, and this is a legal argument.

8          My argument is it can't be applied to anyone.  If

9  you believe that it can be applied, then what we have waived

10  is the right to have jury findings of fact.

11          THE COURT:  That's what I would --

12          MS. LEE:  Yes.

13          THE COURT:  For certain, that is how I read your

14  plea agreement, but I also didn't -- I didn't see it as your

15  ability to argue that as a legal argument per se.  I see

16  that as a waiver of your fact-finding right altogether, and

17  if you waive that as for a jury trial for the liability

18  phase of this trial, it appears to me in this waiver you

19  have also waived that fact-finding ability for the

20  sentencing obligation of this court, and that's specifically

21  in Paragraph 5 of the plea agreement on Page 2, resolution

22  of sentencing issues.

23          MS. LEE:  There is Paragraph 5 about resolution of

24  sentencing issues, and then there's a different paragraph

25  specifically about the terrorism enhancement that says that

1    everyone is reserving argument on the terrorism enhancement.

2    And you may disagree with me, Your Honor, but our intention

3    was to preserve any facial challenges to the terrorism

4    enhancement that we may have. And that's why we thought we

5    were here today.

6            THE COURT: So your argument is, then, really, to

7    the constitutionality of that enhancement, period.

8            MS. LEE: Purely to the constitutionality.

9            THE COURT: And applicability is -- in many

10   respects is waived.

11           MS. LEE: Yes. So if the court rules that the

12   guideline passes constitutional muster, we have waived the

13   right to have a jury find any fact, and we agree that you

14   may find the facts.

15           THE COURT: Right.

16           MS. LEE: We are perfectly comfortable having this

17   court find the facts. Our argument is that a guideline that

18   contemplates this type of fact-finding --

19           THE COURT: On its face.

20           MS. LEE: -- on its face is unconstitutional.

21           THE COURT: Okay. I just wanted to make sure I

22   had it right. Thank you.

23           MS. LEE: Your Honor, to the extent that in our

24   view the guidelines themselves represent a form of

25   overreaching, I want to turn to a different kind of

1 overreaching now, and it's the kind of overreaching that I
2 felt like I was hearing this morning during the government's
3 argument. It's the kind of overreaching that would lead the
4 government to argue that some things are automatic about
5 them. And I guess what I want to say, Your Honor, to the
6 government is it's not about you. The guidelines that apply
7 to this case, as you have just heard a moment ago, are those
8 that were in effect in November 1 of 2000.

9 And the terrorism enhancement, you will hear
10 several arguments related to under what circumstances the
11 terrorism enhancement could apply. I want to focus on that
12 part that relates to governmental -- the governmental
13 conduct link.

14 So the language is that the terrorism enhancement
15 would apply in addition to the crime being one that is
16 listed in 2332b(g)(5) and also if the crime is, quote,
17 calculated to influence or affect the conduct of government
18 by intimidation or coercion, or to retaliate against
19 government conduct.

20 The government argued extensively this morning
21 about how the crimes at issue in this case were focused on
22 people. We heard a lot about how they were focused on
23 people, and that made them terrorism. The guideline focuses
24 on crimes that are focused on the conduct of government, not
25 focused on people. It's very clear that it's focused on

1    government in this case.

2         And I heard the government talk about how, under
3    our reasoning, the crimes of the Ku Klux Klan would not be
4    construed as terrorism, and while I was not planning to
5    argue this point, Your Honor, it's not in our brief, it
6    wasn't in my prepared remarks, I cannot sit idly by and hear
7    what these defendants did be compared to the acts of the
8    Ku Klux Klan and hear the government talk about the Ku Klux
9    Klan burning empty churches.  It is historically inaccurate,
10   it is a gross and unfair understatement, and it is an insult
11   to the African-Americans of this country and of the south in
12   particular.  Four girls in a Birmingham church, Medgar Evers
13   on his front porch, three civil rights workers who
14   disappeared, these are but some of the murders committed by
15   the Ku Klux Klan during the civil rights era.  This is not
16   to mention any of the other murders, linchings, countless
17   injuries committed by the Ku Klux Klan.  The fact that not
18   every incident resulted in an injury or a death to a black
19   person in the south doesn't change one iota the fundamental
20   nature of what the KKK was about.  And to try to put the KKK
21   on all fours with the defendants in this case is appalling.

22        By the plain language of the statute, arsons of
23   privately owned businesses operating in interstate commerce
24   would generally be expected to be outside the scope of the
25   enhancement.  By the plain language of the statute.  It's

1  only in those highly unusual cases where the government can

2  show by clear and convincing evidence that, although the

3  target was nongovernmental, the motivation was somehow to

4  influence or affect governmental conduct, or to retaliate

5  against the government.  That's a very high standard of

6  proof, Your Honor, and it would be a very unlikely set of

7  facts, and it is not what happened here.

8           Because I represent Daniel McGowan, I'm going to

9  focus in particular on Superior Lumber and Jefferson Poplar,

10  but I believe these arguments apply to other incidents as

11  well, and I believe you will hear more from some other

12  lawyers.

13          The government suggests in its brief that it can

14  meet this test by little more than supposition.  The

15  government states, for example, that if a business does

16  business with the government, then the court may infer that

17  that was the basis, that that was the reason for the -- for

18  the arson that occurred.  And that the motive was to

19  influence or affect the government or to retaliate against

20  the government.  That that's all you need.

21          But there's absolutely no evidence to support the

22  assertion that Superior Lumber, for example, was targeted

23  because it was engaged in logging on public lands.  In fact,

24  the communique describes Superior Lumber as, and I'm

25  quoting, just a typical earth raper, indicating that it was

1    but one of many timber companies engaged in logging on both
2    public and private lands that these activists hoped to stop.
3    There's not a word in the communique about harvesting from
4    public lands, about government contracts, about anything
5    related to the government at all.

6            The logic of the government's argument is that if
7    the conduct of the intended victim, the intended victim of a
8    2332b listed crime can in any measure be attributed to the
9    government, and if the defendant could have known that,
10   whether or not the defendant did know that, then the
11   motivational element has been established.

12           Well, Your Honor, I think the ramifications of
13   this reasoning are astounding and unwise.  You can compare
14   it, for example, to farmers in the agricultural industry.
15   You could imagine the disgruntled operator of a small farm
16   operation next door to a large farmer engaged in corporate
17   farming.  If the small farm operator decides to murder his
18   neighbor, is he to be prosecuted as a terrorist?  Under the
19   government's reasoning, that prosecution as a terrorist
20   would be justified because the corporate farmer gets federal
21   subsidies.

22           There's a word for this, Your Honor, and it's
23   overreaching.  It's stretching.  It's attempting to force
24   the concept of terrorism to fit a set of facts and a group
25   of people that it does not fit.

1      One thing the government said earlier this morning
2  is that, I'm sure the defendants thought they were motivated
3  by, and he ended that sentence, in that case, talking about
4  the Vail incident with a phrase about the lynx. He said,
5  I'm sure they thought they were motivated by that, as though
6  in fact they were motivated by something else that they
7  weren't entirely aware of.

8      And then he attributed to them a mixed motive. He
9  referred to it as a mixed motive, this thing that the
10  defendants were not aware of. The problem is that the other
11  part of the mixed motive he was talking about was something
12  that he was making up. There's no evidence to support it.

13      Jefferson Poplar Farms was also a privately owned
14  corporation. As the government's noted in its brief, the
15  defendants believed it was a different privately owned
16  corporation when they committed the arson, but they never
17  thought that it was a government-run operation, and it's not
18  a government entity.

19      Now, the government also argued that the same
20  motivations underlie both Jefferson Poplar and the
21  University of Washington arson that occurred the same night.
22  Well, not only is there no basis to assume that the same
23  motivations drove all of these individual people, there's no
24  evidence that each person had precisely the same
25  motivations, and they cannot be presumed to have the same

1 | motivations. And there's no *Pinkerton* liability for an

2 | individual motivation for purposes of the guideline.

3 | There's another critical flaw in the government's

4 | reasoning. The government has argued, without any basis in

5 | fact, that the University of Washington qualifies as a

6 | government for purposes of the guideline enhancement. This

7 | is a dramatic departure from anything in the reported cases.

8 | Being a publicly funded institution of education does not

9 | render an entity a government.

10 | The university is quite separate from the state

11 | government of Washington. The Washington Revised Code sets

12 | forth a charter that establishes a board of regions that

13 | governs the University of Washington. The university

14 | occupies lands that have been deeded to it. It has

15 | independent authority to purchase property, to sell

16 | property, to receive property by gift. University employees

17 | are hired and fired by the university, not by the state.

18 | They are paid by the university, not by the state. They are

19 | insured by policies purchased by the university, not by the

20 | state. And the state cannot be held liable for the acts of

21 | university employees or for acts that occur on university

22 | property.

23 | So while the university may have some form of

24 | government, it is not a government. It is not the state

25 | government.

1          The government also asks this court to read into

2     the communique motivations that are simply not in evidence

3     about the Jefferson Poplar incident.  The government argues

4     that the reference to pending legislation in Washington and

5     Oregon, about how this legislation will not stop the

6     defendants' chosen intent to retaliate against the

7     government.  And in fact, it shows exactly the opposite,

8     Your Honor.

9          The communique says, in essence, we know that this

10    is illegal and we will do it anyway.  That's a communication

11    about the law, Your Honor.  That's a communication that says

12    the law is irrelevant to us and the law will not deter us.

13    Let's be clear about this.  The defendants who targeted

14    Jefferson Poplar believed the experimental tree farming was

15    harmful.  Whether they were correct or not about that

16    belief, that's what they believed.  And their intention was

17    to stop it, whether the government supported them or not.

18          They weren't getting back at the government by

19    burning a tree farm, and the communique cannot rationally be

20    read to suggest that.  They were intending to stop the tree

21    farm.

22          The government also argued that if the communique

23    did not show actual retaliatory intent, it showed a link

24    between the action and the government.

25          Your Honor, a link is not what the statute

1   requires.  A link is not the test.  The test is very clear
2   in its requirement of -- of the intent to influence or
3   affect the actual conduct of government through intimidation
4   or coercion, or to retaliate against the government.  A
5   link, a supposed or positive link between an arson and the
6   government is just not sufficient.

7           Your Honor, as I think you know, in some ways this
8   isn't really about the numbers.  It's not really about the
9   months or the years that these defendants will serve.  The
10  government's sentencing recommendations are not going to
11  change as a result of your ruling.  I'm not suggesting for a
12  moment that your sentencing decisions might not change.  But
13  I am saying that I believe the government's recommendations
14  will not change, and I believe, as a result of our plea
15  agreement, that our sentencing recommendations are unlikely
16  to change as a result of your ruling.

17          That doesn't mean that your ruling on this issue
18  is not profoundly important to all of the defendants in this
19  case.  It's about who these defendants are.  It's about what
20  the concept of terrorism means in these troubled times,
21  about whether we still know the difference between, yes,
22  people we have mentioned in our briefs, Osama bin Laden,
23  Timothy McVeigh, and the people sitting in this room who
24  adhered firmly to a credo of not killing and injuring
25  people.

1    And if it hasn't been made abundantly clear to you
2  in the reams of briefing you have received, I want to
3  reemphasize it to you now in person, face to face, with my
4  client in the room, that regardless of what sentence you
5  impose on Mr. McGowan, we implore you today, and we will
6  implore you at sentencing on June 4th, if you have not
7  decided before then, to issue findings and to issue a
8  statement, reasons in support of your judgment, that state
9  strongly that the terrorism enhancement does not apply.
10  That he is not a terrorist.

11    Your Honor, you have heard before in this case,
12  and I think you will hear more today in greater detail, that
13  the credo of the people who committed these crimes was one
14  of not doing harm to people. They did intend to destroy
15  buildings by fire. They did intend to harm real property.
16  They did intend conflagrations by fire and to make a point,
17  and they did do that.

18    They did also plan carefully to try to ensure that
19  no one would get hurt. That no one would be there when the
20  fires were set. And no people were there. And I say that
21  not to justify the crimes, not to excuse the crimes, not to
22  make Mr. McGowan look -- look better than he may look to you
23  at any -- at any point, but when you impose sentence on
24  Mr. McGowan and these other defendants, I hope you will be
25  open to the argument, to the view, that these defendants are

1   not dramatically different from a defendant who burns a
2   house out of vengeance toward a separated spouse or not
3   dramatically different from a man who burns a business in
4   order to collect on insurance policies, not dramatically
5   different from those kinds of people who commit arsons for
6   reasons of their own that may be base reasons.

7           The determination that someone is a terrorist is
8   and should be one that involves the most careful scrutiny of
9   things like the long-term likelihood of risk that he will
10  commit future crimes, the person's current family life, the
11  person's work history and what kind of work the person's
12  doing now, the person's, you know, community ties and what
13  he or she is doing in the community now, his or her actual
14  violent nature and whether he or she represents the kind of
15  danger to the entire community that sets him so far outside
16  the range of offenders that he warrants this lifelong label.

17          And I say this not only because I personally
18  believe it to be true, but because the Bureau of Prisons'
19  practices are bearing it out. The creation of special
20  management units where offenders who are classified as
21  terrorists are all but cut off from the outside world tells
22  us something about how severely the department of justice
23  seeks to punish these offenders. One hour of phone time a
24  month at Terre Haute, Indiana. One hour. That's 12 hours
25  in a year. Four hours of visiting time in a month, and all

1   of it through the glass wall. All visiting live monitored.
2   Never a private moment with your family or your friends or
3   the people who should be there to support you when you get
4   out.

5       Now, the government says that people who have been
6   sentenced as terrorists are not all at Terre Haute or at
7   Florence. And certainly that's true. Terre Haute just
8   opened in December of last year. The wing isn't full. And
9   I'm not here to argue that every single defendant in this
10  room would be assigned to Terre Haute. My point is that any
11  one of these defendants, or all of them, could be assigned
12  to Terre Haute and there wouldn't be a thing that anyone in
13  this room could do about it, or they could be assigned to
14  different special management units with the same kinds of
15  conditions imposed on them or worse. That's my point. This
16  is what the department of justice is doing in punishing
17  people that it classifies as terrorists based on the
18  terrorism enhancement being imposed on them.

19      Your Honor, I -- I have enormous respect for the
20  men at that table, but I could not disagree with them more
21  about the issue of whether these defendants are terrorists.
22  When Mr. McGowan is sentenced, we will present to you
23  letters from his friends and extended community who lived
24  and worked in New York City at the time of the World Trade
25  Center attack on September 11th. And they will tell you in

1  their own words that they too disagree with the notion that
2  fires in buildings that are empty could be described as
3  terrorism, given the abiding intention of each of these
4  defendants never to kill, never to injure people, only to
5  destroy property.

6           I don't doubt that the men at the other table are
7  sincere in their request for the terrorism enhancement, but
8  their action with respect to Jacob Ferguson speaks volumes
9  about what they see as the actual risk that these men and
10 women pose to society.

11          Are the people of Eugene, Oregon, are they to
12 believe that these ten individuals are dangerous terrorists
13 who pose a grave risk to this community, while one of them,
14 Jacob Ferguson, who is responsible for more than a dozen
15 arsons, is not?

16          Mr. Ferguson made a deal with the government to
17 cooperate with them, to assist them in their investigation,
18 to avoid the punishment that the other defendants in this
19 room will face.  But it is simply not believable that the
20 government would have made that deal with him if they
21 thought he was a dangerous terrorist who needed to be
22 removed from the community.  I don't think they think that.
23 I don't think they will stand here and tell you that they
24 think that.

25          But what they are unable to admit is that the same

1   thing is true of these other defendants in this room. They

2   are unable to admit that the same thing is true of Daniel

3   McGowan.

4            I'm not saying that Daniel McGowan hasn't earned

5   punishment for the crimes he committed. He has. Let me be

6   clear about that. But what I am saying is that the plainest

7   evidence that the government knows that these defendants

8   pose no continuing risk to this community, that they are not

9   terrorists who shouldn't be on the street, is that Jacob

10   Ferguson is a free man.

11            And I got to tell you, Your Honor, I'm a human

12   being, like everyone else in this room. I believe that

13   people deserve punishment for their crimes, and I pray that

14   my government is not making the kind of deals with real

15   terrorists that it made with Jacob Ferguson.

16            Further, Your Honor, I believe the court is

17   absolutely entitled to examine the process of applying the

18   terrorism enhancement in the larger context of this era. I

19   am not aware, in fact, of cases, in the years prior to the

20   attacks of September 11th, in which the government sought

21   the terrorism enhancement for property destruction alone in

22   the absence of additional factors strongly suggesting that

23   the defendant harbored intentions to harm or kill people,

24   such as federal officials.

25            The government cited cases such as *Dowell* and

1   *Harris.* In *Dowell*, the tax protestor case, there was
2   evidence in the record that the defendants were actually
3   planning to kill IRS officials. In the *Harris* case, the
4   defendant had, in the days prior, made two threats to kill
5   police officers.

6          So while these are property destruction cases,
7   there was clear evidence that the defendants had actual
8   motivations that were established clearly in the record to
9   harm or kill people. In the past few years, the rate of
10  seeking the enhancement has escalated, however, to the point
11  where the Bureau of Prisons has opened this new facility for
12  lower risk terrorists in Terre Haute. I got to tell you,
13  this concept alone would have boggled our minds a few years
14  ago, and it still boggles my mind. It is one thing to say
15  we need a special facility in Florence, Colorado, a supermax
16  facility for the most dangerous terrorists we know of, but
17  now we need a facility for low-risk terrorists.

18         I believe the term is an oxymoron. I don't know
19  what a low-risk terrorist is, and yet now we have whole new
20  facilities for them. You know, next we are going to have
21  camps for terrorists.

22         But sadly, Your Honor, and all -- you know, my
23  flip attitude about this aside, I think that this may end up
24  mirroring, you know, in the long run, what we are seeing out
25  of places like Guantanamo, where what we see in the long run

1    is that offenders who are released, after years under these
2    conditions of confinement, are horribly damaged
3    psychologically.

4             I understand that what awaits a low-risk terrorist
5    in Terre Haute is nothing like what happens in Guantanamo.
6    The conditions are not nearly so severe. But that doesn't
7    mean that there aren't some reasonable comparisons. It's
8    harmful in a way that goes way beyond what is necessary to
9    cut an offender off from the outside community that way.

10            The research on this is broad, it's deep, it's
11   lengthy. It goes back to the 1950s, and it all shows that
12   depriving prisoners of meaningful contact with family and
13   supportive friends has a tremendous negative effect on an
14   inmate's adaptation to custody and his reentry upon release.

15            THE COURT: Counsel, for all of you, I just need
16   to intervene at this point. I am -- having been on this
17   bench nine years, I, more than others, know exactly what my
18   recommendations to the Bureau of Prisons leads to. It leads
19   generally to a letter saying they couldn't accommodate. It
20   leads to the fact that I can't find a placement in the State
21   of Oregon for female offenders. It leads to the fact that
22   people accused and who have been convicted of immigration
23   crimes go to the specified institutions. Just those two
24   examples alone cut people off from their families and their
25   support. That is the system we live in. I understand that

1  argument. I understand the research. You don't need to
2  belabor it.

3        But I understand what my role is with regard to
4  this argument, and those that you may raise are not helpful
5  to me in making the decisions I need to make today. But I
6  am painfully aware of, receiving the stacks of letters I
7  have, where my recommendations are generally, across the
8  board, not followed. The same with my colleagues, as we
9  make these recommendations, hoping to put people in prison
10  and in situations where, when they reenter the communities,
11  and most of them do, they are in a better position to not
12  offend and not commit additional crimes and create
13  additional victims. But our recommendations generally fall
14  on administrative deaf ears.

15        So proceed, but please don't take the time that I
16  know is important for others to --

17        MS. LEE: I will -- I will -- I will drop the
18  remainder of that point, Your Honor, and I guess all I will
19  say is I appreciate your -- I appreciate your candor and
20  your saying that for everyone's benefit. And all I would
21  add, frankly, is that I believe that the terrorism
22  enhancement has an effect all its own. And I realize that
23  that's not a factor that should drive a court's
24  consideration, but I don't think it's a factor that the
25  court is required to ignore. That's my point. I don't

1   think it's a factor the court is required to ignore.

2           Your Honor, we depend on judges to sort through

3   the natural and human desires for vengeance, for making

4   examples of people, and for delivering retribution.   We

5   depend on judges to get through all of that and craft a

6   punishment that fits the human being that violated the law,

7   nothing less and nothing more.

8           This court's decision today, this court's

9   statement of reasons in support of each and every judgment,

10  may be the only thing that stands between Mr. McGowan and

11  any of these defendants and these -- some of these special

12  management units, you know, so we would be asking for

13  recommendations against placement in special management

14  units, the special communications units that particularly

15  limit communication, that are designed to limit outside

16  communication.

17          Your Honor, I want to close by -- by saying -- by

18  saying a few words about -- as if I haven't already said a

19  whole bunch about what I really think, I want to say a

20  little bit more about what I really think about this, just

21  as I believe the government has.

22          You know, every, every nation has its moments of

23  shame in its history.   And one of this country's darkest

24  moments, I believe, has to be the internment of the

25  Japanese-Americans during World War II.   It was a time when

1    we had been attacked, we were at war, and we lived in a

2    climate of fear.  And it was so easy for the government to

3    stretch and to overreach to say they might be spies, they

4    might be terrorists, they might be traitors.

5            Japanese-Americans, at that time, turned to the

6    courts, saying, we aren't any of those things, but the

7    courts also turned their backs.  And it wasn't until 1988

8    that the government apologized, saying that the actions were

9    based on, and I quote, prejudice, war hysteria, and a

10   failure of political leadership.  And all of this was

11   because we were afraid and because the government

12   overreached in a time of fear.

13           Your Honor, I believe that people will look back

14   on this era as well because we are at war, we are at war

15   overseas, we are at war with terror, because we have been

16   attacked and because we are afraid.  And I ask myself, what

17   will they see, Your Honor.  I think they will see a

18   government that has, again, stretched, a government that has

19   overreached.  Now there are terrorists everywhere overseas.

20   There are terrorists everywhere among us.  The person next

21   to you may be a terrorist.

22           Now, there's an obvious difference between these

23   defendants and the Japanese-Americans of World War II.

24   Daniel McGowan committed a crime.  The Japanese-Americans

25   committed no crime at all.  But just as the

1    Japanese-Americans were not traitors, were not spies, the

2    people in this room are not terrorists.

3          We implore you, Your Honor, not to turn your back.

4    We implore you to uphold the letter and the spirit of the

5    law.  We ask you to remind us all that in a world of true

6    threats to our nation's security, in a world of real people

7    who would slaughter innocents, we have never been terrorized

8    by men and women who burn empty buildings.

9          We ask you to tell the government that the concept

10   of terrorism cannot be stretched so far.

11         Thank you.

12         THE COURT:  Mr. Weinerman.

13         MR. WEINERMAN:  May it please the court, Judge,

14   I'd like to talk a bit about the practical significance of

15   what's happening here today and what the government is

16   trying to do.  We heard earlier that the government is

17   engaged in a process, I think they used the term truth in

18   sentencing.  I would suggest that there's something else

19   that's going on here.

20         In my view, whether the court imposes the

21   terrorism enhancement will have little effect on the

22   government's recommended sentencing for many, if not most,

23   of the defendants in this case, because the government will

24   be moving for a significant downward departure based on

25   substantial assistance.  Now, I don't think the court has

1   that information yet.  My understanding is the government is

2   going to be submitting letters to the court in that regard.

3   So the court, as the court sits here today, doesn't know,

4   other than looking at the plea agreement, you know, what the

5   basis is.

6           So what is the effect of what's happening?  Well,

7   we know, of course, that the sentencing guidelines are

8   advisory.  The court is not bound by them.  And the

9   government is making recommendations, and the court

10  obviously has the discretion to go below the government's

11  recommendations, and every defendant will be asking the

12  court to do that.

13          So because the guidelines are advisory and because

14  the government is going to be making substantial assistance

15  motions, whether or not the court imposes the terrorism

16  enhancement is going to have very minimal effect on the

17  ultimate sentence the court is likely to impose.  If I could

18  use my client, Chelsea Gerlach, as an example, and I think

19  this is pretty consistent with probably most of the

20  defendants, but I don't profess that I speak for every

21  defendant in saying this.

22          But in Chelsea Gerlach's case, if the court does

23  not impose the terrorism enhancement, she winds up with a

24  total offense level of 26, her criminal history category is

25  Roman Numeral I because she has no criminal history, and her

1   advisory guideline range is 63 no 78 months.  That's without
2   the terrorism enhancement.

3           If the court applies the terrorism enhancement,
4   that results in a sixfold increase in her advisory guideline
5   range.  In other words, she winds up with a total offense
6   level of 38.  Her criminal history category, although she
7   has no record, is the highest because 3A1.4 of the
8   guidelines say treat everybody as if they have the worst
9   criminal history category possible, so she's a VI rather
10  than a I, and the guideline range is 360 months to life in
11  prison.  So that's a 12-offense level increase and a six
12  criminal history category increase in her sentence if the
13  court imposes the terrorism enhancement.

14          But after the government seeks this sixfold
15  increase in the advisory guideline range, the government's
16  going to immediately turn around, and I'm obviously not
17  criticizing the government for doing this, but I think the
18  court needs to know this to see what the practical effect
19  is.  The government immediately turns around and recommends
20  an identical 12-level downward departure.  So raise the
21  offense level 12, go down 12.  So we are back down to a
22  level 26.  The only difference is if the court imposes the
23  enhancement, then the guideline range is 120 to 150 months
24  because Ms. Gerlach is now a Criminal History VI rather than
25  a Criminal History I.  And the government recommends a

1   sentence of 120 months.

2           So the effect, at least under the plea agreement,

3   is rather than a sixfold increase in the sentence, a

4   doubling of the sentence, 63 to 78 versus 120 to 150 months.

5           And that is, of course, and we'll be making some

6   of these arguments at sentencing, the issue out there, which

7   I just want to plant in the court's mind, is whether

8   anybody, if the court imposes this enhancement, whether any

9   defendant who has a Criminal History Category I, if you

10  place them in Criminal History Category VI, does that

11  significantly overrepresent their criminal history, and does

12  it overrepresent the likelihood that any of these defendants

13  are going to reoffend.

14          But that's -- that's an issue that can be talked

15  about at the individual sentences. And, again, and I don't

16  mean to presume that the court will or should impose a

17  terrorism enhancement. I'm just speaking now theoretically

18  if the court does it, what is the effect.

19          So with that backdrop, with that background, the

20  question becomes why are we doing this. Why are we engaging

21  in this tortuous exercise. It seems we are all riding on a

22  roller coaster. We are going up. We are going down. We

23  are going sideways. We are going back. And we wind up in

24  practically the same place. So why are we doing this?

25          The government, earlier today, said that this is

1    not about politics.  They disclaim that there were any
2    political motives.  And, again, I would echo that I have
3    dealt with all counsel representing the government, and I
4    have nothing but respect for them as well.  And I am not
5    impugning any bad motives to them individually or as a
6    group.  But I have to say, and I'm not going -- because this
7    has already been said far better than I can, to compare
8    these defendants to the Ku Klux Klan, I think you are making
9    this a political situation.  I am glad to see that the
10   government is refraining from comparing these defendants to
11   al-Qaeda, but nonetheless, it's no better to be compared to
12   the Ku Klux Klan.

13           So there are political considerations at work
14   here.  And the political considerations, in our view, are
15   not coming from Eugene, Oregon, or coming from Portland,
16   Oregon.  They are coming from Washington, D.C.  And when
17   this case was indicted in January of 2006, the attorney
18   general of the United States, Alberto Gonzales, held a press
19   conference in Washington, D.C. and, as far as I know, for
20   the first time described these acts as acts of the domestic
21   terrorism.  At the press conference, Mr. Gonzales used the
22   term "domestic terrorism" to describe the offenses committed
23   by the defendants in this case and used the term terrorists
24   to describe these defendants individually.

25           And, again, to my knowledge, that's the first time

1   that label has ever been used in a similar situation; in
2   other words, arsons, environmentally motivated arsons that
3   resulted in property destruction and no harm to individuals,
4   no physical harm to individuals, and the first time, to our
5   knowledge, that has been used to describe these type of acts
6   committed by Earth Liberation Front, Animal Liberation Front
7   types of groups.

8           And so it seems to me that there are labels at
9   work here.  That there is this ever-expanding attempt to try
10  to stretch this term, it's this loaded word, "terrorists,"
11  beyond common sense.  You know, we are not talking about the
12  gold standard here.  We are talking about common sense, in
13  our view, and we are saying that shouldn't we reserve the
14  use of the term terrorists for the most egregious acts of
15  violence designed to hurt people and not designed to hurt
16  property?  Because if we are going to label these defendants
17  terrorists, then I think someone's going to have to invent a
18  new word to describe what the KKK did in the past, what
19  Timothy McVeigh did, what Eric Rudolph did, because it just
20  doesn't fit when the purpose and the motive is to harm
21  property and not to harm people.

22          The government said earlier that we are lucky that
23  no one was hurt.  And I think we can all agree on one thing.
24  We are all glad no one was hurt.  But in our view, that was
25  not luck.  That was design.  Without justifying the arsons

1   that were committed in this case, no one was hurt by design.

2   You know, Judge, there's an old saying, once is an accident,

3   twice is a coincidence, three times is a pattern.  It was no

4   accident that in all of the acts that were committed, not

5   only in this case, but in other ELF and ALF cases throughout

6   the country, nobody was hurt, and that's not a coincidence

7   either.  It was a pattern.  It was by design.

8          So that is what the court is dealing with, and

9   that's the backdrop.  Should we use this term "terrorist" to

10  describe these individuals.  That's kind of the general

11  view.

12         Others are going to be arguing, you know, the

13  nuances and specifics of the law.  I just want to basically

14  address a few issues.

15         The briefing and the government's contention is

16  that there's really only two things the court looks at in

17  determining whether a federal crime of terrorism has

18  occurred which would justify the imposition of the terrorism

19  enhancement, and that is was a predicate offense occurred,

20  and I cannot deny that Chelsea Gerlach and others had been

21  convicted of predicate offenses, like arson, like damaging

22  an energy facility.  I can't deny that.

23         And the other element that the government argues,

24  the only other element that the government argues must be

25  established is the motivational prong, whether the purpose,

1   the motive of the persons who committed the offenses was to

2   retaliate against the government, coerce.

3          I would suggest to the court that there's more

4   that the government has to prove, and I ask the court to

5   look at this entire chapter, Chapter 113B.  That's where

6   these statutes are.  It starts with 2331 and it goes up to

7   2340.  And 2332b(g)(5), and I also hope to say that just

8   once, is within that chapter, Chapter 113B.  And it seems to

9   me the court has to look at the entire chapter in deciding

10  what a federal crime of terrorism is, not just that one

11  particular section.

12          There's a section, 2331(5), which defines domestic

13  terrorism.  Now, I will say, I understand that that

14  particular section was not -- did not become the law until

15  October 26th, 2001, as part of the Patriot Act, so it was

16  not -- it was not the law at the time the acts -- the arsons

17  in this case were committed, but it seems to me that that

18  definition, which, incidentally, involves acts dangerous to

19  human life, that's the definition that congress gave to

20  domestic terrorism in October 26th, 2001, it seems to me

21  that that tells us what congress was thinking all along in

22  1996 when they decided that the terrorism enhancement should

23  apply to acts of domestic terrorism.

24          That's what congress was thinking.  That it has to

25  involve an act dangerous to human life.  It has to involve

1    an act -- if we are going to apply it to acts involving the

2    targeting of real or personal property, then those acts have

3    to be dangerous to human life.  Saying it another way, they

4    have to be acts that create a substantial risk of death or

5    serious bodily injury to another person.

6         So it seems to me there's a third -- there's a

7    third element that has to be established by the government

8    by whatever the burden of proof is, clear and convincing,

9    beyond a reasonable doubt, that has to be established before

10   the court can find there's a federal crime of terrorism and

11   before the court can impose the terrorism enhancement on any

12   defendant in this case.

13        I want to just briefly address the government's

14   argument in some of the individual cases, and I hope the

15   court will allow me also to briefly talk about that at

16   Chelsea Gerlach's individual sentencing, and that is if we

17   get down to whether the court, the fact-finding the court

18   has to make in determining whether, in these individual

19   arsons, what the motivation of the individuals were.  In

20   other words, did they have the motivation to retaliate,

21   coerce, intimidate, et cetera.

22        The government made lots of arguments.  I'm going

23   to leave some of the rebuttals to some of my cocounsel, but

24   I would like to just talk about the argument that they made

25   as it -- as it pertains to some of the arsons, particularly

1    the Vail arson, the Boise Cascade arson, and the JPF,
2    Jefferson Poplar Farm arson.  And it's this issue of the
3    multiple motive and such.

4         It seems to me that the best evidence of motive,
5    the motive that the court should look to, the evidence of
6    the motive that the court should look to is what did the
7    communique say.  Those were written either shortly before or
8    shortly after the arsons, and that tells us -- that's the
9    best evidence of motive and purpose.

10        And if the court looks at the plain language of
11   these communiques, and I will take Vail for example.  You
12   know, the government makes an argument that I would
13   characterize as a heads-I-win/tails-you-lose argument.  If
14   the communique says that you are motivated to harm the
15   government, if you chose the victim as a government entity
16   or your motive was to harm the government, you say it in the
17   communique, you -- or we, the government, win.  But even if
18   the communique says nothing about the government, you still
19   lose because we are going to infer that your motive was to
20   harm the government, although you said absolutely nothing
21   about it.

22        So for example, the Vail arson that the government
23   is saying indicates that there was a motive of the persons
24   who committed that arson to retaliate, I ask the court to
25   look at the communique and what it said.  It clearly said it

1    was targeting a private entity, the Vail ski resort, not the

2    government. Doesn't mention the government at all. It said

3    that the arson was targeting the conduct of the ski resort

4    for expanding its operation which intruded --

5                    (Reporter interrupted.)

6            MR. WEINERMAN: The communique said the arson

7    targeted the conduct of the Vail ski resort for expanding

8    its operation and intruding upon the lynx habitat. It

9    talked about -- it criticized a private entity. It said

10   nothing about the government.

11           The fact that the government was involved in some

12   approval process when the Vail ski resort decided that they

13   wanted to expand their operations is not mentioned anywhere

14   in the communique, and to my knowledge, no one has made any

15   statement that would be admissible for the court to consider

16   in deciding whether to impose the enhancement that would

17   indicate that that was the motive.

18           So the government is never mentioned, and the

19   government has just not proven by clear and convincing

20   evidence that the Vail arson, for example, was committed

21   with the motive or purpose to intimidate the government or

22   to coerce the government.

23           Again, the same thing can be said for the

24   Boise Cascade arson. I, again, urge the court to look

25   carefully at the communique, and it criticizes the logging

1    practices of a private company.  It says nothing about the

2    government.  The fact that Boise Cascade has contracts with

3    the government and Boise Cascade logs on government, U.S.

4    Forest Service land is really besides the point, because

5    that has never been indicated by any of the defendants who

6    committed those offenses to be their motive.

7             So I would ask the court, you know, not to

8    accept -- Ms. Lee said it's an overreaching argument.  I

9    would say it's a bootstrapping argument.  It's basically

10   saying, if a private entity has any sort of relationship

11   with the government, then we are going to presume that the

12   intent of the persons who committed the offense, the arson,

13   was to retaliate or to coerce the government.  And it seems

14   to me that is not overreaching, but --

15            THE COURT:  Is Vail different because it is on

16   forest property?

17            MR. WEINERMAN:  I'm sorry?

18            THE COURT:  Is Vail different than Boise Cascade

19   because it is on entirely forest property?  Can that be

20   distinguished, or do you see it as a distinction?

21            MR. WEINERMAN:  I don't see the distinction,

22   Judge, because there's no proof that -- by clear and

23   convincing or whatever burden of proof the court selects,

24   that that would -- that they even knew that.  You are

25   presuming -- you know, a statement was made earlier today

1   that -- in a different context, I think the Cavel West, that

2   there were all these newspaper articles which, you know,

3   described the BLM's involvement and all. You know, we are

4   making presumptions that people were aware in the Vail case

5   of a lawsuit, were aware that the Vail ski resort is on

6   forest service land.

7               You are making a presumption without any proof,

8   and I don't see the distinction unless someone has made an

9   admission or someone said in a communique, we did this not

10  to -- not to try to change the behavior of a ski resort, we

11  did this to change the behavior of the government. And I

12  think that's a distinction that has to be made, and the

13  government has just not established it.

14              THE COURT: And what I think that leads me to tell

15  all of you is that these individual sentencings may be more

16  intense because I'm not going to necessarily be able to make

17  a ruling that defines, in each case, how this guideline is

18  applied.

19              MR. WEINERMAN: Correct.

20              THE COURT: And after reading all the briefing, I

21  came to that conclusion, and I'm even further convinced

22  that's the case today. So you need to argue, if you have

23  more to argue, or you need to just reserve the cases you

24  intend to offer with further evidentiary issues so that I

25  don't have to -- I can detail those in my opinion, and I

```
 1   will, but if you want to give me a heads-up on which ones
 2   you know you are going to have to do, that would be helpful,
 3   as well, in your rebuttal.
 4         MR. PEIFER:  Each sentencing will involve evidence
 5   presented.  For example, at Vail, we'll have the senior vice
 6   president explain the entire time line of what happened and
 7   how it's tied to the government.
 8         THE COURT:  And, again, I was concerned when I
 9   talked about doing this in an overarching --
10         MR. WEINERMAN:  Sure.
11         THE COURT:  -- manner and having the arguments.
12   It's going to be extremely helpful, but it also may be
13   inconclusive in how we address each sentencing.  So I'm just
14   raising those issues for down the road.
15         MR. WEINERMAN:  Sure.  And I find myself in kind
16   of an unusual position, because by the time the court
17   sentences Chelsea Gerlach, I believe a week from Friday, the
18   court will have already decided this issue in the sentencing
19   of Mr. Meyerhoff because the same issue is going to be
20   raised.  So I feel I had to --
21         THE COURT:  No.  That's fine.
22         MR. WEINERMAN:  -- to say this today because, by
23   the time I show up on Friday, either, you know, we have won
24   the issue or we have lost the issue, and I don't think the
25   court can or will make a distinction between the two.  I
```

1  think that they are in a similar situation.

2          The last thing I just want to say, and, again,

3  because the court is going to be hearing sentencings of

4  Mr. Meyerhoff before Chelsea Gerlach, I just want to ask the

5  court, when listening to what the evidence is of motive, for

6  example, counsel, this morning, talked about what the motive

7  was for the toppling of that transmission tower, BPA, and

8  what the motive was for the attempted arson at the Eugene

9  Police Substation.  I would just - I guess I would like to

10  preserve the record at this point and say that if the

11  government -- and the government cited statements, I think,

12  made by Mr. Meyerhoff in one or both of those, and I have

13  some concerns that the government is using statements that

14  were made during protected debriefings, and under the

15  guidelines 1B1.8, the court cannot use those types of

16  statements to increase a person's sentence under the

17  guidelines.  So I'd just alert the court to that issue on

18  those -- those two.

19          So Judge, the court is going to be hearing from a

20  lot of others, and I'm going to step aside.  I would just,

21  you know, say that the court has a very difficult decision

22  because, you know, there's more to this -- there's more to

23  this than just, you know, the practical effect on the

24  individual defendants, if that is not bad enough.  But

25  there's a label here, a very loaded term that the court is

1    being asked to put on these individual defendants, and I

2    would ask the court not to do it.  To proceed with caution.

3           And in the end, I think when the court hears all

4    the legal and factual arguments, the court should rule that

5    the government has not met their burden of proving the

6    terrorism enhancement and the label terrorist should apply

7    to these defendants.

8           Thank you.

9           MR. SHARP:  May it please the court, I would like

10   to speak from here, if I may, so that I can use the overhead

11   projector.

12          THE COURT:  That's fine.

13          MR. SHARP:  I'm going to mention only two topics

14   and speak about only one.  The topic I will just refer to

15   and mention was my memorandum that dealt with the issue that

16   congress did not intend, back in 1996, that all arsons be

17   deemed a federal crime of terrorism, and I supplied the

18   court with some legislative history about that particular

19   situation having to do with the Oklahoma City bombing.  That

20   what congress was really worried about, when it was adopting

21   that law, was government property and private property that

22   was involved in the conduct of government, such as the

23   day-care center that was privately owned but was serving

24   government employees.

25          The topic I wish to address to the court today

1   is -- by the way, I would be happy to respond to questions

2   regarding that memorandum or to respond to opposition, but

3   as yet, there hasn't been any, so I feel like I fully

4   covered that topic and don't intend to revisit it unless

5   there's a question later.

6          What I would like to address is the issue that's

7   been addressed by several attorneys and provide some history

8   to it, and that is what is terrorism? Where have we come

9   from and where are we going?

10         Mr. Weinerman, in his argument, stated that

11  property damage only should not be considered terrorism and

12  that none of these defendants belong in the same category as

13  Timothy McVeigh or the September 11th terrorists, and I join

14  in those arguments.

15         So I'd like to take a look at what did congress

16  mean when, in 1995 and '96, when it passed the laws that

17  amended 18 United States Code § 2332b.

18         I have read all of the house and senate judiciary

19  committee minutes on this topic of terrorism in the years

20  1995 and 1996, and I have abstracted most of it in a few

21  pages. And I have read all that I could find for the year

22  2001 when the law was changed.

23         My inquiry has been, what did congress intend to

24  cover in 1995 and 1996 under the rubric of terrorism? What

25  type of activity was it trying to have investigated and

1 | stopped?

2 | The tables that I put together summarize what was

3 | the threat that congress was addressing. On the video

4 | screen I will present the table showing the results of my

5 | legislative history research. I will ask the court's

6 | permission that I be allowed to file these tables later as a

7 | second appendix to my memorandum previously filed.

8 | I'd like to go through each of the hearings,

9 | beginning with the hearing before the house committee on the

10 | judiciary, April 6th, June 12th and 13th, 1995.

11 | THE CLERK: Turn it over.

12 | MR. SHARP: Oh, I see. That's better.

13 | Okay. And the only one -- I've listed the

14 | speakers on the left. And then I have abstracted what the

15 | speakers were concerned about, what either incident or

16 | threat they were concerned about. And so the main one I

17 | want to talk about on this page is Representative Henry

18 | Hyde, because Representative Hyde introduced House

19 | Resolution 1710, which later was merged with the Clinton

20 | Administration bill which amended 18 U.S.C. § 2332b.

21 | Representative Hyde referred to the following

22 | incidents: The Pan Am Flight 103, the victims of strife in

23 | Northern Ireland, kidnapping and execution of Marine Colonel

24 | Higgins by Hezbollah in Lebanon, the first World Trade

25 | Center bombing in 1993, the gassing -- I have put poisoning

1    by a Japanese terrorist cult.  That was the gassing of the

2    Tokyo subway where several people killed.  The murder of two

3    American consulate officers in Karachi, Pakistan.

4         So -- and then the rest of the representatives who

5    spoke before the other speakers at large spoke at the

6    April 6th hearing essentially focused on the 1993 World

7    Trade Center bombing where several people were killed and on

8    Pan Am Flight 103 where a great number of people lost their

9    life over Lockerby, Scotland.

10        Next, the acting director of the CIA spoke, and he

11   first gave us some statistics about the number of

12   international terrorism incidents, talked about the 1993 WTC

13   bombing; bombing of the Jewish cultural center in Buenos

14   Aires; gassing of the Tokyo subway; firebombings of Turkish

15   targets by Kurdish separatists, which actually was resulting

16   in the death of about one Turk every five minutes, according

17   to the statistics later given.

18        And then Mr. Studeman concluded by stating, "The

19   greatest terrorist threats to the United States today come

20   from extremist religious groups, especially Islam.  These

21   include the Lebanese" -- excuse me -- "Lebanese Hezbollah,

22   the Palestinian group Hamas, and the Algerian Armed Islamic

23   group."

24        Then Jamie Gorelick, the administration's chief

25   representative, who is an assistant attorney general --

1          (Reporter interrupted.)

2          MR. SHARP:  Jamie Gorelick spoke who was -- I'm

3    trying to get all this in before lunch, but I'll --

4          THE COURT:  I'd rather have a court reporter this

5    afternoon who can function.

6          MR. SHARP:  Very well.  I will slow down a little

7    bit.

8          THE COURT:  Please do.

9          MR. SHARP:  Sure.

10         Jamie Gorelick spoke, and she referred to Pan Am

11   Flight 103; assassination of two American consulate

12   officials in Pakistan; the aircraft hijacking, such as TWA

13   841 [sic], which involved the murder of a soldier; 1993 WTC

14   bombing; and plots to bomb federal office buildings, U.N.,

15   Lincoln Tunnel, and George Washington Bridge.

16         Louis Freeh -- which are all the major

17   transportation facilities.

18         Louis Freeh, director of the FBI, referred to the

19   Pan Am Flight 103, biological weapons, the Biological

20   Weapons Anti-Terrorism Act of 1989, production of nerve

21   gasses in the U.S. and Japan, threats to kill or injure

22   nongovernmental officials and leaders of interest groups.

23         And Philip Wilcox, coordinator, counterterrorism

24   of the department of state, he addressed the threats that

25   were shown by Pan Am 103, taking hostages in Lebanon, murder

1    of Colonel Higgins in Lebanon, murder of the consulate
2    officials in Pakistan, plot to bomb American airliners in
3    Asia, 1993 WTC bombing, bombing of the Jewish Cultural
4    Center in Buenos Aires, bombing of the Israeli embassy in
5    Buenos Aires, and the Tokyo subway nerve gassing.

6           So -- and then that's about all I will mention on
7    that page.  But I think it should give the court the idea of
8    the types of threats that congress was being concerned
9    about.

10          Okay.  So we move from April 6th, 1995, which was
11   pre-Oklahoma City bombing, to June 12th, 1995, which was
12   post-Oklahoma City bombing.

13          And then Representative Hyde introduced his bill,
14   and he provided a definition of terrorism in his bill, and
15   we can see that at least some of Representative Hyde's
16   definition found its way into law.  As I have indicated,
17   Representative Hyde's bill was merged with the Clinton
18   Administration's bill for a final product.  But that's where
19   we can see where some of the definition came from.

20          Then the speakers who addressed threats, as we can
21   see, the different representatives, Bryant, Gekas, Skaggs,
22   all primarily referred to Oklahoma City.  Jamie Gorelick
23   came back, the assistant AG, and spoke about -- the threat
24   she focused was on a threat such -- like Oklahoma City.

25          Then the other speakers before the house

1    committee, I will just very briefly say they all spoke of

2    threats involving people dying, and either actually people

3    dying or attempts or plots to kill people.  And there -- I

4    added this other part here because this is about the only

5    time where there's much discussion about what the definition

6    of terrorism is in the speaking portions.  There are a few

7    written submissions later on in the senate judiciary

8    committee where they talk a little bit about, well, should

9    we have a broad or narrow definition of terrorism.

10          And, as the court can see, James Fleissner, who is

11   a former assistant attorney general, argued that, "All of

12   the crimes added in House Resolution 1710 could easily be

13   involved in terrorist action.  My simple view is that adding

14   to the list of crimes, filling these gaps, is just a good

15   idea."

16          And what I got from the context of that colloquy

17   they were having was he's saying we need a broad definition

18   so that we can really get the people who we are trying to

19   get, which -- and the people who they are trying to get, as

20   was very clear from what everybody in that hearing was

21   saying, were the people who were killing other people.  And

22   that was the clear context of everything that was going on

23   these days, and his argument was not to try to make

24   everybody a terrorist, but to have a broad -- kind of a

25   broad net so we can catch the people who really are

1   terrorists.

2          The final speakers, and this is by far the longest

3   set of hearings, actually, was -- were the house hearings in

4   April and June of 1995.  These were all people, again,

5   who -- they either spoke about explosives, controlling

6   ammonium nitrate, taggants for explosives, or they talked

7   about specific terrorism incidents where people were killed.

8          At about the same time, the senate judiciary

9   committee was meeting, Senator Hatch spoke, and, I think

10  tellingly, in his opening statement, and he -- the only

11  danger that Senator Hatch referred to was the Oklahoma City

12  event, and he said, "Of all the evils of our age, terrorism

13  is one of the greatest.  *The taking of innocent life in*

14  *order to make a political statement, advance a cause, or*

15  *coerce a government is utterly reprehensible."*  And the

16  italics have been supplied by me.

17         Then Senator Specter, Biden, Kohl, Dole -- sorry.

18  I'm probably going fast there -- Nickles, and Inhoffe all

19  addressed Oklahoma City, and Specter and Biden addressed the

20  WTC, the 1993 World Trade Center.

21         The next set of speakers appearing before the

22  senate judiciary committee were, once again, Assistant

23  Attorney General Gorelick.  She again -- she spoke of

24  Oklahoma City, Pan Am 103, 1993 WTC, the Tokyo subway

25  gassing, manufacture of the nerve agent ricin in Minnesota,

1    and the murder of consulate employees in Pakistan, and then

2    also nuclear devices.

3            Director -- FBI Director Freeh talked about

4    specific incidents where people were killed, several, such

5    as Pan Am 103, 275 [sic] people killed; Beirut Marine

6    Barracks, 241 people were killed in that.

7            And then Mr. Freeh concluded by saying that, "The

8    FBI cannot and should not, however, tolerate and ignore any

9    individuals or groups who advocate violence which would kill

10   innocent Americans and which would kill America's kids."

11   That was on Page 27.

12           Robert Kupperman, Center For Strategic and

13   International Studies spoke.  He referred to Oklahoma City,

14   1993 World Trade Center and Tokyo subway gassing.

15           At this point, I will just do one other one for

16   2001.  The reason I looked at 2001 was a little bit in

17   connection with what I believe Mr. Weinerman -- it was

18   Mr. Weinerman who stated.  Sometimes it might be interesting

19   to see what congress was saying in 2001 to see if it gives

20   us any hint about what they meant in 1996.  And I know the

21   rules in looking at legislative history.  What congress says

22   later about what it meant is never as persuasive as what it

23   said at the time that it was doing it.  And so what we just

24   saw was the statements in 1995-96 that are more persuasive.

25           In the senate judiciary committee, these speakers

1  spoke.  Everybody else, actually, just gave written

2  submissions.  But Senators Leahy, Hatch, and Attorney

3  General Ashcroft, Senator Thurmond, Senator Grassley all

4  spoke about September 11th.  Of course, it was

5  September 25th, 2001.

6      So I have a few other, but I will -- with the

7  court's permission, I will just submit by appendix.  But

8  that's -- I wanted to give the court a -- the -- the facts

9  as far as what our congress was looking at, what it was

10  concerned about, what type of a threat was it trying to

11  address, what was it trying to investigate and stop.

12      So here are the conclusions from my legislative

13  history research for the years 1995, 1996, which were the

14  years when the operative definitions of terrorism were

15  formulated.  These are not gray areas.  They are not

16  uncertain.  They are not disputable.

17      First, all persons who spoke to the house and

18  senate judiciary committees on terrorism who cited specific

19  historical incidents of terrorism referred only to incidents

20  where people were actually killed.

21      The only exceptions to that are cases where

22  somebody was trying to kill somebody else, such as the plot

23  to assassinate president George H.W. Bush.  There was some

24  discussion of that.  But other -- the only -- just the focus

25  was on attempts to kill people or actually killing people.

1          Number two, all persons who spoke to the house and

2    senate judiciary committees about future threats talked in

3    terms of government employees or civilians dying, or they

4    talked about guarding against attempts to kill government

5    employees or civilians.

6          Number three, no person who testified argued that

7    people who seek only to damage property should be deemed as

8    terrorists.   No member of congress expressed a desire that

9    people who are only trying to damage property should face

10   terrorism laws.

11         My conclusion, after the review of hundreds of

12   pages of legislative history, research, and transcripts of

13   hearings, is terrorism is about killing people.  That is

14   what our members of congress thought, and that is what the

15   witnesses before the judiciary committee said.  It is not a

16   close call.  It is simply not possible for anyone to read

17   this history and come up with any other conclusion.

18         One final point of the legislative history that is

19   ironic, instructive for us, perhaps, and even a little bit

20   amusing.  On October 3rd, 2001, a veteran policy expert

21   Morton Halperin testified before the senate judiciary

22   committee.  Mr. Halperin testified that he wanted to comment

23   on two administration proposals.  The second administration

24   proposal he commented on was this:  He said, quote, I want

25   to comment on the extraordinary proposal to include

1   disclosure of the names of covert agents in the new list of

2   terrorism crimes.  This is a speech crime that has no place

3   on the list.

4           Mr. Halperin's position won the day, and the

5   disclosure of covert agent names did not become a federal

6   crime of terrorism.  That was 2001.

7           In light of what took place two years later in the

8   disclosure of the Valerie Plame -- Valerie Plame was a

9   covert agent, one shudders to think of how many

10  administration officials could have been prosecuted under

11  the terrorism laws.

12          The administration officials have the liberalness

13  of Mr. Halperin to thank when he, in essence, said, come on,

14  that is not terrorism.

15          And Your Honor, that is the argument I am making

16  to this court today.  Similarly, what we are talking about

17  in this case is not terrorism.

18          MR. STORKEL:  Your Honor, would this be the

19  appropriate time to take a lunch break or --

20          THE COURT:  Does that work for everyone?  I knew

21  we were going to break at one o'clock.  That gives -- you

22  are up next, Ms. Wood, and that gives you a chance to get

23  the computer set up?

24          MS. WOOD:  Yes, Your Honor.

25          THE COURT:  Okay.  All right.  We'll break then.

1    An hour?  Take an hour?  An hour?

2            MR. FEINER:  Judge, will the courtroom be locked?

3            THE CLERK:  Yes, it will.

4            THE COURT:  The courtroom will be locked.

5            MR. FEINER:  Okay.  Thank you.

6            THE CLERK:  Court is in recess for an hour.

7                        *(Recess.)*

8            THE COURT:  Thank you.  Be seated.

9            MS. WOOD:  Your Honor, Terri Wood for

10   Mr. Meyerhoff.  If it please the court, I will proceed.

11           Your Honor, I have one witness, Dr. Zelda Ziegler,

12   who we'd like to present some brief evidence through that

13   supports the arguments that were made in a section of the

14   terrorism memorandum that deal with the legal issue about

15   the substantial risk of injury or death, and they will be

16   applicable to all the defendants in this case.  So she's on

17   the witness stand, if I could have her sworn in.

18           THE COURT:  How long do you expect this to take?

19           MS. WOOD:  Very -- as short as possible, Judge.  I

20   hope to be done in 30 minutes or less.

21           THE COURT:  Okay.

22           THE CLERK:  Ma'am, can I have you stand and raise

23   your right hand.

24                   *(The witness was sworn.)*

25           THE CLERK:  Can I have you state your name for the

1   record, spelling both your first and last names.

2          THE WITNESS:  My name is Zelda Ziegler.  That's

3   Z-E-L-D-A; Ziegler, Z-I-E-G-L-E-R.

4          MS. WOOD:  Please be seated.

5          Your Honor, Dr. Ziegler has provided her

6   curriculum vitae and the statistical analysis of fire safety

7   risk, and I have given a copy to the court and to the

8   government.  So unless there's objection, she would testify

9   briefly as an expert in the fields of statistics, chemistry,

10  and physics regarding fires and explosions.

11         THE COURT:  Counsel.

12         MR. ENGDALL:  No objection, Your Honor.

13         THE COURT:  Thank you.  Proceed.

14                      **DIRECT EXAMINATION**

15  BY MS. WOOD:  3

16  Q.  Dr. Ziegler, you were one of Mr. Meyerhoff's

17  instructors at Central Oregon Community College in Bend,

18  correct?

19  A.  Yes.

20  Q.  And you have maintained contact with Mr. Meyerhoff

21  after he left Bend, including after his arrest in this case,

22  correct?

23  A.  That's correct.

24  Q.  You have also agreed to work as a defense expert on

25  this case?

1   A.    I have.

2   Q.    We asked you to try to tell us, from applied

3   mathematics, how likely it was that all of the arsons

4   committed by the ELF and ALF over the course of its history,

5   as tracked by the FBI, have never resulted in a single

6   injury or death?

7   A.    That's true.  I was asked to do that.

8   Q.    We also asked you to demonstrate some of the physical

9   properties of the incendiary devices that were used by

10  Mr. Meyerhoff and others in this group and, in particular,

11  to show whether these devices were explosives or fire bombs.

12  A.    I was asked to do that, as well.

13  Q.    And we also asked you if you could tell us, based on

14  scientific evidence, about the hazards of exposing propane

15  tanks, outdoor propane tanks to fire?

16  A.    I was asked to do that, as well.

17  Q.    Have you charged for any of your expert services in

18  this case?

19  A.    I have not.

20  Q.    Would you just tell the court briefly why you donated

21  your services?

22  A.    I donated my services because I have kept track of the

23  case through the newspaper, and I have read the indictment,

24  and I know Mr. Meyerhoff.  And it's -- as a scientist, I

25  have a strong belief that it's important to make decisions

1    based on data wherever possible and let your decisions be

2    informed by that and less by emotion, and I wanted to make

3    sure that that, as much as possible, was available in this

4    case.

5    Q.    Dr. Ziegler, I have provided you with Defense Exhibit

6    101, which is your curriculum vitae, and Defense Exhibit

7    102, which is the statistical study you did.  What question

8    did your study address?

9    A.    The statistical study addressed the question of whether

10   1200 arsons would result in -- what the chances of 1200

11   arsons resulting in zero injuries and deaths would actually

12   be.

13   Q.    And you also reviewed Pages 28 through 29 of the

14   memorandum in opposition to application of the terrorism

15   enhancement that I filed on Mr. Meyerhoff's behalf that

16   references some of the statistics from your report?

17   A.    Yes, I reviewed that.

18   Q.    And did the statistics that were set out in the

19   memorandum, were they accurately stated from your report?

20   A.    Yes.

21   Q.    Does this report truly -- which -- I'm sorry.  This

22   report, which is Defense Exhibit 102, does it truly and

23   accurately state the source of the data, the methodology you

24   used, and the conclusions you reached in answering this

25   question?

1   A.   Yes, it does.

2   Q.   And would you adopt your report as your testimony

3   today?

4   A.   I will.

5        MS. WOOD:   Your Honor, we would offer Exhibits 101

6   and 102 into evidence.

7        MR. ENGDALL:   No objection.

8        THE COURT:   Be received.

9   BY MS. WOOD:

10  Q.   Dr. Ziegler, we also asked you to try and help us

11  understand how the incendiary devices used by Mr. Meyerhoff

12  in this case function from a scientific standpoint, correct?

13  A.   Yes.

14  Q.   And we provided you with materials from discovery that

15  included a manual about setting fires with electrical

16  timers?

17  A.   Yes.

18  Q.   And after reviewing those materials, did you develop a

19  demonstration to help explain how these devices worked?

20  A.   Yes.

21  Q.   I'm sorry.

22  A.   Go ahead.

23  Q.   Particularly to address our concern about whether these

24  were explosive devices or firebombs.

25  A.   Yes.

1   Q.   Can you just tell us briefly what -- you made a video

2   of that, correct?

3   A.   I made a video of that.

4   Q.   Okay.  Can you just describe for us briefly what we are

5   going to see in the video.  How you came up with this as

6   being an accurate miniature-type depiction of the types of

7   devices used by this group.

8   A.   I chose to make a video so I could -- it could be more

9   portable and amendable into your new courtroom.  I also

10  scaled it down quite a bit, and I believe that -- and after

11  I looked at the -- the scaled-up version that was performed

12  by the Corvallis Fire Department, I could see that the

13  assumptions were correct in choosing the smaller size of the

14  demonstration.

15        Basically what we did, we took two small yogurt

16  cups that were the same rough dimensions, the same

17  proportionate dimensions as the five-gallon buckets used in

18  the arsons.  We used about 10 or 15 milliliters of the fuels

19  listed in the documents that were provided to me, and we

20  used an ignition source that was external to it.  And then

21  we videoed it as it -- after we ignited it as it burned to

22  demonstrate exactly what it looks like when these things

23  actually burn.  And I think we have -- is it time for the

24  video?  We have --

25  Q.   If you would go ahead and explain what we are seeing on

1    the screen.

2    A.   Sure.  You will see on the screen, as soon as he gets

3    it loaded up, that there are two yogurt cups, and I'm

4    putting -- on the left-hand side there is a mixture of

5    diesel fuel and gasoline, and on the other side is a 100%

6    gasoline, similar volumes, and off to the right-hand side of

7    that gasoline cup is -- there are staged some live matches.

8    They haven't been lit.  So those are typically easy to

9    ignite with a reasonable flame.  They are easy -- so those

10   are at various distances.

11            We had to turn the lights down so that we could

12   see the contrast.  And we started the cup on the -- the cup

13   with the gasoline with a Bunsen flame.  I think that's

14   beginning to happen right there.  You can see it takes quite

15   a little bit of -- quite a bit of contact with a flame to

16   get the vapor to ignite.  And then it ignites.

17            And you will see right away that the focus gets

18   really bad, mainly because the camera is trying to focus in

19   on a flame.  But the first thing that happens is the cup

20   melts away.  And the part you can't see is that the cup that

21   still has liquid fuel in contact with it is -- it still

22   maintains its integrity.  So it's not a broad expanding pool

23   so much as it is just a little contained pool.  And you will

24   notice that the cup with diesel fuel in it doesn't light

25   on -- doesn't catch fire, even though there's a burning

1   ember right next to it.

2          And see that the matches are also not lit.

3   There's no fireball.  There's no mushroom cloud.  In fact,

4   in my -- in my experience with flames, a yellow flame is

5   pretty cool.  You can put your hand in there.  The fact that

6   it's smoky indicates to me that it's an oxygen-poor flame, a

7   fuel-rich flame.

8          I think we are going to skip to -- skip to a piece

9   in the video in a second where we actually demonstrate that

10  those matches are live because we start another match by

11  sticking it directly in the flame above it.

12         Four minutes later.  It's -- it's notoriously

13  boring, unfortunately.  We called it the yule log for a

14  while.  It was -- so we take a match, and I light the other

15  matches to indicate that they are real matches.  And they

16  are just a little further away, and none of them lit.

17         And the diesel fuel mixture, we couldn't get any

18  action out of lighting the pure diesel fuel with a match, so

19  we had to -- this is the thing that ELF also noticed, that

20  they couldn't get -- they couldn't get 100% diesel fuel to

21  light, so they had to mix it at least 50/50 with gasoline,

22  and that's one of the things it says in the manual.

23         You will see that we had put the match deeply into

24  the cup with the diesel fuel in it to get it to start.  It

25  burns in a very similar fashion.  And it goes on for several

 1   more minutes before I finally extinguish the flame by
 2   inverting a beaker over it to reduce the source of oxygen to
 3   it.
 4   Q.   Now, Dr. Ziegler, it's actually the -- the vapors that
 5   are on fire, not the liquid?
 6   A.   Right.  The liquid actually cools the cup and keeps it
 7   from melting, and everything happens in the gas phase.  And
 8   that's one reason why the flame goes up and down is because
 9   it's slowly -- it slowly depletes the oxygen in one region,
10   and it takes a little while for it to diffuse in.
11   Q.   And your understanding, from reading the discovery
12   materials, is that the decision by this group was made to
13   mix diesel with gasoline to cause the flame to burn slower
14   and longer?
15   A.   That's my understanding, yes, and I would corroborate
16   that.
17   Q.   By that process, succeed in catching something on fire?
18   A.   Right.
19   Q.   And you also reviewed a video that was done by the
20   Corvallis Fire Department that we obtained through
21   discovery?
22   A.   I did.
23   Q.   And we are going to show just a short segment of that,
24   because you believe that corroborates the validity of your
25   experiment in terms of how this functioned?

1   A.    That's true.  I will point out the observations that --
2   that support my opinions.  And they actually show
3   constructing a device as well, and unfortunately, they are
4   not using a funnel, so there tends to be a lot more gasoline
5   spilled on the outside of it.  As soon as he gets -- yeah.
6   He spilled some gasoline there, which is going to increase
7   the surface area and promote more evaporation.

8          I don't know if they are adding -- it looks like
9   gasoline to me.  I can't tell.  And then he douses the
10  sponge.  That's part of the igniter.  And they have a remote
11  lighting step.  There's a spark.  And you can see that
12  the -- the sponge wick with the gasoline on it lights first.
13  It takes a little while for it to take off.  You see the
14  same yellow flame.  You see the same smoke.  You might see a
15  little bit different behavior of the plastic jug because it
16  has the gasoline on the outside and not on the inside.

17         And you will see that the majority of the liquid
18  inside the gallon jug is not doing anything.  The reaction
19  is definitely at the interface between the liquid and the
20  vapor, and if any of it is spilled, it tends to make it go
21  worse, a little faster.

22         But again, there's no fireball.  There's no --
23  there's no dramatic explosion of anything.
24  Q.    Dr. Ziegler, is it your understanding, from reviewing
25  the materials, that a one-gallon jug would often be used as

1   a fuel source to have flames that would ignite the liquid in
2   the five-gallon buckets?

3   A.    I believe that's the intent of the design.  And then
4   they go through and extinguish.  I think that's what we
5   are -- we are done with that part, right?

6   Q.    And just, now, turning to the last topic, which is
7   propane tanks.  We asked you to try and tell us, based on
8   science, what hazards are posed by exposing large outdoor
9   propane tanks to fire.  And I don't want you to be long
10  because I'm sensitive to the court's needs, but can you just
11  explain briefly what would make a propane tank explode in
12  terms of exposure to fire?

13  A.    There's very little that will actually make a propane
14  tank explode.  They are -- in the last -- since the late --
15  late '60s, early '70s, the National Fire Protection
16  Association has made that a priority.  They used to ship
17  liquid -- liquefied propane gas in train cars, and every
18  time they had a derailment, they'd have what was called a
19  BLEVE, which is an acronym that stands for boiling liquid
20  evaporating [sic] vapor explosion --

21                  (Reporter interrupted.)

22            THE WITNESS:  BLEVE, B-L-E-V-E, which is an
23  acronym for boiling liquid expanding vapor explosion.  And
24  it's true with any compressed liquid.  It doesn't have to be
25  flammable.  You can have a steam BLEVE.

1    The problem with liquefied propane gas is it's
2    also a fuel source, which can actually cause other things to
3    light on fire.  And so the National Fire Protection
4    Association decided to address this with some engineering
5    controls, and they installed relief valves and shutoff
6    valves inside of tanks that you can't even get to unless you
7    are engaged in actually the construction of the tank, so
8    that any time there's a release of pressure that happens too
9    quickly, it will activate an automatic shutoff.  If the flow
10   of the material outside of the tank is going too fast, it
11   will activate a shutoff mechanism, and if the temperature of
12   the tank gets up to 200 degrees Fahrenheit, there's an
13   automatic shutoff valve that will keep it from escaping.

14   So I think you have to have your oven at 275 to
15   bake cookies, and this will shut off before it gets to that.
16   It's difficult to get an enormous tank to blow up.  In fact,
17   the bigger tanks are safer than the littler tanks.  They
18   have spent a lot of money over the last 30 years to
19   implement these safety measures.  In fact, it seems fairly
20   recently they moved to the five-gallon capacity tanks to
21   change those out.  You might have seen a program in the
22   summer a couple years back where they instituted that
23   particular change-out.  So it's difficult to do that.

24   So they have engineering controls.  And instead of
25   actually announcing it to the general public that it's safer

1  now than it used to be to have propane tanks around, they

2  just fixed it and never said much, so everyone still

3  probably believes that it's dangerous, but it's not true.

4  And as a result of that, they have gone through

5  and tested their assumptions scientifically.  There's a

6  paper by -- that was published -- it was submitted for

7  publication in 2004.  It was actually published in 2005, and

8  it's -- it's a systematic study of exposure of a liquefied

9  gas container to an external fire.  It's published in the

10  *Journal of Hazardous Materials*, a peer-reviewed scientific

11  journal.

12  And then they also -- and this actually applies to

13  tanks of 1,000 gallons and larger.  And then they did a very

14  systematic test on five-gallon tanks to prove that -- or to

15  test whether that was the -- whether it was safe or not.  So

16  it's very difficult to actually get a tank to explode, and

17  as a result of their efforts in the last -- since the '80s,

18  there has not been one firefighter injury resulting from a

19  BLEVE at all.

20  Q.  Dr. Ziegler, does a tank actually explode like a hand

21  grenade explodes?

22  A.  It does not.  It tends to weaken at one spot.  You have

23  to bring the temperature of the steel up to a point where it

24  begins to soften.  And steel doesn't -- doesn't have that

25  characteristic.  It tends to bulge or split.  If it's going

| 1 | to fail, the failure mode is by having a little crack. |
| 2 | Q.   So what you are saying, a BLEVE would cause the |
| 3 | container to crack? |
| 4 | A.   And then -- then the vapor that comes out would be |
| 5 | expanding, and then that's what explodes, is the vapor, if |
| 6 | it gets out. |
| 7 | Q.   Okay. |
| 8 | A.   And the goal is to keep the vapor inside, and they are |
| 9 | fairly successful in that goal. |
| 10 | Q.   And if the -- if the pipe that went between the tank |
| 11 | and the building, if that pipe was somehow melted through, |
| 12 | would that cause the tank to explode? |
| 13 | A.   It would not.  What would happen, then, is the second |
| 14 | type of fail-safe mechanism would kick in, and that would be |
| 15 | the mechanism, where the flow rate would increase to a |
| 16 | certain level and then it would shut that -- shut that port |
| 17 | off. |
| 18 | Q.   That's all of the questions we have, Your Honor. |
| 19 | THE COURT:  Questions? |
| 20 | MR. PEIFER:  Yes, Your Honor. |
| 21 | **CROSS-EXAMINATION** |
| 22 | BY MR. PEIFER: |
| 23 | Q.   Is it Dr. Ziegler? |
| 24 | A.   Yes, sir. |
| 25 | Q.   Dr. Ziegler, have you seen the videos of the various |

1    arsons involved in this case?

2    A.    I have not.

3    Q.    So you haven't seen the one at Jefferson Poplar Farm?

4    The extent of the fire there?

5    A.    I have not.

6    Q.    You haven't seen the one of Romania Chevrolet?   The

7    extent fire there?

8    A.    No.

9    Q.    Have you seen an ATF video that was provided in

10   discovery to the defendants that shows an experiment using

11   actual five-gallon buckets placed near a wooden wall?

12   A.    Yes.   I think that's the abridged version we just

13   showed you.   I have seen it in its entirety.

14   Q.    This is one involving five-gallon buckets made at -- in

15   Tualatin.   Have you seen that?

16   A.    I don't know where it was made, but I do remember

17   seeing one that has two five-gallon buckets of fuel and a --

18   and a one-gallon milk jug, and it's set right next to a

19   plywood wall that's held up with a 2 by 4.   Is that the one?

20   Firefighters and diesel fuel.

21              MR. PEIFER:   Your Honor, we debated among

22   ourselves whether to show that because it does very

23   graphically demonstrate how the fire actually spread so

24   quickly, but Mr. Engdall, I think, intends to show that to

25   the court during the Meyerhoff sentencing.   Just because of

```
 1    the economy of time today, we decided not to present it now.
 2              THE COURT:  Well, if it helps you ask your
 3    questions, you might need to show it, is the thing.
 4              THE WITNESS:  I live in Bend, so.
 5              MR. PEIFER:  Pardon me?
 6              THE WITNESS:  I live in Bend and I'm here now, so
 7    go ahead and ask.
 8    BY MR. PEIFER:
 9    Q.   You would agree, I think, based on your testimony, that
10    the ELF was working constantly to improve their devices so
11    they worked better and were more effective at starting
12    fires; is that correct?
13    A.   I don't know what their goal was.  I know about their
14    researches or their research efforts.  I suspect that -- the
15    publications that I saw indicated that they had suggestions
16    on placement, they had suggestions on fuel ratios.  But it
17    didn't look to me like it was the result of extensive,
18    ongoing research.  I have seen ongoing research, and this
19    looks like a bunch of people trying stuff and --
20    Q.   Right.  But the devices evolved over time, didn't they,
21    from when they were first used in 1997 to the ones used in
22    2001?
23    A.   I think that would be information that was in the
24    discovery, and I didn't see all the details about one device
25    after another one.  I saw the -- I saw the manual that was
```

1    given to me.  But I can't really speak to how they changed.

2    I mean, basically what you have got is a fire and it

3    spreads, and the bigger the fire, goes a little faster.  But

4    I was asked to actually address whether something exploded.

5    Q.    And regarding propane tanks, the -- you are aware that

6    the propane tank we are speaking of at Jefferson Poplar Farm

7    was a propane tank, an older tank, in 2001.  You understand

8    that?

9    A.    I do.  And the thing you need to know is the National

10   Fire Protection Association has gone back and retroactively

11   fixed every -- every propane tank.  They started with the

12   larger tanks at -- at factory facilities, and they

13   systematically hit every one.  So I would suspect that that

14   one was also upgraded to the other one.  The National Fire

15   Protection Association makes recommendations to federal law,

16   so -- and the federal law has encoded their suggestions.

17   Q.    But you weren't able to inspect or view the

18   photographs, or you couldn't tell from the photographs

19   whether the propane tank at Jefferson Poplar Farm had been

20   upgraded in 2001, had you?

21   A.    No one can tell from looking at the tank from the

22   outside because the improvements are internal to the tank.

23   Q.    Now, in your study of propane tank explosions, are you

24   aware of a propane tank explosion that occurred in West

25   Virginia two years ago at a service station in which four

1  people were killed when the propane tank exploded because it

2  was exposed to fire?

3  A.    No, I didn't.

4           MR. PEIFER:  That's all I have, Your Honor.

5           MS. WOOD:  Nothing further with this witness, Your

6  Honor.  May she be excused?

7           THE COURT:  Thank you.  You may be excused.

8           MS. WOOD:  Your Honor, the -- Mr. Meyerhoff has

9  filed a request for judicial notice in connection with this

10  hearing, and it's something that the government, as far as I

11  know, has not responded to yet.  We basically asked to take

12  judicial notice of the fact that the terrorism enhancement

13  has only been applied in two cases where arson was the

14  offense of highest severity, that information coming from

15  the U.S. Sentencing Guidelines Commission, and that neither

16  of those two cases involved arsons committed by

17  defendants -- excuse me -- known to be affiliated with the

18  ELF or ALF.

19           We have asked for judicial notice that the

20  government has not sought the terrorism enhancement against

21  any defendants known to be affiliated with ELF or ALF in any

22  previous arson prosecutions that have taken place

23  nationwide.

24           And I do think they addressed number three, which

25  was a request that the court notice that the government is

1  not seeking the terrorism enhancement in the cases against

2  Jennifer Kolar and Lacey Phillabaum that are pending in the

3  Western District of the Washington.  The government

4  apparently disputes that, so -- but I don't know their

5  position on points 1 and 2 and if they oppose the court

6  taking judicial notice on those.

7         MR. PEIFER:  Your Honor, I don't think that's a

8  matter the court can take judicial notice of because it's

9  incomplete information, and we don't know the full universe

10  of cases out there.  We have given the court, as best we

11  can, reported cases, cases that we are aware of.  This is

12  the first time a case of this magnitude has been prosecuted

13  against an entire cell of ELF and ALF.  So it's like

14  comparing apples and oranges.

15         THE COURT:  Are you intending on filing anything

16  further?  Do you intend to file anything further?

17         MR. PEIFER:  Not on that issue, Your Honor.

18         THE COURT:  All right.  Fine.  We'll take it under

19  advisement.

20         Proceed.

21         MS. WOOD:  Your Honor, we also ask that the court

22  take judicial notice that none of Mr. Meyerhoff's crimes of

23  convictions involved a substantial risk of serious bodily

24  injury or death, and also that he did not knowingly create a

25  substantial risk of serious bodily injury or death, and ask

1    that if the government does dispute that, that they advise

2    that, and that they present facts and evidence, not just

3    opinions, to support those claims at the sentencing hearing.

4          MR. ENGDALL:   Your Honor, we will provide evidence

5    at the time of sentencing on that specific issue.

6          MS. WOOD:   Your Honor, I'm sure the court's read

7    my lengthy argument in opposition to the terrorism

8    enhancement, and I don't intend to reiterate that today in

9    court.

10         I do want to make just two points that aren't in

11   my memorandum.   One is that I urge the court to make the

12   efforts to try and sort through the facts from the rhetoric

13   about the dangerousness of the fires in this case.   We

14   presented some statistical information on it today.   It

15   looks like we may be dealing more with the individual facts

16   of the case of these incidents in Mr. Meyerhoff's sentencing

17   hearing.   I just -- I think that what -- what we all run up

18   against is a preconception that fires and -- that fires are

19   dangerous because arsons, after all -- arsons aren't

20   dangerous.   They don't cause injury or death.   It's the

21   fire.   And the injury or the death has happened before the

22   motive or the cause of arson is determined.

23         And so it's quite valid to look at what the

24   statistics are nationwide on injuries and deaths in fires of

25   nonstructures, for example, as are cited in the statistical

1   study we presented.  And keep in mind that those statistics

2   from the National Fire Protection Association concern all

3   nonhome structure fires; that is, occupied as well as

4   unoccupied structures.  And we would all assume that if

5   firefighters think there's somebody in a burning building,

6   they are much more likely to rush in at their peril than

7   they are if they believe that it's an unoccupied building.

8          And I ask the court to consider the recent fire at

9   the Gheen Irrigation Company here in Eugene that happened

10  back in April.  We have got just a brief showing of that.

11  This fire, according to the newspaper reports, was the

12  largest fire that's been in this area in about the last 25

13  or 30 years.  It was, according to the newspaper, in very

14  close proximity to the Ferry Street Bridge neighborhood.  It

15  was wedged in between residential buildings to the east and

16  north.  And additionally, the facility housed about 30

17  chemicals that were on the hazardous chemical list.  And

18  there were no evacuation of people living next to that fire.

19  There were no injuries in that fire.  There were no deaths

20  in that fire, either by emergency responders or by anyone in

21  the vicinity.

22          So I just -- I ask the court to recognize that we

23  can have big fires in the middle of a residential area and

24  it not result in injury or death.  And the statistics from

25  the National Fire Protection Association would show that, in

1　fact, even when you have occupied structures that are

2　nonresidential that it's fairly low.

3　　　　So I am -- I am just certain that if we had an

4　article that came out a day or two after this where the ELF

5　had claimed responsibility for this fire, we would have been

6　reading headlines about how ELF action endangers North

7　Eugene community; whereas, the reaction reported in the

8　newspaper to people observing the fire was pretty much like

9　curiosity, wow, have you seen anything this big before.　So

10　it's just to try and look at the facts and not get swept up

11　in the rhetoric about how dangerous this group was or how

12　dangerous these fires were.

13　　　　Your Honor, the next point or last point I'd like

14　to make comes back in response to the government's request

15　that the court apply this enhancement basically as it reads

16　on its face and that it apply it uniformly, and that we have

17　truth in sentencing.　And that caused me to go back and look

18　at a case that was sentenced by Judge Hogan recently in this

19　district, and it was the case of *United States v. Jacob*

20　*Albert Laskey* in Case No. CR 05-60053.　You will see that

21　the indictment in that case charged that he, among others,

22　were self-avowed white supremacists, and that they sought to

23　commit acts of violence and destruction against Jews,

24　African-Americans, and members of other ethnic and racial

25　groups.

1          It's on the second page.  And if you turn to

2     Page 6 of that indictment, you will see Count 9.  And you

3     will see that it charges there that Mr. Laskey solicited

4     another person to violate Title 18 United States Code

5     § 2332a(a)(3).  That is a crime listed in the 2332b(g)(5)

6     list of terrorism offenses.  It's been listed there since

7     the beginning of that statute being enacted in 1996.

8          And he's charged there under the general

9     solicitation statute, 18 U.S. Code § 373, which we submit is

10    analogous to the general conspiracy statute in § 371.  And

11    so using the government's approach to applying the terrorism

12    enhancement, we find that Mr. Laskey, by his own admission,

13    solicited another individual to commit a federal crime of

14    terrorism and therefore obviously intended to promote a

15    federal crime of terrorism.  That involved calling in a bomb

16    threat to the courthouse.

17         Then we know from further filings in that case,

18    Attachment B to the government's supplemental sentencing

19    memorandum, the government obtained a -- an article that

20    Mr. Laskey had mailed off to *Resistance Magazine* while he

21    was at Sheridan pending sentencing, and the article itself

22    is pretty hard to read.  So that's the first page of it, and

23    I have just excerpted a few sentences out of that.  It says,

24    "Resisters Revolutionary Manifesto - Jake Laskey.  I am a

25    political prisoner.  I am a casualty of the endless Race War

1    that proceeds today."

2              He goes on, "Never will we have peace in America

3    until the foreign, despicable, and oppressive System's

4    presence is removed."

5              It's clear, if you read the entire submission by

6    Mr. Laskey, that "systems" is his word for the "government."

7              He goes on, on that same page, to talk about a

8    method of helping accomplish the -- them winning the race

9    war.  He urges execution cells to break into homes at early

10   dawn and kill targets in front of wives and children,

11   political officials coming or going to work.  The key is

12   television because funerals of targeted officials are

13   covered with great detail.

14                      (Reporter interrupted.)

15             MS. WOOD:  Right.  Because funerals of the

16   targeted officials will be covered in detail -- great

17   detail, and create a media frenzy.

18             And then he goes on, on the second page, to -- to

19   talk about how cells must adopt a policy of shoot and scoot

20   and target public officials and politicians.

21             He says that assassinating public figures or

22   bombing campaigns in the system, again, government office

23   facilities, like the 1990s Oklahoma City bombing, will get

24   us more time on television and commentary than mass killings

25   of civilians, just like the murder of John or Jane Doe.

1    So we -- we know that his motive in throwing rocks

2 through the Temple Beth Israel window while there was a

3 service in -- going on and people were present was part of

4 his plan to overthrow the government.  We have got proof of

5 his motivation.  We have got proof of a federal crime of

6 terrorism, and the terrorism enhancement was never sought in

7 this case.

8    And so, again, the court's heard arguments about

9 the unequal application of this enhancement to the

10 defendants in this case.  And this is the closest case I can

11 find in this district that it should have been applied to

12 and it wasn't, if you take the government's reading of the

13 enhancement.

14    The final thought I'd like to leave the court with

15 is that the decisions the court makes in interpreting this

16 statute have ramifications beyond this case.  And when the

17 defense urges the court to -- to find that when you look at

18 the act as a whole, congress intended this third element of

19 substantial risk of serious bodily injury or death when the

20 crime involved was simply one of property damage, we are not

21 proposing that simply because these are arson crimes.  We

22 are proposing that based on the whole act, and that's where

23 that language comes from.  It happens to dovetail in with

24 the guidelines with similar language under the arson

25 guidelines.

1    But the court -- the court's decision about

2  whether this act applies literally on its face to simply

3  property crimes with nothing else will have ramifications

4  for the next defendant, for the next Mr. Laskey who comes

5  before the court, and perhaps simply because he threw rocks

6  through a window with a wrongful, hateful motive, perhaps he

7  wasn't somebody that congress intended to have the terrorism

8  enhancement apply to.

9          That's all I have, Your Honor.

10         MR. STORKEL:  Your Honor, I'm going to stay here

11  because I have a very short legal argument.  I will be

12  relying on my memo that I filed and the joinder in the

13  arguments of the other attorneys in this case.

14         In my argument, this is a constitutional case, and

15  it's in the right forum.  It's in the United States District

16  Court.  The acts of Nathan Block predate the legislation

17  that was enacted on October 26th, 2000 --

18                    (Reporter interrupted.)

19         MR. STORKEL:  I will slow down.  Sorry.

20         The acts of Nathan Block predate the legislation

21  that was enacted on October 26th, 2001.  Any application of

22  the October 26th, 2001, legislation in this case constitutes

23  an ex post facto application of the law, in violation of

24  Article I, Section 10, Clause 1 of the United States

25  Constitution and the due process clause of the Fifth

1    Amendment of the United States Constitution.

2            As a citizen, Nathan Block is entitled to the fair

3    application of the guidelines, consistent with the

4    principles and protection of the United States Constitution.

5            The defendant and government agree that the

6    guidelines calculations should be derived from the United

7    States Sentencing Commission Guidelines Manual with an

8    effective date of November 1st, 2000.

9            Statutory changes after November 1st of 2000

10   cannot be constitutionally applied to this case, and so

11   therefore, with that, along with the arguments in our

12   memoranda, we are asking that the court not apply the

13   terrorism enhancement in this case.

14           Thank you.

15           THE COURT:  Mr. Kolego.

16           MR. KOLEGO:  Your Honor, on behalf of Ms. Savoie,

17   we join in the arguments of the other counsel and reserve

18   the right to produce evidence at the sentencing hearing.

19           That's really all I have right now.

20           THE COURT:  Thank you.

21           Mr. Foreman.

22           MS. MCCREA:  I'm taking Mr. Foreman's place.

23           May it please the court, counsel for the

24   prosecution, members of the defense, Your Honor, Kendall

25   Tankersley's unlawful activities were brief in time and

1    limited in scope, and I intend my comments to be the same.

2              Three points.

3              On behalf of Ms. Tankersley, we adopt the

4    arguments ably made by the other counsel and, based on the

5    arguments made before the court today, ask the court to not

6    apply the terrorism enhancement in this case.

7              Two, if the court determines that the terrorism

8    enhancement does apply generally, we submit it is not

9    applicable to Ms. Tankersley. One business was targeted.

10   That was U.S. Forest Industries, a private property. We

11   agree that there was an effect on interstate commerce, but

12   our position is that Ms. Tankersley's statements in

13   connection with her plea do not support a claim of intent to

14   affect the government.

15             And three, even if the terrorism enhancement is

16   applicable, it should not be applied to Ms. Tankersley on a

17   factual basis. Clearly, the court has to evaluate that at

18   sentencing, at her sentencing with regard to her, and not

19   here. And that will be a question of the evidence to be

20   presented both by the government and the defense as to

21   whether it can be established that there was an intent to

22   calculate -- calculated to influence under the terrorism

23   definition.

24             THE COURT: Mr. Feiner.

25             MR. FEINER: Thank you, Your Honor.

1      Everything's the same as it was before.

2          THE CLERK: All I can suggest is that you shut it

3      off and start over again. We are picking up something from

4      you, but --

5          MR. ROBINSON: Your Honor, could I take this

6      moment, while we are working on the technology, on behalf of

7      Mr. McGowan just to indicate that, given the court's remarks

8      this morning about what we should be prepared for at the

9      individual sentencing hearings, we would like to make a

10     request that the government provide *Jencks* material for any

11     witnesses that are going to be testifying so we can be

12     prepared to cross-examine them on the morning of the

13     hearing. I don't know that the government is going to

14     provide -- call witnesses in our particular case. It may be

15     that they are just going to submit evidence, but if there

16     are going to be witnesses, we do want to be prepared to

17     cross-examine them.

18         MR. ENGDALL: Your Honor, we will provide the

19     necessary information to counsel.

20         THE COURT: We are going to take just a brief

21     recess. I think that will help the performance anxiety of

22     getting the machinery to work. For some strange reason, it

23     will make it work. I don't know why. But if we are all not

24     watching, it seems to work, and Ms. Engdall is going to get

25     our technician who is on site to assist. So we will take

1    that brief recess.

2            I suggest counsel have an opportunity to talk,

3    because I'm going to tell you, if I walk into court and

4    there are, all of a sudden, surprises with witnesses and

5    things that aren't expected, it will disrupt everyone's

6    schedule, because I'm not going to be proceeding to hearing

7    if people aren't on notice and prepared, period.

8            So everybody needs to at least have that

9    conversation today, because you are all here, and if there

10   are any issues or concerns that will disrupt the schedule, I

11   want to know about it because we have held on as hard as we

12   can to these dates and are trying to stay within the

13   boundaries of meeting everybody's expectations, and the

14   first one who goes sideways with it will blow the dates for

15   every single person, including the staff that's been ready

16   to go, and cases that are bumped in accordance with

17   attempting to keep your schedule together.

18           So why don't you use the ten minutes or so wisely,

19   and then it looks like we'll finish earlier than the end of

20   the day, and use the end of the day to work through any

21   issues, because I will be available to resolve any

22   ministerial matters that need to just have clarification.

23           All right?  We'll take a recess.

24           THE CLERK:  Court is in recess.

25                      *(Recess.)*

1          MR. FEINER:  Good afternoon, Your Honor.  I

2     believe we have all the glitches resolved.

3          My name is Dan Feiner.  I represent Darren

4     Thurston.

5          Our position on the terrorism enhancement is

6     considerably different than anything that you have heard up

7     to this point.  We are narrowing the focus very much.  Our

8     approach is that the enhancement itself, given

9     Mr. Thurston's involvement in this offense, does not apply.

10          What I have here today are a number of visual

11     images that will enhance the position that I took in Section

12     2 of the discussion in the memorandum that I filed.

13          Where I'd like to begin is just first talking

14     about the crimes that Mr. Thurston was convicted of.  He was

15     convicted of one count of 18 U.S.C. 844(f)(1).  In the memo,

16     I referred to that as the California arson.  That's the

17     Litchfield arson that occurred on October 15th, 2001.

18          In Eugene, he pled guilty to a conspiracy count,

19     and that really forms the basis of my presentation here

20     today.  What I would like to first show you is the -- we

21     have all seen this, but this is the information in

22     Mr. Thurston's Eugene case, and I just want to point out

23     here that the crime was alleged to have begun in

24     October 1996 and continued through October 2001.  And that

25     language becomes very important, as I identified in the memo

1  and as I will speak to in a moment, because on October 26th,

2  2001, the Patriot Act amendments were passed. Unlike some

3  of the defendants, who are arguing against application of

4  the Patriot Act in their case, in fact, it's our position

5  that the Patriot Act establishes that the terrorism

6  enhancement does not apply to Mr. Thurston.

7         The next image is the last page of the information

8  that he pled guilty to. And I am presenting that to reflect

9  that, in fact, on October 30th, 2001, so after the

10 October 26th date, during the time that this conspiracy was

11 running, before its termination on October 31st, according

12 to the charge, there was an act taken, a communique was

13 distributed attributing the fire to the ELF.

14        And the government's sentencing memorandum,

15 Page 48, reflects that, in fact, it was Mr. Thurston who

16 posted that communique. So we not only have an act that

17 occurs in relation to the conspiracy after the October 26th

18 enactment of the Patriot Act, we have an act taken

19 specifically by Mr. Thurston himself.

20        In the prosecution's opening statement or opening

21 presentation, there was a reference to the plea agreement

22 that we signed here. There was a reference to having

23 honesty, I would call it accuracy, in guidelines

24 calculations. Where I think that is important is that there

25 are references to the fact that Mr. Thurston and that the

1   other defendants agreed to use the guidelines book as it
2   existed on October -- November 1st, 2000.

3           This is a copy of the plea agreement where it
4   references it, and it doesn't say exactly that.  What it
5   says is that, "Defendant and government agree that the
6   guidelines calculations should be derived from the United
7   States Sentencing Commission Guidelines Manual with an
8   effective date of November 1st, 2000."  It doesn't say "as
9   it existed on November 1st, 2000."  We are dealing with, and
10  we agreed to use, a particular guidelines manual.

11          Now, the government is taking the position that
12  because 3A1.4 references 18 U.S.C. 22 -- 2332b(g)(5), that
13  in one way or another, that statute is incorporated into the
14  sentencing guidelines, and that we have agreed to use the
15  statute as it existed on November 1st, 2001.

16          As I provided in the memorandum, we did not do
17  that.  It is not in the agreement.  However, for the
18  purposes of this argument, I will accept that fact, that, in
19  fact, 2332(b) is incorporated by the language in 3A1.4.  So
20  the guidelines refer to the statute, and they pull the
21  statute into the guidelines, and when we agreed to the book,
22  we agreed to the statute.  Because the fact is, under the
23  law that applies to the sentencing guidelines, the amended
24  statute becomes the one that is appropriate for us to use.
25          What we have here is just a really basic time line

1   that lays out the fact that on October 15th, 2001, the
2   Litchfield arson occurred. On October 26th, 2001, the
3   Patriot Act amendments went into play. On October 30th,
4   Mr. Thurston posted his communique. And on October 31st,
5   for the purposes of this information, the conspiracy
6   terminated.

7        So what we have got is a conspiracy that bridges
8   the amendment to 2332b on October 26th. The reason that's
9   important, of course, is that the amendment on October 26th
10  took out of 2332b(g)(5) any reference to 844(f)(1), which is
11  the crime that Mr. Thurston was convicted of in California.
12  It is the primary crime that the conspiracy that he pled
13  guilty to is alleged to have promoted, and it also -- the
14  conspiracy -- the Patriot Act amendment removed 18 U.S.C.
15  1361, which is the destruction of government property
16  offense and, until the government's memorandum, we were not
17  aware was involved in this case. Each of those crimes, each
18  of the two crimes that the government says Mr. Thurston's
19  involvement in the conspiracy promoted was removed on
20  October 26th.

21       So when we go from that point, what we next --
22  what I next looked at was the crime of conspiracy itself.
23  The crime of conspiracy is a continuing offense. It is
24  generally held to have occurred at the time when its
25  objective is thwarted. *United States v. Castro*, which is

1    972 F.2d 1107, a Ninth Circuit case, indicates that
2    conspiracy is a continuing offense.  It is presumed to
3    continue until there is affirmative evidence of abandonment,
4    withdrawal, disavowal, or defeat of the object of the
5    conspiracy.

6         What happened in *Castro* is there were amendments
7    to the sentencing guidelines that occurred in the middle of
8    the conspiracy that Mr. Castro was involved in.  And the
9    court indicated that it had never had that issue, never had
10   to deal with that issue before.  That it was an issue of
11   first impression.  However, they went back and looked at
12   conspiracies that extended past the starting date of the
13   sentencing guidelines and had begun before there were
14   guidelines and ended when there were guidelines.  They
15   looked at statutes that had been amended during the course
16   of a conspiracy running.

17        And what the court said, and it's the last part of
18   the statement right there, "Here, the object of the
19   conspiracy was not defeated until the final seizure of
20   cocaine and the arrest of the coconspirators.  That occurred
21   after the effective date of the amended guidelines.
22   Therefore, the amended guidelines apply to this offense."

23        So the Ninth Circuit has held that when a
24   conspiracy charge bridges an amendment to the guidelines or
25   an amendment to a statute, in this case we are considering

1  them both the same for the argument, you apply the

2  guidelines or the statute that were in effect at the time

3  the conspiracy terminated.

4        So we now have the situation where, at least for

5  the conspiracy charge, I suggest to you that an honest

6  application of the United States Sentencing Guidelines would

7  provide that we would use the amended version and we would

8  use the amended version of 2332b(g)(5), and the two offenses

9  that Mr. Thurston is alleged to having promoted were not

10  considered federal terrorism offenses at that time, and

11  therefore, they would not form the basis of the terrorism

12  enhancement.

13        We still have one conviction, and that was the

14  conviction on the time line for October 15th, the Litchfield

15  arson, hanging out there.  Obviously, if that was the date

16  we were looking at, that precedes the October 26th

17  amendment, and that would become an issue.  The guidelines

18  have taken care of that for us, however, with 1B1.11.  "If

19  the defendant is convicted of two offenses, the first

20  committed before and the second after the revised edition of

21  the guidelines manual became effective, the revised edition

22  of the guidelines manual is to be applied to both offenses."

23        So basically we have got the conspiracy happening

24  after the amendments.  We have the 844(f)(1) occurring

25  before the amendments.  The conspiracy reaches back, it

1   grabs the 844, and it pulls it up to after the amendments.

2          At the time the conspiracy terminated on

3   October 31st, 2001, neither 844(f)(1) or 1361 were listed in

4   2332b(g)(5) as federal crimes of terrorism.  Therefore, when

5   3A1.4 in the 2000 book, the November 1st, 2000, initiated

6   book, there's been no change in the guidelines book, and we

7   are in no way suggesting we are using a different book other

8   than that 2000 book, when you pick up that book at the

9   conclusion of Mr. Thurston's crime and you look back, you

10  look -- 3A1.4 refers you to the statute, 2332b, and those

11  crimes are not there.  Therefore, he cannot receive the

12  terrorism enhancement because the crimes that he committed

13  and promoted are not on the predicate list.

14         Thank you.  I have nothing more.

15         THE COURT:  Mr. Blackman.  You are batting

16  cleanup, it would appear.

17         MR. BLACKMAN:  May it please the court, counsel,

18  Marc Blackman on behalf of Jonathan Paul.

19         Let me say that the court made a comment earlier

20  today that was something that occurred to me about two weeks

21  before our memos were originally due, which is don't --

22  doesn't the court have to make an individualized assessment

23  of each offense and each offender in determining how to --

24  whether or not this terrorism enhancement applies, and what

25  can this hearing, which is sort of like a global address of

1    that issue, accomplish.

2            And as I was researching and drafting the

3    memorandum on behalf of Mr. Paul, I found it very difficult

4    to discuss the law in the abstract and not bring in facts,

5    and, of course, the court hasn't heard any facts yet.  You

6    have heard assertions by the government.  We saw those in

7    the government's memo, and on behalf of Mr. Paul, I felt a

8    need to immediately respond.  The court hasn't ruled on my

9    motion to file that supplemental memo yet, but it really is

10   impossible, in this setting and with this situation, to make

11   any definitive call as to any defendants being subjected to

12   the terrorism enhancement because it is, contrary to what

13   I -- I thought I heard Mr. Peifer say today in his reference

14   to *Pinkerton* liability, that somehow a guideline application

15   could be based on a *Pinkerton* substantive responsibility for

16   a conspiracy theory.  It is certainly my understanding that

17   the guidelines and the application of the guidelines, even

18   in the conspiracy setting, require the court to make a

19   particular and individualized assessment as to the role of

20   each defendant in the offense, the nature of the offense,

21   and the defendant's role in that offense.

22           And so I don't know if Mr. Peifer misspoke when he

23   was making that reference to *Pinkerton*, but it highlighted

24   for me what we could maybe accomplish as a result of this

25   hearing.  And so over the course of the day, I have actually

1   just made a little list of things that I think we might ask
2   the court to rule on in anticipation of the individualized
3   sentencings that are coming.

4        The first thing is, are the offenses on which the
5   government is relying, and specifically the offenses that
6   the defendants have pled guilty to, do they qualify as
7   predicate offenses for the application of the terrorism
8   enhancement.  This sort of is what Mr. Feiner was talking
9   about specifically with respect to Mr. Thurston, but I think
10  it can be something the court can look at and give us some
11  guidance on, on a defendant-by-defendant, charge-by-charge
12  basis.

13       For example, as Mr. Feiner points out, an offense
14  under 844(f)(1) today is not a predicate offense.
15  Technically, that changed, as he's just explained, at the
16  tail end of the time covered by this conspiracy.

17       Clearly, I think the court can say that is an
18  expression of what the congressional intent was all along,
19  and that's why all this talk about what is terrorism, what
20  is -- what does that concept capture is important, because
21  it's important in trying to find out what offenses the
22  congress intended to include as the predicate offenses for
23  the application of the federal crime of terrorism guideline.

24       So I think the court could tell us, for example,
25  that an offense that meets the elements only of an 844(f)(1)

1    offense, which is property damage only, simply does not
2    constitute a federal crime of terrorism.  Conversely, the
3    court could say, you know what?  They didn't segregate out
4    those (f)(1), (2), (3) sections until a week later, and so
5    too bad, Mr. Thurston, you are stuck.  No.  You can tell by
6    my presentation that I think that would not be an accurate
7    reflection of the intent that is clear now as to whether or
8    not 844(f)(1) is a federal crime of terrorism.  But I think
9    the court could give us a clear guidance on that question.

10          For Mr. Paul's situation, we fall right in line
11   behind that because, as I point out in our memo, 844(i),
12   which relates only to private property, is analogous to
13   844(f) except -- because somewhere in the congressional
14   drafting office some people were drafting sections and liked
15   semicolons and other people liked sub paren 1, sub paren 2,
16   sub paren 3, so you have an 844(i) statute that is
17   absolutely identical to the 844(f) statute except (f)
18   applies to government property, (i) applies to private
19   property.  But the first clause of 844(i) is identical to
20   (f)(1).

21          And so I think the court could say drafting is not
22   the basis on which we determine if an offense is a federal
23   crime of terrorism.  And if an 844(f)(1) offense, property
24   damage only of government property, is not a predicate
25   terrorism offense, then certainly the same violation of

1    844(i), property damage only, private property, can't be a
2    federal crime of terrorism, even though 844(i), in general,
3    is referred to in the guideline reference in 2332(g)(b)
4    [sic] whatever.

5         In other words, I think you can tell us, and I
6    would urge the court to tell us, that the clear
7    congressional intent, when you look at the 844(f)(1)
8    subsection and the analogous language in 844(i), means that
9    if it's property damage only, private property does not
10   qualify as a terrorism predicate offense.

11        I think the second thing you can tell us is
12   whether or not on the motivational element, or prong,
13   whether you agree with the government that someone else's
14   motivation can be sufficient to hold another defendant
15   responsible for the essential motivation, or if it does
16   require the individualized and particularized assessment
17   that I believe runs throughout the guidelines.

18        And I, again, would hope the court would say that
19   this is an individualized assessment that looks at each
20   defendant's motivation and the real evidence of what that
21   motivation is, which is, of course, a very fact-specific
22   issue.

23        Along with that, I think the court could tell us
24   whether or not, in making that assessment, it would be a
25   violation of 1B1.8 to use the statements our clients were

1   required to make as part of their plea agreements with the

2   government or whether that is a violation of the guidelines.

3           That portion of the guidelines is very mysterious

4   to normal people like my client who read it and say, well,

5   the guideline says the court is to be told, right, when a

6   defendant makes a statement, as my client did, about his own

7   activity, the guidelines say that information is to go to

8   the court, but the court may not consider it in determining

9   the application of the guidelines.

10          And my client says, well, how can a judge make --

11   do those mental gymnastics. And I say, well, that's what

12   judges do every day. But I think you could tell us whether

13   or not 1B1.8 precludes the government and the court from

14   relying on the debriefs made as part of the plea agreements

15   in determining what the motive may have been with respect to

16   a specific incident.

17          I also think that you can tell us whether or not

18   you agree with the defense position that if you find that an

19   offense is not a federal crime of terrorism, that the

20   Application Note 4 to 3A1.4, which says that if it's -- if

21   it's only directed against the civilian population or

22   private business, the court may consider that as a basis for

23   an upward departure, whether that application note, which

24   was adopted after the fact in this case, can be applied

25   retroactively.

1        Of course, we believe it cannot be, and we believe

2   that the post-offense conduct adoption of that application

3   note not only confirms that an offense like Cavel West

4   cannot constitute a federal crime of terrorism, but also

5   that it cannot be a basis for an upward departure, because

6   applying an upward departure adopted after the conduct and

7   after the guideline book that we have all agreed controls

8   simply can't be under the ex post facto clause applied

9   retroactively.  And I think you can tell us that.

10       Then I think you can tell us whether or not you

11  believe that if you find that the terrorism enhancement

12  applies, you retain the authority to conclude that

13  categorizing someone as a Category VI criminal history

14  overrepresents their criminal history and warrants a

15  reduction in the standard way that the court does in every

16  case where the issue of whether the criminal history does or

17  doesn't accurately reflect the person's -- the purposes of

18  that categorization.

19       I think that if you could give us some guidance on

20  that, it would help all of the parties prepare for their

21  sentences.

22       With respect to the conspiracy count, I think you

23  can tell us whether or not you believe that a conspiracy can

24  qualify or not as a federal crime of terrorism, and, if so,

25  what the criteria for that would be.  In our view, of

1   course, a conspiracy cannot be a qualifying offense if the
2   offense, the substantive offense that it was allegedly
3   promoting is itself not a federal crime of terrorism.

4   So in Mr. Paul's case, for example, the arson of a
5   private business under 844(i), as I have explained, we do
6   not believe can qualify as a federal crime of terrorism.  A
7   conspiracy to commit that offense, therefore, we believe,
8   cannot be found to have promoted a federal crime of
9   terrorism.

10  Now, you may take a different view, but I think if
11  you could let us know in advance, that might be helpful.
12  And I think, again, it would be helpful in that regard to be
13  clear or let the parties know if in fact my client -- a
14  particular defendant's exposure to the terrorism enhancement
15  is an individualized assessment of that client's actions and
16  motives or if vicarious liability under *Pinkerton* could
17  possibly be a way for the government to get there.  That, I
18  think, would be new law for sure.

19  Then I think the last thing that you probably
20  could help us with is how do we handle the logistics of the
21  sentencings, given that we have sequential sentencings but
22  some incidents in common.  I think it was Mr. Weinerman,
23  maybe, made reference to the fact that by the time he
24  gets -- we'll follow up on the baseball analogy -- gets into
25  the batter's box, the court may have already made a ruling

1  on at least one of the incidents that his client is accused

2  of.  I'm in the same situation on behalf of Mr. Paul,

3  because Cavel West, I think, will be involved in the Tubbs

4  sentencing, which precedes ours.

5          I believe it is a very difficult Sixth Amendment

6  issue for the court, in an evidentiary hearing in which a

7  party is not participating, to make a ruling that is binding

8  on that party.  Conversely, even if it's not technically

9  binding, it's very difficult for me to imagine that you

10  might rule in the Tubbs sentencing that the Cavel West

11  incident somehow qualified as a predicate offense and then

12  say, oh, you know, at the Paul sentencing, I didn't know

13  that at the time I sentenced Tubbs, so I was -- for

14  Mr. Paul's purposes, Cavel West is not a federal qualifying

15  offense.

16          And I don't know logistically, but I think if you

17  could give us some guidance on, you know, should

18  Mr. Weinerman show up?  Should he be there and say, I'm

19  here, Your Honor.  I have some things I'd like to present in

20  connection with this sentencing?  Should I show up at the

21  Tubbs sentencing and participate to make sure the court has

22  all the information I think the court needs in assessing

23  whether that is an offense that qualifies just on the

24  predicate level?

25          And I think all of those questions really would

1   help us refine the issues that we need to clearly present to
2   you at the time of sentencing. And they can do so in a way
3   that I think will give everybody a fair shot at trying to
4   establish the factual basis that is relevant to you in
5   making that decision.

6          The Cavel West offense is obviously the only one I
7   care about. It is the only one that I really think I know a
8   lot about, and it's one that I think I can demonstrate,
9   without really even any reservations on the part of
10  Mr. Peifer, was motivated, for someone like Jonathan Paul,
11  to be designed for one purpose only. To put an end to a
12  horrendous operation. I have a video, I think I made
13  reference to it in a footnote, of a slaughterhouse
14  operation. I was going to show it today to respond to some
15  of the allegations of the government's memorandum. I don't
16  believe that's an appropriate thing to do today. I do
17  intend to present it at the time of his individualized
18  sentencing. But I might want to present it at the time of
19  the Tubbs sentencing, because I think anyone who sees it
20  would -- the last thing they'd ever ask themselves were --
21  would be where did these horses come from. That's not a
22  question you ask when you see this.

23         When you read about Cavel West, as I have quoted
24  in our memorandum, and the way it fouled the water in
25  Redmond and stunk up the air and overwhelmed the water

1   treatment system and inhumanely disposed of healthy animals,
2   I don't think the question would occur to anyone, certainly
3   not Jonathan Paul, that where these horses came from meant
4   anything.

5       And that is the key in making individualized
6   decisions about individual defendants.  And I think if the
7   court tells us that's right, we can focus these
8   presentations and maybe have this one be the longest one you
9   have to endure of this series you are about to engage in.

10      Other than that, I want to thank the court for
11  your great patience today.  I think all of the parties see
12  this as a very significant issue on a whole bunch of levels.
13  I don't necessarily share some of the views of some of the
14  folks here.  I think this court has a function in our
15  system.  I'm not sure that it can be to cure the ills of the
16  world.  I don't think it was a court that remedied the
17  Japanese internment, and I don't think it is fair of us to
18  ask you to do that.

19      But I think it is fair of us to ask you to give us
20  clear guidance, to confirm that what this is going to all
21  turn out to be about is what did an individual defendant do,
22  why did he or she do it, does that offense qualify, is that
23  what the congress had in mind, is that what they meant to
24  capture, is there evidence that that's why it was done, or,
25  given the allegations -- and, again, Mr. Peifer read the

1  allegations in the conspiracy count as if they were "and."
2  They are not. They are "or." This conspiracy is some of
3  the defendants were motivated for this reason, some for that
4  reason, some did this, some did that, or, or, or.

5          The government generally could not hold defendant
6  A responsible for something that he or she was not a party
7  to. And I think that when we get down to it at these
8  individual sentencings, that's what it's going to come down
9  to. Is it group guilt or is it individual guilt. I think
10  if the court agrees with the defendants that this is an
11  individual assessment, the court will find that these were
12  not, certainly Cavel West, was not a qualifying predicate
13  offense, and that Mr. Paul did not act with the requisite
14  motivation. This was not about the government.

15          Thank you.

16          THE COURT: Do either of you wish to respond?

17          MR. PEIFER: Your Honor, one thing I want to point
18  out right away is that the reference to § 1B1.8 of the
19  guidelines regarding the use of certain information doesn't
20  apply to Mr. Paul, doesn't apply to three other defendants,
21  because it only applies where a defendant agrees to
22  cooperate with the government by providing information
23  concerning unlawful activities of others. And the reason
24  they made that plea agreement, Mr. Paul and Ms. Zacher and
25  Mr. Block and the remaining defendant -- I forgot his

1    name -- and Mr. McGowan, of course, the reason they made
2    that agreement was so they wouldn't provide information
3    regarding others.  And so it's just not applicable for them
4    to invoke that provision because it doesn't apply to them by
5    its very terms, on its very face.  They never gave us any
6    information regarding other people.  And every time we asked
7    for information regarding other people, they said no, it's
8    not part of the plea agreement.  So they can't benefit from
9    1B1.8.

10       MR. BLACKMAN:  Could I just respond to that, and
11   then I will go sit down?

12       The guideline says, cannot use information when
13   it's in the context of providing information about others.
14   We were required to provide information about others.  Not
15   names.  Not roles.  But the fact that others were involved,
16   and I think it said, I will read it to you, defendant agrees
17   to participate in disclosure sessions with the government
18   which shall be conducted pursuant to FRCP 11(f), FRE 410,
19   and U.S.S.G. § 1B1.8, and, as described below, provided that
20   defendant shall not be required to reveal information that
21   inculpates others, reveals their identities or would be the
22   functional equivalent of revealing their identities.

23       And then it goes on to say that we must disclose
24   the details of the defendant's own individual conduct and
25   whether defendant acted alone or in concert with others.

1    And we did that, and that is information about others.  The
2    guideline 1B1.8 uses the word "others."  It doesn't say
3    "identities."

4         MR. PEIFER:  Your Honor, the argument about
5    whether the offenses qualify as predicates in this case is
6    answered by reference to the plea agreement and reference to
7    the statute as it existed at the time of the offenses.
8    844(f) was not distinguished in terms of whether it was
9    subsection (1) or (2) at that time under the definition of
10   federal crime of terrorism.

11        And that was -- it was made very clear for all ten
12   defendants that they were agreeing to the guidelines in
13   effect at that time, and the guidelines in effect at that
14   time referred specifically to a provision in Title 18 that
15   was changed later.  And so the agreement supersedes any --
16   any conflict as far as that goes.

17        As far as implying motivation, I didn't want the
18   court to think that I was arguing that just because somebody
19   had motivation A, that another person would necessarily have
20   motivation A.  That's based upon the totality of the
21   circumstances, what the second person knew.  And our
22   position is that, yes, Mr. Tubbs had that motivation.  He's
23   admitted that motivation, or at least that knowledge, in his
24   sentencing memorandum to the court.  And that was based upon
25   something that was commonly known virtually throughout the

1  country.  Anyone reading newspapers about horses would know
2  that this was going on, that Cavel West and that BLM were
3  linked together.  And that's a factual question.  The court
4  will have to decide that at sentencing.

5           As far as using Application Note 4 for a departure
6  as an alternative ground, that, of course, would apply if
7  the court found that in each case for each defendant no
8  crime sufficed as a federal crime of terrorism.  And if it
9  does that, if the court does that, then we are asking you to
10  consider Application Note 4, not because Application Note 4
11  created a new ground for departure, but because, as in many
12  cases of the commentary, and we cite cases to the court on
13  how the commentary is interpreted, the commentary doesn't
14  create new grounds for departures, in this case, not for an
15  enhancement based upon the regular offense level increase,
16  but a departure, it doesn't create the grounds.  In many
17  cases, it recognizes grounds that already preexisted.  And
18  there was a general ground available in cases prior to that
19  time for a departure based on the more generic sense of
20  terrorism as described in that application note.

21           I think we have answered, at least I did in the
22  opening argument, about whether § 371 conspiracies can
23  qualify if the predicate is 844(i), because that was what
24  was listed as a predicate offense at the time of -- the
25  statute was enacted as applicable in this case.

1        As far as how the court wants to proceed regarding
2   justifying, you know, sequential sentencings, that's
3   something we'll have to deal with with each sentencing.   I
4   know that Mr. Engdall will be presenting the evidence
5   against Mr. Meyerhoff, and that will include the actual
6   arsons that he was involved in.

7        Now, one of the defense attorneys, I think it was
8   Mr. Blackman, I'm getting them confused.

9        MR. BLACKMAN:  We are all the same.

10       MR. PEIFER:  Right.

11       Made an interesting statement, Your Honor, and the
12  statement basically was, of course, everybody has to be
13  judged differently based upon their motivation, based upon
14  the facts of their individual cases.

15       And there's no doubt that conventionally the
16  court's going to be presented with the situation in which
17  the court may very well want to deny it -- I shouldn't say
18  no doubt, but the defense will ask this -- deny it for
19  somebody who got it -- the sentencing enhancement for
20  another defendant.  And that's just the way it works.  We
21  judge people individually.

22       But there's no doubt that the court can, under the
23  *Booker* decision and under § 353(a) [sic], can make your own
24  determination about where to sentence, you know, within the
25  guideline range, especially after we make the recommended

1   sentencing reduction for acceptance -- for substantial

2   assistance, because that -- as they point out, that will

3   bring the sentencing range back down into the range that was

4   anticipated under the plea agreement.

5           Unless you have any other questions, that's all I

6   can say at this time.

7           THE COURT: The only thing I want to say is I very

8   much appreciate all the briefing and the work everyone has

9   done, and I don't take these issues lightly. But I do have

10  to say that it's an interesting issue, just generally, and I

11  go to Mr. Weinerman's argument, and that is that the courts

12  make decisions when they are asked to make a decision or

13  required to make a decision. So the court is faced with the

14  obligation of completing the guidelines calculation, and the

15  government has made the request for an application of a

16  particular guidelines factor. And I will make my decision

17  individually and as it affects collectively based on

18  whatever I can glean from this argument helps give you some

19  guidance for your individualized sentencings, which is

20  exactly what we will do, is individualized sentencings.

21          But on the one hand, I will make that legal

22  determination, it doesn't do anything other than to apply

23  the law that the court has to read and apply. It doesn't do

24  anything more than that. And then I will go through the

25  exercise of the sentencing for each individual that, in many

1    ways, Mr. Weinerman has already indicated goes up and then
2    goes down before I even have an opportunity to take a look
3    at what I might do in a particular case, because those were
4    the negotiations that you all entered into before this case
5    came before me on individualized changes of plea.

6         So in other words, today I will give a legal
7    analysis and give the best guidance I can give towards your
8    individualized sentencings, but they are individualized.

9         Now, the issue that Mr. Blackman addresses, and
10   it's come up any number of times, is what is the judicial
11   economy that's accomplished by the individualized dates, or,
12   as Ms. Bloomer and I have discussed, maybe you all need to
13   sit here for ten straight days and we just do it as one huge
14   sentencing.  I think it argues that individualized
15   sentencing should be just that.

16        And we will take a look at these cases and we will
17   give you the guidance we can give you.  But I understand
18   that may be difficult for some people, and they may need to
19   sit in on other sentencings.  But I will just leave that up
20   to you to make your own professional determinations.  But I
21   understand the issues that I have to give guidance on.  I
22   will give you the best guidance I can give you.

23        But by and large, your sentencings will be just
24   that, your own individualized sentencings.  And as clearly
25   as stated by Mr. Weinerman, so much of that information is

1    available in each plea agreement, and those calculations
2    have in fact been done, and I understand what I am required
3    to do today because when courts are asked to make a decision
4    and are required to, I will make that decision.  That
5    doesn't mean necessarily all that the defense would like to
6    implore that it might mean or might label somebody.  It's
7    simply the decision this court has to make based on the
8    requirements of a statutory calculation under the
9    guidelines.  That's all it is.

10   So for today's purposes, thank you very much for
11   your arguments and your -- the way you broke it all up.  I
12   think you covered everything you needed to cover and
13   augmented the briefing that you accomplished.  I appreciate
14   your talking about it.

15   If there are any issues that are going to have us
16   running longer than we expect the time lines to take up, I
17   would like to know that ahead of time, because we are pretty
18   tightly scheduled.

19   If there are any disagreements about how you are
20   going to proceed, I'd rather know sooner rather than later.
21   I'm not going to tell you whether I'm going to have this to
22   you before late Monday, maybe even Tuesday.  We are working
23   as hard as we can to get our rough work done, but I'm just
24   not going to promise when you will have an opinion or when
25   you will have some guidance in writing or whether you will

1  have enough or as much as you would like to have, because I

2  may leave open any number of questions to resolve through

3  individualized sentencings.

4          But again, thank you very much for your time, and

5  I appreciate all the work you did.   Thanks.

6          THE CLERK:   Court is in recess.

7          *(The proceedings were concluded this*

8          *15th day of May, 2007.)*

1        I hereby certify that the foregoing is a true and

2    correct transcript of the oral proceedings had in the

3    above-entitled matter, to the best of my skill and ability,

4    dated this 10th day of August, 2007.

5

6

7    _____
     Kristi L. Anderson, Certified Realtime Reporter

8

9                                        

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25