1    UNITED STATES DISTRICT COURT

2    DISTRICT OF OREGON

3

4    THE HON. ANN L. AIKEN, JUDGE PRESIDING

5

6

7    UNITED STATES OF AMERICA,                )
                                              )
8                        Government,          )
                                              )
9          v.                                 )  No. 06-60069✓
                                              )      06-60120
10   DARREN TODD THURSTON,                    )
                                              )
11                       Defendant.           )
     _____   )

12

13

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                       EUGENE, OREGON

16

17                   TUESDAY, MAY 29, 2007

18                       PAGES 1 - 70

19

20

21                              Kristi L. Anderson
                                Official Federal Reporter
22                              United States Courthouse
                                405 East Eighth Avenue
23                              Eugene, Oregon 97401
                                (541) 431-4112
24                              Kristi_Anderson@ord.uscourts.gov

25

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:  KIRK ENGDALL, ESQ.
 4                        kirk.engdall@usdoj.gov
                          and  JOHN RAY, ESQ.
 5                        john.ray@usdoj.gov
                          405 East Eighth Avenue
 6                        Eugene, Oregon 97401
                          (541)465-6771
 7

 8   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY
                          BY:  STEPHEN PEIFER, ESQ.
 9                        1000 SW Third Avenue, Suite 600
                          Portland, Oregon 97204-2902
10                        (503)727-1044
                          steve.peifer@usdoj.gov
11
     FOR THE DEFENDANT:   DANIEL FEINER
12                        BY:  DANIEL FEINER, ESQ.
                          1030 NW 12th, Unit 5
13                        Portland, Oregon 97209
                          (503)228-2822
14                        dan@danfeiner.com

15

16

17

18

19

20

21

22

23

24

25
```

1                        PROCEEDINGS

2                  TUESDAY, MAY 29, 2007

3            THE CLERK:  This is the time set for Criminal

4    06-60069 and 06-60120, United States of America versus

5    Darren Todd Thurston, imposition of sentence.

6            MR. FEINER:  Good morning, Judge.  Failure to

7    appear was not one of my concerns in this case, but

8    Mr. Thurston appears not to be here.  Here he comes.

9            THE COURT:  Good morning.  Who is batting -- you

10   are up.

11           MR. ENGDALL:  Mr. Peifer is up this morning.

12           THE COURT:  Go ahead.

13           MR. PEIFER:  Yes, Your Honor.

14           Darren Thurston is before the court for sentencing

15   today on one count of conspiracy out of the District of

16   Oregon and one count of arson under § 844(f) out of the

17   Eastern District of California.

18           Mr. Thurston, I believe, is 36 years old today --

19   at this time.  Since 1990, at age 20, he's been in the

20   forefront of the radical animal rights movement, both in

21   Canada and in the United States.  That association over the

22   years has involved both lawful and unlawful activity, and

23   eventually it brought him virtual stardom among the extreme

24   activist community in that field.

25           He began in 1990 with simple acts of the graffiti

1  and damaging billboards, doing the type of things that many
2  people in this case did when they first started out,
3  relatively minor offenses.

4          In 1991, he began to direct his attention to the
5  facilities -- research facilities at the University of
6  Alberta, and eventually there would be crimes committed
7  there.

8          In December 1991, he burned three trucks at a fish
9  company.  He used the ALF publications on timing devices to
10 help him do that.  He was caught inadvertently attempting to
11 reprint a how-to book, booklet on arson, and the printer
12 turned him in to the police, and that's how he was caught.

13         In June 1992, Thurston and his cohort, David
14 Barbarash, who is another major figure in animal rights
15 activities in Canada, they targeted a research station at
16 the University of Alberta, they burglarized it, and they
17 stole 29 cats.  Thurston ended up pleading guilty to that
18 offense, plus the 1991 truck arson.

19         I should note at this time that Mr. Thurston has
20 no criminal history points because those -- even though he
21 has these prior felony convictions in Canada, because of the
22 age of the convictions and the nature of his sentence, they
23 don't count on the -- they don't score any criminal history
24 points.

25         In 1994, when he was on release pending appeal, he

1   went to California, illegally, of course, and he did that
2   for an EarthFirst! gathering.  There he met Jonathan Paul
3   and Kevin Tubbs, two of the members of the conspiracy in
4   this case.  So his association with them goes back at least
5   to 1994.

6          In 1996, he met Jonathan Paul again at an antifur
7   protest in Seattle, and also he began at that time an
8   association with Gina Lynn, who is an animal rights
9   extremist here in the United States.

10          Later in 1996, he stopped off in Eugene for a
11   visit with coconspirator Tubbs.  At that time, of course,
12   there was no conspiracy, but again, it shows their early
13   association together.  He reconnoitered or performed
14   reconnaissance at fur farms in Oregon, Washington, and
15   California, I believe it is, and he did that with Gina Lynn.

16          Also in 1996, he completed the first edition of
17   the book, *The Final Nail, Destroying the Fur Industry, a*
18   *Guided Tour*.  This required, by his own admission, over 500
19   hours of research, and it was a virtual bible for the
20   antifur movement in the United States and Canada.  It was a
21   comprehensive listing of fur farms in the United States and
22   Canada.

23          And a number of those fur farms, over the years,
24   were hit by vandals and those engaged in the release of the
25   animals.

1    *The Final Nail*, authored by Mr. Thurston,

2    instructed on the use of incendiary devices. It was posted

3    on the Internet so it could be widely circulated and widely

4    used. He also produced a second edition of *The Final Nail*,

5    which had added 40 or 50 more farms in the U.S. and Canada.

6          And also at that time, he added more discussion on

7    incendiary devices, and those contributions came from Joseph

8    Dibee, obviously a coconspirator in this case.

9          In 1996 through 1997, Mr. Thurston and Gina Lynn

10   targeted BioDevices Medical Research Lab in Orange,

11   California. They surveilled that location two or three

12   times. They ended up not -- Mr. Thurston ended up not being

13   involved in the actual crimes there, because at that time he

14   was in Canada, back in Canada on his case there. But it

15   was, of course, hit by others, thanks to the planning of

16   Mr. Thurston and Ms. Lynn.

17         In 1997, again, he was illegally in the United

18   States. He planned or attempted attacks on a taxidermy

19   facility in Southern California and a meat company in San

20   Diego. And in connection with the meat company, they were

21   planning to use incendiary devices to cause a fire there,

22   but the plan had to be aborted when a homeless person

23   spotted them and they became aware of that and decided not

24   to commit that crime.

25         In February 1998, he was arrested in California

1    and he was subject to removal to Canada.

2          From 1995 through 2001, Thurston was the ALF's

3    primary publicist and spokesman, operating primarily out of

4    Canada doing that. By his own admission, he posted anywhere

5    from 100 to 200 communiques of various actions, many of them

6    unlawful, which were publicized -- well, actually, they came

7    from all over the world and, of course, were publicized all

8    over the world.

9          And the court knows from the earlier sentencings

10   in this case and the overall nature of the case that

11   publicity was very important to this particular conspiracy,

12   and publicity is very important to those who engage in

13   similar offenses.

14         Up until his arrest in 2005, Thurston hosted Web

15   sites that taught on the Internet about Internet security

16   and anonymity. He also shared with Dibee, Rebecca Rubin,

17   and Tubbs, and others, the use of dead drops, a term that

18   the court's heard already, sharing of unsent e-mail messages

19   as a means of security.

20         He authored *The ALF Primer, A Guide to Direct*

21   *Action and the Animal Liberation Front,* and that publication

22   was also posted on the Internet.

23         He assisted with the reformatting and the posting

24   on the Internet of the publication *Arson Around With Auntie*

25   *ALF: Your Guide For Putting the Heat on Animal Abusers*

1    *Everywhere,* which also was a how-to book, as you can tell
2    from the title, on how to commit arson.

3            He did the same in order to facilitate wire
4    distribution of William Rodgers' book, *Setting Fires With*
5    *Electrical Timers, an Earth Liberation Front Guide.* That
6    was released on the Internet just after the arsons at
7    Jefferson Poplar Farm and the University of Washington, and
8    that was no coincidence, the fact that that came out at the
9    same time as those arsons; added further incentive to the
10    people to commit similar -- similar crimes. And that was
11    what was encouraged by the publication itself.

12            Thurston, for the Animal Liberation Front, worked
13    in conjunction with Craig Rosebraugh, who was the publicist
14    or spokesman for the Earth Liberation Front. They would
15    share information regarding arsons. They did that, for
16    example, in connection with the U.S. Forest Industries arson
17    that occurred in Medford in 1998. As a result of a search
18    warrant of Rosebraugh's computer, the communications were
19    discovered between Thurston and Rosebraugh regarding the
20    U.S. Forest Industries arson.

21            Also they worked together, Thurston and Rosebraugh
22    did, spent hours, according to Mr. Thurston, finalizing the
23    media release for the Vail arson. The media release, of
24    course, was based on the communique that had been authored
25    by Chelsea Gerlach, and that media release did go out

1 | because of Mr. Thurston and Rosebraugh.

2 | Also, Thurston mediated the dispute over the
3 | Jefferson Poplar Farm communique that the court heard about
4 | last week. That was a situation in which Rosebraugh was
5 | basically called on the carpet by Gerlach and others for
6 | changing the wording of the communique. Thurston was
7 | important enough that he could be in Vancouver, British
8 | Columbia, and have Rosebraugh come to him to be dealt with,
9 | and Ms. Gerlach, of course, she came up there as well. And
10 | this, again, shows the significance of his role.

11 | And that was the first time, as the court knows,
12 | that he met Ms. Gerlach, and they continued their
13 | association after that.

14 | When Rosebraugh quit the ELF spokesman position,
15 | it was Thurston who went out and found a Canadian to take
16 | over that position.

17 | Now, in the summer of 2001, there was concern that
18 | Daniel McGowan talked too much, and it was Darren Thurston
19 | who essentially lectured him on why that wasn't a good idea.
20 | Why he needed to keep things to himself.

21 | In October of 2001, we have the crime that
22 | occurred that he's being sentenced for, the arson at the BLM
23 | wild horse facility in -- near Litchfield, which is actually
24 | near Susanville, California. That fire resulted in damages
25 | to the BLM facility in the amount of $122,497.60, so that's

1   an accurate figure that's reported in the presentence
2   report.

3   The other people involved in that arson were
4   Meyerhoff, Dibee, Kolar, Tubbs, and Rubin. Thurston had
5   received e-mails from Dibee and his fellow Canadian, Rebecca
6   Rubin, regarding an upcoming action to be held in the United
7   States without really specifying what it was. Thurston was
8   interested because he understood that Ms. Gerlach would be
9   there and he wanted to meet with her again. As it turned
10  out, Ms. Gerlach was not involved in the arson at
11  Susanville.

12  Thurston and Rubin, of course, being Canadians,
13  had to cross over the border, and they did that illegally,
14  of course, and they went across at a point where they could
15  not be noticed in the wilderness there. They were picked up
16  by Jennifer Kolar, taken to Dibee's house in the Seattle
17  area, and it was there that Thurston learned the nature of
18  the crime. And he particularly asked to be part of the
19  horse release. It was a combination horse release and
20  arson, but he wanted to be involved with releasing the
21  horses.

22  He did help with preparations for the crime,
23  working with the equipment, making sure there were no
24  fingerprints. And they received their maps from Ms. Kolar,
25  clean maps, so there were no fingerprints on those. They

1   left Seattle, and they picked up Tubbs in Eugene and then
2   went down to California.

3           Thurston's role was essentially to cut through the
4   fences and get to the horses to try to funnel them out of
5   the corral into the rangeland there.  He wasn't able to do
6   that effectively, however.  They couldn't -- he couldn't
7   seem to get them to leave the corral.

8           The arson itself was committed by other people, as
9   the court knows from earlier descriptions of that crime.
10  Certainly Mr. Thurston aided and abetted throughout the
11  crime, however.

12          The communique in this case was directed against
13  the government.  Made it very clear that BLM, of course,
14  physically was the target, and it was the target of the
15  plan, itself, to -- it was calculated to retaliate against
16  BLM, to coerce it, and intimidate it from any further action
17  regarding the capture and corralling of wild horses.

18          The communique condemned BLM for, quote, rounding
19  up thousands of wild horses and burros to clear public land
20  for grazing cattle.  Many of these wild animals are sent to
21  slaughter.  And then it warned of future action.  Quote, we
22  will continue to target industries and organizations of this
23  nature.  That was in October of 2001.

24          From 2001 through his arrest on December 7th of
25  2005, in Portland, Thurston was personally involved,

1  romantically, and also engaged in criminal activity with

2  Chelsea Gerlach. They did commit numerous crimes together

3  in the interim period. They supported themselves selling a

4  variety of drugs, Ecstasy, LSD, and marijuana.

5       Thurston, of course, was an illegal alien, a

6  criminal alien because of his prior felony convictions,

7  living in the United States, periodically crossing the

8  border back into Canada and illegally entering the United

9  States again. This went on from 2002 to 2005. And these

10  border crossings, of course, were in very remote areas and

11  involved quite a bit of effort to cross the border without

12  being noticed. He traveled with Ms. Gerlach. Before they

13  lived in Portland, they lived in San Francisco for a while,

14  rented property there, an apartment, under a false name.

15       By his own admission, he and she went to New York

16  and New Jersey to perform reconnaissance at sites owned by

17  the Monsanto Corporation, a bioengineering firm, and

18  possible attacks. There's no indication that they engaged

19  in any actual attacks, but their purpose was to reconnoiter

20  those sites.

21       He did move to Portland with Ms. Gerlach in 2003,

22  where he lived until their arrest on the same day. Thurston

23  went by the name Ian Holladay, but he had other

24  identification in another name, a true living Canadian,

25  whose name he was carrying on a phony green card, as well as

a Canadian identification card, the equivalent of a Social Security card in the United States.

He also had received identity cards from Kevin Tubbs. The court will recall that Mr. Tubbs would take those when they were left by mistake at the store where he worked, and then he would collect them himself, and he delivered some of those to Mr. Thurston. And Mr. Thurston made purchases with stolen credit card numbers. I think in particular he bought a computer with a stolen credit card number.

In 2003, he and Ms. Gerlach performed reconnaissance of a predator research station in Utah and facilities at Utah State University and Logan State University. In 2003, they dug up a cache of firearms, the court knows that they were buried in rural Lane County, and then reburied those at the coast.

Thurston and Gerlach went to a gun show in Las Vegas where she purchased two firearms for him since he couldn't purchase firearms because of his status as a convicted felon and illegal alien, plus purchased ammunition, cannon fuse, and books on detonators and incendiary devices. Those were the items that were pointed out by Ms. Gerlach in the Siuslaw National Forest and were dug up and are in the government's possession at this time. Mr. Thurston is agreeing to forfeit those firearms or

1   abandon those firearms to the government as part of his plea
2   agreement.

3           Mr. Thurston worked with a representative of
4   Mexico's Zapatista guerrillas in Redway, California.  He
5   demonstrated the explosive HMTD, an explosive that he
6   actually manufactured, that Mr. Thurston manufactured in
7   Portland.  And they tested it there in Redway, California by
8   blowing up a stump for the benefit of the representative of
9   the guerrillas.

10          Your Honor, the sentence recommendation by the
11  government in this case is the lowest of all the ten
12  defendants before the court.  37 months.  Mr. -- I think it
13  was Weinerman last week referred to the Bell Curve, and
14  Mr. Thurston, by virtue of his participation in only one
15  arson and his relatively minor participation in that arson
16  is at the bottom of the Bell Curve, so we are requesting 37
17  months.  Of course, that's because also there should be a
18  substantial reduction for his -- not just for his acceptance
19  of responsibility, but his continued cooperation,
20  substantial cooperation with authorities in the
21  investigation and prosecution of this case and providing
22  information about a whole array of activities that I have
23  discussed just now and providing information on other
24  people.

25          We have done our best, Your Honor, as you know, to

1  present to the court ten proposed sentences, proportionate

2  sentences, and he is -- he fits within the very bottom of

3  that list of proportionate sentences.

4  The reason we are asking for the -- the minimal

5  role in this case is that he was in it essentially for the

6  horse release, not for the arson. There's no doubt he aided

7  and abetted the arson. He was there to meet Ms. Gerlach,

8  who turned out not to be there. And that was apparently the

9  reason he crossed the border to begin with. And of the six

10  participants in the arson, there's no doubt that he did the

11  least in terms of the arson itself.

12  We are seeking -- in order to be consistent in all

13  these cases, and this case is a good example of one, we are

14  seeking the terrorism enhancement under the guidelines. It

15  factually meets the requirements of the guidelines as far as

16  being calculated to retaliate against the government and

17  coerce and intimidate the government, specifically BLM, in

18  reference to the wild horse program.

19  The only question is whether, and Mr. Feiner I'm

20  sure will have quite a bit to say about this as well, and

21  the court has addressed it in your opinion, the only

22  question is whether the change in law that occurred several

23  days later with the Patriot Act should work to his benefit,

24  and I just have a few remarks about why that should not work

25  to his benefit in this case and, in fact, would be an

1  exception to the plea agreement.

2         The basic problem with -- there are two problems

3  with his argument.  The first is that the plea agreement,

4  and it's the same for all the defendants, specifies what

5  guideline manual applies for calculation purposes.

6         That was an agreement of all the parties, and a

7  conspiracy has occurred in this case, not just with

8  Mr. Thurston, but all the defendants, that involved crimes

9  that occurred from 1996 through 2001.

10        It was essential, in order to make the plea

11 agreement essentially work and be meaningful for all the

12 parties that one book be agreed on.  And that's why the --

13 the sentencing guidelines that went into effect on November

14 the 1st, 2000, were chosen.

15        And the court knows that generally speaking, there

16 is a one book rule, that when you choose a book, you stay

17 with that book.  There could have been books in this case

18 from any of the other years as well, but they were all --

19 everybody agreed that the 2000 guideline manual would be the

20 one applicable.

21        According to the plea agreement, and this is the

22 exact language, guidelines calculations should be derived

23 from -- the parties agree, guideline calculations should be

24 derived from the United States Sentencing Commission

25 Guidelines Manual with effective date of November 1, 2000.

1  In other words, that when the court is looking at the

2  calculation in the guidelines, that that book and that book

3  alone is controlling.

4  Now, of course, in Mr. Thurston's case, that is

5  the guideline book that is applicable or would be applicable

6  even without an agreement, because his crime occurred after

7  November 1 2000, namely in October of 2001. Essentially

8  what this agreement does is freeze the state of the law in

9  effect at that time on that date and makes that guideline

10  manual alone applicable.

11  Now, as the court noted in your opinion, we are

12  actually dealing with the change in a statute here, a

13  statute that's referenced in the guideline, but the actual

14  terms of the statute are not -- not set out in the

15  guideline, but the statute itself is the controlling factor

16  for purposes of defining a federal crime of terrorism.

17  The fact that that statute changed should have no

18  effect on this defendant, no benefit to him. That change

19  occurred, of course, after the date of the crime. The crime

20  was complete on October 15th of 2001.

21  As the court notes in the opinion on Page 32, the

22  defendant should not be entitled to benefit -- defendants

23  generally are not entitled to benefit from future statutory

24  changes. Now, that's true in general. It should be even

25  truer in a case like this where they -- all the parties have

1    agreed to what is applicable to their case so that the plea
2    agreement and the existing statute in effect on
3    October 15th, 2001, essentially froze the law in effect at
4    that time and on that date, and that's what should be
5    applicable to Mr. Thurston. Otherwise, he would -- he would
6    basically have a windfall from a future -- a future
7    statutory change that didn't apply to him.

8            The court asks in the opinion whether the rule of
9    lenity applies. Well, the rule of lenity only applies if a
10   question is truly ambiguous, and we submit that it's not
11   ambiguous here. That on October 15th, 2001, only one
12   guideline book and only one definition of federal crime of
13   terrorism existed. And there's simply nothing ambiguous.

14           I imagine Mr. Feiner will say, well, the guideline
15   book says that when you have two overlapping crimes, then
16   you use the more recent guideline manual. Well, that was
17   the whole purpose of the agreement, was to prevent that type
18   of two book approach and to limit it to just one book,
19   namely, the book that I have here with the blue cover that
20   was in effect on the date of the crime.

21           Your Honor, the government's sentencing
22   recommendation is 37 months, and we ask the court to achieve
23   that sentence as follows: With the application of the --
24   excuse me -- the base offense level, of course, is 20. And
25   then we ask for a 12-level increase for the terrorism

1    enhancement.  If the court disagrees with our analysis under

2    § 3A1.4, we ask that the court nonetheless depart upward, as

3    has been done in other sentencings in this series of cases,

4    in order to reach the same result through the court's

5    general discretionary authority to depart upward, because,

6    as the court has explained in the other sentencings, the

7    purpose of the activity here was the same as that covered in

8    a meaningful way by the enhancement under the guidelines.

9            That leads to Criminal History Category VI and an

10   Offense Level 38.  We ask the court to depart -- not depart

11   downward.  This is actually a -- not a departure itself, but

12   simply an adjustment, an adjustment downward four levels for

13   minimal participant, as I have explained, which leads to

14   Level 34.  Then three levels for acceptance of

15   responsibility takes it down to Level 31, Criminal History

16   Category VI.

17           Then we are asking for a substantial assistance

18   downward departure no greater than 17 levels.  The purpose

19   of that is to get the defendant down to Level 14, Criminal

20   History Category VI, which would be a range of 37 to 46

21   months.

22           THE COURT:  I think you need to go back to your

23   calculations because I don't think I see what you are doing.

24   And I'd like you to --

25           (The court conferred with the law clerk.)

1          THE COURT: Yeah. And -- I know.

2          You are in conflict with the PSR, so I just want

3  you to highlight for me why --

4          MR. PEIFER: Well, the PSR doesn't recommend

5  minimal, it recommends minor role.

6          THE COURT: No. It's more than that.

7          MR. PEIFER: So it's a two-level difference there.

8          THE COURT: So walk through it. It's a base level

9  offense of 20.

10         MR. PEIFER: Right.

11         THE COURT: You add 12 levels for your requested

12  terrorism enhancement or the alternative theory, which then

13  is 32. There is an judgment for role --

14         MR. PEIFER: I'm sorry. 32. Right.

15         THE COURT: 32. You said 38. So that's -- I just

16  want you to go back and do your calculations on the record.

17         MR. PEIFER: Right, Your Honor.

18         You take off four for minimal participant, so

19  that's 28, and then three for acceptance of responsibility,

20  25.

21         And then, Your Honor, at that point, the range is

22  110 to 137. So then we go down as far as necessary to get

23  to 37 months, which is 11 -- I'm sorry -- 11 levels down.

24         We -- in each one of these cases, as you have

25  noticed, I'm sure, so far, we have built in enough leeway so

1　that there could be a greater departure, if necessary, to
2　get down to the recommended sentence, so.

3　　　　THE COURT: I just wanted to make sure I had the
4　calculations on the record.

5　　　　MR. PEIFER: I apologize for that. I had some
6　numbers wrong. So that's an 11-level downward departure to
7　37 to 46.

8　　　　Your Honor, I think Mr. Feiner has been very
9　helpful, and the other attorneys too, for that matter, in
10　noting the fairness and reasonableness of the government's
11　recommendations in these cases and the fairness of the plea
12　agreement, even though they are free to argue for less. We
13　submit that 37 months is -- is a fair, reasonable sentence
14　under all the circumstances for the type of participation
15　that Mr. Thurston engaged in in this case.

16　　　　Now, the court, I recognize, and respectfully, has
17　disagreed with us on the other three defendants and reduced
18　it a little farther in their cases for a number of reasons,
19　but we submit this is not one which should merit any further
20　reduction. 37 is sort of a rock-bottom sentence for this
21　type of activity.

22　　　　And before I finish, I just want to make one other
23　point.

24　　　　THE COURT: What I'm actually going to tell the
25　defendant shortly is he's lucky I'm not going to go up. I'm

1    free to go up or down, and he's very lucky, given the nature
2    and circumstances of the plea agreement, my attempt to honor
3    those plea agreements, that I'm not going to go up.

4             MR. PEIFER: I just wanted to say one thing. This
5    case, of course, is out of the Eastern District of
6    California. The government conferred very closely with
7    prosecutors on this case in Sacramento, the Sacramento
8    office of the U.S. Attorney's Office. Particularly, the
9    prosecutor we were dealing with almost exclusively was the
10   prosecutor in the Unibomber case. He prosecuted Ted
11   Kaczynski. He's very familiar with various types of
12   terrorism from the most extreme down. And he -- he agreed
13   that in a case like this with someone cooperating as
14   extensively as Mr. Thurston did, being as limited as he was
15   in his involvement in the overall conspiracy, that he agreed
16   that 37 months was -- or is the appropriate sentence from
17   their standpoint.

18            Thank you.

19            THE COURT: Mr. Purdue, do you just want to
20   explain the difference? They have reached a four for
21   planning, role adjustment. Do you just want to tell me why
22   you have a two?

23            MR. PURDUE: I just felt, Your Honor, that just
24   his involvement from the time he began and the activities
25   that they were involved in, it just -- I didn't feel like he

1    was more or else culpable than all other defendants, and

2    that was the difference.

3              THE COURT:  Thank you.  Anything else?

4              MR. PEIFER:  That's all.

5              THE COURT:  Mr. Feiner.

6              MR. FEINER:  Thank you, Your Honor.

7              At the outset, I have a number of nuts and bolts

8    issues that I just want to go over and make -- number one,

9    make sure I understand, and then a couple of issues related

10   to the language in the PSR.

11             The first, I didn't raise it at the outset here,

12   but I have been working under the assumption that the court

13   made a ruling on the second day of the Meyerhoff case when I

14   wasn't here that 1B1.8 applies to all the defendants in this

15   case; is that correct?

16             THE COURT:  I have applied it that way.

17             MR. FEINER:  Okay.  I just wanted to make sure

18   since I had not separately filed anything.

19             Secondly, I'm referring to the presentence report

20   now.  There's a paragraph in there which I objected to by

21   sending a dismissal notice and an e-mail to Mr. Purdue, and

22   I would like to ask the court to consider asking that that

23   paragraph either be removed or substantially amended from

24   the report.  And I have mentioned this to Mr. Purdue this

25   morning.  I'm referring to Paragraph 57a.

1            That paragraph concerns a protest that occurred in

2  October of 1990 that my client was party to. Subsequent, or

3  in the course of that protest, he was stopped for

4  jaywalking. A weapon was found in his possession. He was

5  charged. The case sat because of identity issues and also

6  lack of law enforcement contact with Mr. Thurston until this

7  case came up, and then he was connected back to the name

8  Darrell Thorton, and that case was rediscovered. It was

9  ultimately dismissed by the Multnomah County District

10  Attorney's Office.

11            What concerns me about this is that the paragraph

12  in here, first of all, is outside my normal experience with

13  presentence reports regarding dismissed, unconvicted

14  conduct, in that it has a considerable amount of information

15  rather than an identification of the charge and a dismissal.

16            More significantly, what bothers me about it is

17  that it certainly creates an inference that my client was

18  involved in the White Aryan Resistance Movement, and that

19  that's why he was at the courthouse protesting Mr. Metzger.

20  That cannot be further from the truth. My concern about

21  that being in there is we heard from Mr. Cox, the BOP

22  representative, what the BOP does when they perceive someone

23  is a member of a disruptive group.

24            My client is not a member of any Aryan

25  organization, any white supremacist organization. What he

1    was doing at the Metzger trial, in fact, was appearing there

2    as a member of a group called The Skinheads Against Racial

3    Prejudice. And they were largely persons involved in the

4    music culture who were opposed to Mr. Metzger and the

5    skinheads who are the White Aryan Resistance skinheads. And

6    they came there just to be a counter-presence.

7         I'm not trying to justify what Mr. Thurston did in

8    terms of using a false name, in terms of carrying a weapon,

9    but this could be extremely misleading, and we would just

10    ask the court to consider either asking that it be amended

11    or just have the text of the crime deleted from it.

12         THE COURT: I have modified presentence reports in

13    earlier cases because not only Ms. Wood raised these issues

14    in open court, but also did a follow-up letter because she

15    had issues with regard to the specificity and lack of

16    corroboration on some of those items, and as a result,

17    Mr. Purdue went back and reviewed his PSR.

18         In addition, Mr. Tubbs' letter was filed late by

19    Mr. Friedman. I asked Mr. Purdue to go and, in the normal

20    course of his review, address those issues.

21         I believe those have all been addressed, correct?

22         MR. PURDUE: Just on the Meyerhoff case.

23         THE COURT: Mr. Meyerhoff is done. So Tubbs is in

24    the works. We'll take that under advisement. I don't have

25    any difficulty eliminating the additional language and just

1  noting that there was -- it's been dismissed. I think
2  that's a fair statement with regard to how we have handled
3  other matters addressed in any number of presentence reports
4  that have been filed.

5      It is additional information, and it would have
6  the potential, I think, of blocking his placement in a less
7  secure facility and increasing his risk severity count,
8  perhaps unnecessarily.

9      MR. FEINER: I appreciate it.

10     Also, just -- and I have already mentioned this to
11 Mr. Purdue, but the restitution figure was corrected in
12 Paragraph 83. There are two references in Paragraph 30 and
13 in Paragraph 40 which uses the old figure. Insignificant,
14 but --

15     THE COURT: No. But those are -- we try to do --
16 do it correctly, and if we can make those modifications,
17 there's no reason we can't do that.

18     MR. FEINER: And then finally, the last paragraph
19 that we -- this was not part of my objection letter. In all
20 honesty, I didn't notice it until I was talking to my client
21 about it yesterday, so if it can't be done, I accept
22 responsibility for that, but I would at least like to point
23 it out to the court, if it can't otherwise be adjusted, and
24 that is Paragraph 29 has a second sentence that says, "They
25 traveled to Seattle, Washington, and met with Mr. Meyerhoff

1   and planned the arson at the BLM horse facility."  I think
2   even just by the government's presentation this morning,
3   it's clear my client did participate in the planning of the
4   action, but throughout the course of this particular
5   incident and the planning of it, he absented himself from
6   planning of the arson.  And I note from my conversations
7   with Mr. Purdue, he regards arson and actions as sort of
8   interchangeable, and I'm thinking that that may be why it's
9   in there in this way.  But if it is possible to amend that,
10  we would also appreciate it.

11          THE COURT:  I don't think -- you don't have any
12  objection to that?

13          MR. PEIFER:  No.

14          THE COURT:  That comports with your what analysis
15  is and your sentencing statement?

16          MR. PEIFER:  Exactly.

17          THE COURT:  Mr. Purdue, would you make that
18  modification as well?

19          MR. PURDUE:  I will, Your Honor.

20          MR. FEINER:  All right.  The next subject that I'd
21  like to talk about would be the terrorism enhancement issue.

22          First, I'd -- I'd like to focus for a second on
23  Mr. Peifer's discussion of the plea agreement, how it got to
24  be where it was and whether or not, as he says, there was
25  anything in that agreement that bound us to a particular

1   state of the November 1st, 2000, sentencing guideline book.

2           First of all, it's my understanding that the

3   reason we ended up dealing with the 2000 book, and I could

4   be wrong on this, I was told this by another one of the

5   defense counsel, was because, for some of the defendants,

6   there was a concern that the amendment to 3A1.4 that came

7   along later authorizing the upward departure for acts which

8   would not be considered crimes of terrorism might create an

9   ex post facto situation.  So there was a determination by

10  the government, prior to my ever participating in any plea

11  negotiations, that the 2000 book would be used.

12          I recall, during the course of that discussion,

13  suggesting that, as far as my client went, we were not

14  concerned about ex post facto application of that particular

15  section, and we were prepared to proceed as the

16  guidelines -- with the book that's in force at the time of

17  sentencing.  Basically, I was told that we were going to be

18  using one book for all the defendants and that we would be

19  accepting the 2000 book if we were going to negotiate, which

20  we did.

21          And I point that out because later on in this

22  presentation, I will refer to how plea agreements are to be

23  construed specifically because of the fact that the

24  government's in control of those plea agreements.

25          I also think it's fair to say that at the time

1   that we all agreed to those plea agreements, none of us

2   understood the consequence of the Patriot Act amendments to

3   3A1.4. From subsequent conversations that I have had with

4   Mr. Engdall, I feel comfortable saying that we were all kind

5   of in the dark at the time as to the fact that there had

6   been an amendment that might change the appearance of the

7   terrorism enhancement.

8           When Mr. Peifer says there was an agreement that

9   we use one book, and I believe I heard him say that, perhaps

10  what I'm arguing is in one way or another, in contravention

11  to the plea agreement, that really can't be further from the

12  truth.

13          As I mentioned during the terrorism enhancement

14  discussions that we had, we accept the 2000 book. That

15  simply is not an issue. And the book as it existed on

16  November 1st is the book as it existed on October

17  October 30th of 2000.

18          What changed was the statute, which was adopted

19  and incorporated by reference into the book. We didn't

20  agree that we would accept the October 2000 book as it

21  existed on October 15th or as it existed on October 30th.

22  We just said that we would accept that book. And we have

23  accepted that book. If you look at that plea agreement,

24  including the language that Mr. Peifer read, there is no

25  attempt to limit it to the book as it existed on the day it

1   was drafted or on the day that it expired. It's simply left
2   as an undiscussed, unagreed upon issue because none of us
3   knew that there was an issue there at the time.

4           So in essence, what's going on at this point is
5   backing and filling and trying to make sense out of what we
6   agreed to, not knowing it was there.

7           In doing some extra research based on the court's
8   opinion, I, over the weekend, reflected on the sentencings
9   that you have held for the prior three defendants in this
10  case, and a little light went off in my head, something that
11  I hadn't thought of in any of the prior briefings or
12  arguments but I think actually is a controlling factor in
13  this particular issue. And that is the fact that at the
14  beginning of each sentence you pronounced so far in this
15  case, you have begun by grouping the offenses. You have
16  grouped the conspiracy and all the substantive offenses
17  involved in the case, calculated them out into the
18  guidelines, and given a solid or a single sentence to each
19  of the defendants.

20          And in fact, in Mr. Thurston's case, the
21  presentence report, and I'm sure the government and Your
22  Honor will look at it the same way, is substantive crime of
23  arson is going to be grouped with his conspiracy count.

24          So I understand that the court, in your opinion,
25  was not ready to accept the concept of the one book rule of

1    1B1.11, taking a crime that was before an amendment to the

2    guidelines or a revision, I think is the term that they

3    used, and saying that the conspiracy came after the revision

4    and the arson came before the revision, and therefore, as

5    that section provides, it would -- you would use the later

6    date.

7              But the fact is, prior to there ever being that

8    rule, the common procedure under the guidelines was that

9    when counts were grouped for purposes of determining a

10   guidelines sentence, the date of the last grouped crime

11   would be controlling. And if there had been a change to the

12   guidelines in the intervening period, as long as the ex post

13   facto rule didn't provide otherwise and require that you go

14   back to the earlier date, and I would remark that it does

15   not in this case, we have no ex post facto issues that we

16   are arguing, that the last of a series of crimes that was

17   grouped would be the one that controlled which version or

18   book of the guidelines was utilized.

19             And I have a Fifth Circuit case that I provided to

20   the court and the prosecutors this morning that I would just

21   like to point out some language from.

22             Okay. So the case -- whoops. The case is *United

23   States v. Kimler*, 167 F.3d 889. That's a Fifth Circuit case

24   from 1999. And in the course of the *Kimler* opinion on -- I

25   can hardly see this. It looks like it's Page 894. The

1   court there talked about the fact that this use of the last
2   day of the last incident of the grouping became controlling,
3   and they said that a number of other courts had previously
4   ruled that way. They cited a case called *Bailey*, which was
5   out of the Eleventh Circuit.

6          And I'd just like to highlight the portion of the
7   opinion dealing with that. And it said, and this is
8   referring to the *Bailey* court:

9          "The court reasoned that the one book rule,
10       together with the guidelines grouping rules and
11       relevant conduct, provide that related offenses
12       committed in a series shall be sentenced together
13       under the sentencing guidelines manual in effect
14       at the end of the series. Thus, a defendant
15       knows, when he continues to commit related crimes,
16       that he risks sentencing for all of his offenses
17       under the latest amended sentencing guidelines
18       manual. Analogous to a continuous criminal
19       offense, like conspiracy, the one book rule
20       provides notice that otherwise discrete criminal
21       acts will be sentenced together under the
22       guidelines in effect at the time of the last of
23       those acts."

24          So that's exactly the situation that we have got
25   here.

1       Secondly, then, in the holding on the *Kimler* case,
2   which is on Page 895, the court indicates that it agrees
3   with *Bailey* and other courts that have faced the issue, and
4   then goes on to say, "Application of the revised guidelines
5   thus does not violate the ex post facto clause."

6       So this court actually is even saying that if the
7   amendment that occurs or the change that occurs works to the
8   detriment of the defendant, the ex post facto clause is
9   superseded by this analysis. The Ninth Circuit, and I will
10  just provide the cite for that, has said that that isn't the
11  case in an ex post facto situation.

12      But in this case, because *Kimler* was sentenced
13  under the sentencing scheme in place when he committed the
14  counterfeiting offense, the last offense in the series of
15  grouped offenses, he was on notice that the revised
16  guidelines would apply to his mail fraud counts as well.

17      So the Ninth Circuit takes up something related to
18  this in *United States v. Orltand*, which is 109 F.3d 539, in
19  1997. And I just point that out because in that, they
20  decline to follow the previously set -- or the opinion in
21  cases like *Kimler*, but it wasn't based on anything that I'm
22  asking the court to pay attention to here today. It was
23  based solely on the fact that the Ninth Circuit believed
24  that if, in a course of a series of grouped cases, there was
25  a change in the guidelines that created an ex post facto

1  situation, that in fact, that last offense that was affected

2  by the ex post facto change had to be sentenced differently

3  than the other grouped offenses.

4  So I would suggest to the court that we have got a

5  situation which is entirely consistent with the *Kimler* case

6  and the cases cited in *Kimler*, and that under the grouping

7  rules, the conspiracy case, which concluded on October 30th,

8  is the last in the series of two offenses that were grouped

9  here, and that the guidelines as they existed, the 2000 book

10  but with the amendment to the Patriot Act that the court's

11  already ruled applies to the conspiracy case, should be the

12  one that is utilized and that the terrorism enhancement

13  should not be applied to Mr. Thurston.

14  I also -- I will do this one briefly because I

15  think it's really a secondary argument at this point to the

16  grouping issue, and that is asking the court to reconsider

17  the revision of the guidelines portion of 1B1.11. And the

18  reason for that is if you look at the language in 3A1.4, it

19  makes it very clear that what they are doing is adopting and

20  incorporating by reference the text of 2332b, the

21  Definitions section.

22  The sentencing commission, when they drafted the

23  guidelines, could have put a definition into 3A1.4, but

24  instead of doing that, they just referred to the language in

25  2332b and said, we adopt that.

1          Congress has the ability to amend the guidelines

2 to protect that. One example that comes to mind where the

3 change in the guidelines, the amendment was actually

4 initiated by Congress, not the sentencing commission, and

5 what the sentencing commission did, or the guidelines

6 commission in 3A1.4, is basically outsourced to Congress the

7 ability to change the definition of what is a federal crime

8 of terrorism for guidelines purposes simply by redefining

9 what it was, or 2332b. So although it is not actually a

10 guidelines revision in the terms of a new book of the

11 guidelines coming out, it, in fact, occupies the same

12 position of being a change in the text of the guidelines.

13          Mr. Peifer talked about the one book rule and how

14 that's what, you know, we are all instructed to follow. I

15 would point out to the court that, really, the one book rule

16 is what's going to suffer most if a different definition of

17 federal crime of terrorism is applied to the arson case and

18 as opposed to the conspiracy case. The one book rule, the

19 intent of that is that with one defendant, he should be

20 sentenced using just a single book of the guidelines. And

21 the court's already ruled that the conspiracy charge is to

22 be sentenced under the guidelines as they existed after the

23 amendment. And I would suggest that the one book rule, as

24 it is stated in 1B1.11 in the language which refers to the

25 later crime drawing up the earlier crime, in fact, would be

1   enforced and complied with here were the court to analogize,
2   at the very least, the change in the definition of 2332b to
3   an amendment to the sentencing guidelines.

4          I know that you mentioned in your opinion, there
5   was some discussion of the savings clause, and Mr. Peifer, I
6   believe, also just mentioned the idea that a criminal
7   defendant shouldn't benefit from a change in the statute.

8          Well, first of all, I'd point out that that
9   happens all the time in the guidelines.  There are
10  detriments and benefits occurring because a person normally
11  is sentenced under the -- the instruction of the commission,
12  is to be sentenced under the book in effect at the time of
13  sentencing, and it's not uncommon that there's some benefit
14  that accrues between the commission of the crime and the
15  sentencing of a defendant.  The only time we don't follow
16  that is if there is a detriment, which is what's prohibited.

17         And then in terms of the -- just confirming the
18  court's -- both the bringing up the savings clause and then
19  saying -- mentioning that we are not really dealing with an
20  exact situation involving savings clauses here because
21  criminal liability isn't conferred by 2332b in this case,
22  the *Harris* case, which was cited earlier by the government,
23  yeah, during the earlier arguments, and this is the case
24  where the person threw the firebomb in through the municipal
25  building where his -- I believe his father had been held by

the police, this just points out, number one, that the definition of federal crime of terrorism is imported into the guidelines from 2332b, and it says, just the first line of it, "The sentencing guidelines do not predicate an upward adjustment on a violation of 2332b."

And the reason this came about in the *Harris* case was that Harris was saying, hold it. This isn't just a definition we are referring to. You have got to look at it in the context of all of 2332b, and we require conduct which -- we should require conduct which transcends national boundaries to be involved. The court disposed of that rather quickly and said, no, this isn't -- the reference back to 2332b is not one that deals with the conferring of liability. It is merely used for definitional purposes.

So I would suggest that the -- if we are going to make any analogies here, the analogy to an amendment to the guidelines is much more accurate and much more in keeping with the stated purpose and intent of the one book rule than any type of analogy that would consider this one that would be affected by the savings clause.

I actually don't think there's necessarily an ambiguity left after this. I believe that this evaluation would resolve the issue. But if at this point the court is still not feeling like the issue is resolved in one way or another, clearly, I would suggest that this really is a

1   situation for the rule of lenity because there is an
2   ambiguity. It's something that the guidelines -- the
3   sentencing commission and the drafters of the guidelines
4   don't seem to have ever contemplated would exist, and it's
5   facing us now. As far as I can tell, this is the first time
6   this particular issue has ever come up. Be it operation of
7   the rule of lenity or be it just an operation of what is a
8   reasonable sentence and a reasonable interpretation of the
9   guidelines here, it would be our position that ruling in
10  favor of the defendant on this particular issue is
11  reasonable and is in keeping with all the intention
12  expressed in the guidelines.

13          Finally, I would like to, then, move to my client
14  and his sentencing at this time on this case. We have not
15  seen a picture of where this event occurred, and before I
16  start, I would like to just provide the court with a visual
17  image of where this Litchfield corral is.

18          Okay. This is a big picture of the desert, and if
19  I can find the right tool, here, for placement purposes, is
20  the Litchfield corral that was the subject of this arson.

21          From a more close perspective, this building right
22  here is the hay barn that actually was set afire. You can
23  still see some of the hay underneath the roof. This is a
24  replacement, by the way. This was not the building as it
25  existed at the time of the fire.

1          And these fences over here are similar to the

2 fences that my client was preoccupied during the course of

3 this offense.

4          Mr. Thurston has lagged behind a number of the

5 other defendants or most of the other defendants in this

6 case in the sense that he was initially arrested and charged

7 only with immigration violations. And that was back in

8 December of 2005. At the time that he was originally taken

9 into custody, we didn't receive any of the information

10 regarding these offenses. Other people were able to look at

11 reports and begin to make decisions, and we were not --

12 although I think there was a suspicion that something might

13 come along, we were not even sure and I was not being told

14 at that time whether he would ever be incorporated into this

15 particular offense.

16          At that stage in the case, and I am -- my memory

17 is that this preceded the filing of the superseding

18 indictment in the case, which was the first time he was

19 actually charged, but it may have come right around that

20 period of time, I learned that, in fact, Chelsea Gerlach was

21 going to be cooperating with the government.

22          And to understand my client's character, I think

23 it's important to repeat to the court, I was concerned when

24 I went in and told him that. And I think it's important to

25 repeat to the court what he said to me at that time, and

1   that was he simply asked me to attempt to communicate to her
2   lawyer that he understood what she was doing, that it did
3   not cause a problem to him, meaning it didn't upset him that
4   she was doing it, not that it wasn't going to cause problems
5   for him, and that he encouraged her to go forward with it,
6   despite the fact that there might be some detrimental effect
7   to him.

8          So as a first part of my client's character, and I
9   think it's reflected in how the government treated him and
10  it's reflected in terms of the way his peers have treated
11  him, is he is a person who has not run away from personal
12  responsibility. He's not a person who has attempted to use
13  or influence another person, especially in this case, to his
14  benefit.

15         Now, ultimately, we were approached regarding the
16  conference that Mr. Weinerman mentioned or Mr. Ehlers
17  mentioned. I can't remember exactly which one. I guess it
18  was Mr. Weinerman meeting with Chelsea Gerlach at the U.S.
19  Attorney's Office.

20         At the time that my client agreed to that meeting,
21  we had still not received any discovery related to the
22  Litchfield incident. We had at that point begun to receive
23  discovery, but nothing regarding the offense that he was
24  involved in.

25         I prevailed upon Mr. Engdall to provide me with a

1  few reports because of the decision we were facing and
2  choices we were going to have to make, and he did. He gave
3  me four reports of witnesses talking about the Litchfield
4  incident, all of them redacted to disguise or at least make
5  it difficult to figure out who it was who was speaking. And
6  the instructions I had was that I could read them so that I
7  could advise my client, but I was not allowed to provide
8  them to him or discuss them with him.

9          So at the time that Mr. Thurston went into this
10 meeting with Chelsea Gerlach to talk about cooperation with
11 the government and accepting a plea offer in the future, he
12 went in virtually blind as to the nature of any of the
13 information that the government had against him.

14         There's no question that she was persuasive, and I
15 think you probably have a good idea from the way she spoke
16 on Friday how articulate she is and how persuasive she is.
17 But I believe it's worth pointing out that if my client was
18 not predisposed to resolve his case at that time, he never
19 would have had that meeting with her. He knew what the
20 meeting was about. He knew what she was going to say to
21 him. And he was moving in that direction at the time that
22 he walked into the meeting to talk with her.

23         What about that meeting stays in my mind more than
24 anything is the degree of emotion that was involved. I was
25 present when the comment attributed to Mr. Peifer was made,

1 and I agree. There was -- my comment to my investigator

2 when I walked out was I could have spent an extra year

3 trying to humanize my client for the prosecutors, and I

4 couldn't have accomplished anywhere near as much as what

5 took place in that room in one or two hours that we were all

6 sitting there.

7 My client sat on one side of the table and

8 Ms. Gerlach sat on the other. They were not allowed to have

9 any private conversation. They were allowed at one point

10 during that meeting to touch hands. And I remember seeing

11 them there talking. I don't recall the conversation --

12 certainly the excerpts that -- that Mr. Weinerman read to

13 the court were -- although they sound familiar from the

14 meeting, were a minor part of what went on there.

15 And the reason I go back to them is in the back of

16 my mind, I have this sense that having heard those excerpts,

17 in some way Mr. Thurston's ultimate decision to resolve his

18 case here is somewhat diminished by the fact that Chelsea

19 Gerlach had said to him before he made that decision, this

20 is what I'm doing. And I would just hope that the court

21 would not -- as you mentioned, each person comes to these

22 decisions, requires different types of information,

23 different decision-making process. And I would hope that

24 the fact that Chelsea was urging Mr. Thurston to do this

25 doesn't take away from the decision that he made.

1           Clearly at the time she was further along in the

2   process than he was, and she very much assisted him in

3   making up his mind as to how to proceed, but he was already

4   going in that direction.

5           And I think ultimately the image that I take away

6   from it was two people saying good-bye to each other,

7   because given their nationalities, it is extremely unlikely

8   they will be able to meet in this country or Mr. Thurston's

9   country because she can't go there and he can no longer,

10  once he's removed to Canada, come here. So there was that

11  recognition.

12          But more importantly, they were saying good-bye to

13  the people they had known each other as, because each one of

14  them was moving forward in a way that was going to

15  drastically change who they were. Neither one of them was

16  going to be the person they were last with on the day that

17  they were arrested in December of 2005. And from talking to

18  my client and just from my own intuition about Ms. Gerlach,

19  each one took strength from knowing that, as they embarked

20  upon this change, that the other understood, agreed, and

21  encouraged them to follow through with what they were doing.

22          And things moved very quickly once that meeting

23  had occurred. It wasn't long after that that my client

24  indicated to the government that, in fact, he was willing to

25  resolve his case through negotiation and that he was, in

1  fact, willing to cooperate.

2         And to show you or to point out to you how drastic
3  a change that was in his life and how far he had come, we
4  have heard a long litany of incidents that he was involved
5  in provided by the government, actually provided by
6  Mr. Thurston to the government and then provided to the
7  court. And some of those incidents had involved his arrest
8  and prosecution in Canada where he didn't cooperate, where
9  he basically stonewalled the government, where he followed
10  up by encouraging other people not to participate that way.
11  And what those incidents point out to me more than anything
12  is just how far he has come this time around.

13         He can no longer -- first of all, he doesn't want
14  to participate any longer in the ELF, the ALF, or that type
15  of radical activism.

16         Secondly, he has severed his ties in such a way
17  that even at this point if he wanted to in any way
18  reintegrate or reparticipate with persons who are involved
19  in those activities, he would simply not be welcome. I'm
20  sure other people -- that you are aware from what other
21  people have mentioned, the alternative press in Eugene and
22  nationally has not been kind to the people who were
23  perceived to have been cooperators.

24         So my client has -- has cut the ties, is moving
25  on, and despite the role that has been attributed to him of

1   a senior statesman within that organization, he has now

2   withdrawn and resigned from and will have no further

3   involvement in any way in their activities.

4   And what's lost in the focus on his -- and

5   unfortunately, he did this to himself. But what's lost in

6   the focus on his unlawful activities is much knowledge or

7   reference or consideration of his lawful activities during

8   the time that he has been an activist. He's going to talk

9   more about this, but I would also just point out that in --

10   during the time -- that period that the government talked

11   about, he was also involved in a Canadian wildlife

12   organization called Bear Watch which involved maintaining

13   secure habitats for the Canadian bear population. He worked

14   for them for a number of years. He was involved in an

15   organization that provided computer training for

16   underprivileged children in the Vancouver, B.C. community.

17   And he was also involved in an organization called the B.C.

18   Compassion Club, which provides counseling and alternative

19   medicine to chronically and terminally ill people in the

20   Vancouver community.

21   So while he's been in custody, he's used his time

22   wisely. As you have seen from the letters that were sent by

23   supporters of his, he has been thinking about vocation, he

24   has been thinking about going back to school and completing

25   his education, and he has been focusing on the more

1   mainstream activities like I just mentioned, with a
2   recognition that he has taken something from society during
3   his unlawful activities, and that he now has an obligation
4   to return to society an amount equivalent to that which he
5   has withdrawn.

6           He is looking forward to being able to return to
7   his community in Canada. He, as cited in the letters, is
8   recognized as being a caring and compassionate person, and
9   in reviewing those letters, I observed one that I thought --
10  I just wanted to refer the court to one paragraph of it
11  because I think that it describes Mr. Thurston more
12  accurately and effectively than I have just attempted to do
13  in the entire time I have been talking.

14          And this is written by a friend of his named
15  Elaine Budlong who has visited Mr. Thurston on virtually a
16  weekly basis during the time that he's been in custody in
17  Portland.

18          "During my visits with Darren, we talk about
19          everyday issues as well as dealing with hard
20          issues like processing the emotions he has with
21          the acknowledgment that he has left the radical
22          portion of the animal rights and environmental
23          movement. Darren accepts my teasing about his
24          past very good-naturedly and is able to recognize
25          the extremity of the lifestyle he chose to live.

1    We have discussed growing older and recognizing
2    the world is not as black and white as we had both
3    once thought and how that consequently demands a
4    more enlightened approach to dealing with
5    differences of lifestyle.
6        "He is no longer feeling the need to carry
7    the weight of the world on his shoulders and wants
8    to enjoy the freedom of living life without the
9    stress, pressure, and fear that exhausted him
10   during the past."
11       As I mentioned in my sentencing letter to the
12   court, we have felt exceptionally fairly treated by the
13   government during the course of these proceedings.
14       I was going to ask the court to sentence
15   Mr. Thurston without the effects of the terrorism
16   enhancement, and I was going to mention where that left him
17   in the guidelines.  I think given the court's comments
18   earlier, I can only think of a quote that I regularly
19   attribute to Judge Ashmanskas in Portland where he has
20   offered me the opportunity to steal victory from the jaws of
21   defeat.
22       We have always thought that the sentence was fair,
23   and I wish I could argue for less and feel like I was being
24   intellectually honest, but I think Mr. Thurston will walk
25   out of here feeling that he has been treated with the utmost

1   of respect if the court imposes a sentence that was

2   negotiated for him, and we ask you to do that.

3   THE COURT: Thank you. I'd like to take just a

4   couple minutes because I -- I think about these guideline

5   calculations, really no fun right now, because that's what I

6   think about, and how this affects each and every case, and

7   I'd just like to take a minute to look at what I had done in

8   my own analysis and make sure I have covered everything I

9   needed. I have read the case that you provided the court

10  this morning, so I have looked at that. But I just wanted

11  to have everybody's arguments and go back and look at my

12  analysis, and then I will ask Mr. Thurston for his comments.

13  All right?

14  MR. PEIFER: Can I just make a couple points, Your

15  Honor?

16  THE COURT: Sure.

17  MR. PEIFER: The *Kimler* case was a jury trial.

18  There was no plea agreement in that case. There was no

19  attempt to limit the guidelines application to a single

20  book. So in *Kimler*, the court had a true situation we would

21  have had here if we had had no agreement.

22  And of course, our position is the agreement

23  trumps the provision that would take it into another book.

24  As far as the fire itself, it's true that the one

25  barn burned, but there was an attempt to burn other

1  buildings, and they failed. Ms. Kolar literally got her

2  wires crossed on her device and it didn't work, and so the

3  fire could have been more extensive. He wasn't involved in

4  that part, but I wanted to set that straight too.

5          THE COURT: Thank you. We'll take a 15 or

6  20-minute recess.

7          THE CLERK: Court is in recess for 20 minutes.

8                   *(Recess.)*

9          THE COURT: Thank you. Please be seated.

10         Mr. Thurston, you have had a chance to read the

11  presentence report; is that correct?

12         THE DEFENDANT: Yes, I have. That's correct.

13         THE COURT: And have you had plenty of time to

14  talk it over with your lawyer?

15         THE DEFENDANT: Yes, I have.

16         THE COURT: Any additions or corrections you want

17  to call the court's attention to?

18         THE DEFENDANT: Nothing at this time.

19         THE COURT: This would be the time.

20         THE DEFENDANT: Yeah. Nothing.

21         THE COURT: Anything you want to say before I

22  impose the sentence in this case?

23         THE DEFENDANT: Yes, I do.

24         At earlier sentencings I have heard Judge Aiken

25  use the phrase actions speak louder than words. This is a

1 phrase I'm very familiar with. In fact, it is the motto I
2 have strived to live my life by for almost 20 years. You
3 are not going to hear me blame anyone else for my actions.
4 I accept full responsibility for and have many regrets about
5 my actions in this crime.

6 I have long considered that all life is sacred and
7 have a very strong personal commitment to nonviolence. When
8 I agreed to participate, I truly believed the crime at
9 Litchfield would only entail the release of wild horses to
10 their native habitat. After I learned otherwise, I made the
11 decision to continue on with this crime and only take part
12 in releasing the horses. I realize I assisted with the
13 entire crime and am entirely responsible for it. I also
14 understand the very real danger this crime may have had to
15 firefighters or other emergency personnel.

16 My actions in this case have effectively resigned
17 me from further involvement with the Animal Liberation Front
18 or Earth Liberation Front. I have no intention of being
19 involved in actions of this kind in the future.

20 This case has focused attention upon my activities
21 as a activist, but my life's experiences are actually much
22 broader than that. Some of the work I have done includes
23 program leadership for young children. I have campaigned
24 against dolphins in captivity. I have been a librarian. I
25 have campaigned against fur farms. I have managed retail

1    stores.  I have campaigned against trophy hunting and
2    poaching of endangered grizzly bears.

3                    (Reporter interrupted.)

4              THE DEFENDANT:  I have campaigned against trophy
5    hunting and against poaching of endangered grizzly bears and
6    against bear farming and the bear parts trade.  I have
7    worked in print and radio advertising.  I fought
8    clear-cutting in old growth forests.  I have managed small
9    offices.  I have supported First Nations and their claims to
10   sovereignty.  I have campaigned against racism and bigotry
11   and against recruiting by the Aryan Nations and the Ku Klux
12   Klan.

13                    (Reporter interrupted.)

14             THE DEFENDANT:  I have campaigned against racism
15   and bigotry and against recruiting by the Aryan Nations and
16   the Ku Klux Klan.

17             THE COURT:  When you read -- when anyone reads,
18   you read faster, and it's hard on the court reporter, and
19   when you are nervous, it seems to speed up.  So just take a
20   deep breath and read carefully.

21             THE DEFENDANT:  I have worked with the poor and
22   terminally ill.

23             I sincerely regret that my actions in matters like
24   this case have so diminished the positive activities I have
25   otherwise been involved in.  I continue to have passionate

1   views about social and environmental justice, but I have
2   realized several years ago that my actions need to take a
3   more peaceful, constructive approach.

4         Upon my release from prison, I plan to continue my
5   work for those that are less fortunate than me.

6         I want to apologize to my friends and family for
7   the sorrow and disappointment I put them through, especially
8   my mother and grandmother, who I put through untold amounts
9   of pain.

10         (Reporter interrupted.)

11         THE DEFENDANT:  Who I put through untold amounts
12   of pain with my actions and subsequent imprisonment.

13         My mother and grandmother have been -- have made
14   the long trip to Portland from Canada twice in the past 17
15   months, which I deeply appreciate.

16         They are not here today because I have asked them
17   not to attend my sentencing, as I don't feel I need to
18   submit them to any further suffering.

19         (Reporter interrupted.)

20         THE DEFENDANT:  I asked them not to attend my
21   sentencing, as I don't feel I need to submit them to any
22   further suffering.

23         I have several other close friends who have
24   traveled here from Canada who, along with my family, I would
25   like to thank deeply for their support.  They have been

1   there for me since my arrest and will be there for me during

2   my prison time and upon my release into my community in

3   Canada.

4         You have my deepest gratitude. Thank you.

5         THE COURT: You know, Mr. Thurston, I made my

6   statement early on as a way to telegraph to your lawyer

7   that, really, his words weren't going to change my analysis

8   in terms of how this case has been resolved. And I would

9   honor the analysis and honor the agreed upon resolution of

10   this particular case.

11         And the reason that I said that has nothing to do

12   with, you know, any ease of doing this sentencing. In many

13   ways, this is a difficult sentencing because, clearly, in

14   reading reports about you, you are extraordinarily gifted

15   and bright. And you have squandered that in so many ways by

16   not pursuing a different course of action and not

17   understanding the impact as a leader you could have on so

18   many people's lives. And you kept getting sidetracked,

19   lured to do activities that really don't, in the bigger

20   scheme of things, really lead to a conclusion that you have

21   impacted the world in a way in which you really truly could

22   have if you pursued your education. Because you come from a

23   very loving and supportive family, and although there were

24   difficult times, you had individuals who cared about you.

25   You were very talented and gifted, and you did not pursue

1  education to the extent that I think would have given you
2  much more flexible thinking as opposed to the concrete
3  thinking that's demonstrated by these black-and-white
4  actions.

5          And I think the letter -- it was the letter that
6  struck me as well that the letter sort of talks about your
7  intellectual development and understanding that the world is
8  much more complicated and there are much more -- there's
9  much more context in terms of how you have to operate and
10 make decisions and work within a social body.

11         And then again, I have to indicate, you are a
12 Canadian. You are here. Why are you here causing problems
13 for our government? Don't you have some issues in Canada to
14 resolve? Weren't you working up there? Why did you come
15 here and just start problems?

16         Take care of your own place first. You have
17 issues up there. Resolve your issues and be a lawful, law
18 abiding individual, Canadian making a difference in how
19 issues are shaped and formed. Don't be coming down here and
20 causing problems in our neck of the woods.

21         In fact, why I think it's a sentence that I'm
22 going to honor but I'm kind of surprised about is I can't
23 tell you how many illegal reentry cases where people have
24 come in here and committed, you know, drug offenses, and
25 they are not only going to serve a longer period of time and

1  then they are going to be deported to Mexico where their
2  opportunities are way less significant than your
3  opportunities in Canada for success and an economy and a way
4  to participate.

5         So I hope what you get out of this sentencing
6  today and what you tell your mother and your grandmother is
7  you get a chance to do over. And by doing over means doing
8  right by people.

9         So because you probably didn't study American
10  history, American constitutional law, civil rights and civil
11  liberties, but you just decided your own code of the group
12  of people you participate in, I want to read to you from a
13  biography of an activist who understood what it meant to be
14  an activist in the American system of governance, because
15  democracy is a very complicated set of systems. But it was
16  formed and organized with checks and balances on the three
17  branches of government. And I note and read widely. You
18  know, there's been a comment that your behaviors were very
19  similar to the Boston Tea Party. And I thought, well, there
20  you go. Ignorance. The cry in the Boston Tea Party was
21  taxation without representation.

22         For all the activists involved in this activity,
23  you all had a chance to participate in representative
24  governance and coming in and fighting a good fight, whether
25  it's at a city council level or there's just voting, you

1  know, Congress, you know, legislative jobs, you know,
2  working within an administration, getting a legal education,
3  understanding the principles that really did put this
4  country together.

5       But nobody bothered to look at that complexity and
6  that ability to effect change.  It was instant
7  gratification.  And some day I hope people understand that
8  instant gratification has caused so many difficulties for
9  all of us.  We don't have the ability to sustain any efforts
10  longer than the moment to get what we need and want.

11       So to get what you need and want for you was to
12  take action, make your own decisions, be, basically, you
13  know, prosecutor, judge, and jury to make the conclusion fit
14  your framework of what is right.

15       So this is just a quote from what I would tell
16  you -- just a -- I think ironically, an appropriate title, *A*
17  *Defiant Life:  Thurgood Marshall and the Persistence of*
18  *Racism in America*.  Quoting on the 381st page in the chapter
19  called "Always The Outsider, Always Defiant," I'm just going
20  to read you one paragraph that sort of sums up this
21  activist's view, Thurgood Marshall's view of activism.

22            "Law is a series of rules made, modified,
23       discarded, and remade by legislators, judges, and
24       others, Marshall insisted throughout his life as
25       an advocate and as a jurist.  If the law is too

1    unfair or too exclusive or too insensitive and

2    unrepresentative to the needs of some people

3    living in society, it can be challenged by them

4    with the help of lawyers.

5         "'The rules is the rules' principle Marshall

6    absorbed at Howard Law School, and it was

7    confirmed by his practical legal experiences with

8    Charles Houston in the 1930s. But Marshall, as

9    the leader of a successful civil rights legal

10   organization for three decades, understood that

11   rules can be changed and that the tasks of lawyers

12   is to use the law to change the bad ones. Hard

13   work and patience were essential to success."

14        Now, while you were out releasing animals, Justice

15   Marshall saw as his job to release human beings. He used

16   the rule of law. He used the forms of government that were

17   carefully crafted for a check and balance.

18        So when you come back to this country, should you

19   ever be allowed back into this country, understand that

20   change is through the rule of law, not the actions of a few

21   people who think they hold the key to all knowledge. It's

22   more complicated than that. And if you'd stayed in school

23   long enough, you'd have understood the complexities and

24   you'd have been challenged to a meaningful participation in

25   helping the world see the views that you feel so strongly,

1 | because ironically, I will bet if you took a survey in this
2 | room, every single person here probably feels as strongly
3 | about caring for humans and animals as you do. But their
4 | approach is to raise and address those issues lawfully.

5 | So do you understand?

6 | THE DEFENDANT: Yes.

7 | THE COURT: And I hold you today accountable for
8 | your criminal activity up to and including the last
9 | activities.

10 | And I do, again, because the job I hold, I do
11 | believe people can change and make a difference and come
12 | back and pay back society. And you have a lot to pay back.
13 | A great deal to contribute to either knowledge or to other
14 | human beings so that they respect the choices that you are
15 | to make.

16 | And I -- I think it's truly tragic that anyone
17 | would hold you up as anything but a courageous person,
18 | because in your life, it's very difficult sometimes to find
19 | out who your friends are. Right? It's very difficult. But
20 | it's never a bad thing. In the end, the people who truly
21 | care about you, about you, will be there for you. The
22 | others who tend to use people and who move on because you
23 | don't fit their narrow framework, can find other people.

24 | So stand by the people who find you to be a worthy
25 | human being, and your letters demonstrated that you have any

1   number of people who believe in you and see a brighter

2   future, and understand that those that you left behind by

3   the decisions you are making -- your lawyer, I understood

4   that meeting, and I -- people make their own decisions and

5   people come to their own decisions through lots of different

6   processes. And I don't hold it against anybody. Some

7   people have a quicker frame of reference and can walk

8   through that decision-making process one way, and others

9   take in information, process it differently, and have to

10   walk through their own set of decision makings to get there.

11          I do think the ability to have the communication

12   and everybody understand that they were going to move on and

13   they were going to let go of this, you know, terrible

14   secret. Family secrets destroy families. This is just the

15   same. It's a different context. But all your secrets were

16   destroying you anyway.

17          So that meeting was pivotal in many ways to

18   Ms. Gerlach's need to go forward. It may well have helped

19   you, pushed you a little further down the way.

20          I also recognize, as your lawyer indicated, that

21   it was a chance to say good-bye on a number of levels, on a

22   number of levels. And I only hope that you support each

23   other in your positive lifestyles down the road to the

24   extent you can, because that's going to be important because

25   people you thought were your friends, just as the folks when

1  I do sentencings in a drug case, their buddies aren't here
2  either. Okay?

3  So leave your world behind. You have lots of time
4  to make up the difference and to contribute either by
5  working with animals in an appropriate fashion, working with
6  other education programs that you care about, getting a true
7  education and understanding where you can make a difference
8  and perhaps even understanding, by taking some American
9  history and U.S. government, why the frames of reference
10  today have all to do with battles long fought and honored
11  and traditions that we uphold because, in the scheme of
12  things, the three branches of government still is the best
13  model to preserve and protect society as well as the
14  individual. It may not be perfect, but it still is the best
15  model.

16  So accordingly, I looked at the guidelines
17  calculations to your offenses and make the following
18  findings:

19  Case No. 6 -- 06-60069, Count 1, conspiracy.

20  Pursuant to 3D1.2, your conspiracy is grouped with
21  the underlying substantive offense. Accordingly, the
22  conspiracy count then is grouped with the offenses below.

23  Case No. 60-60120 [sic], Count 1, the BLM
24  Litchfield wild horse facility.

25  The base offense level for this offense is 20.

1   Based on the recommendation of the probation office, I also
2   find a two-level downward adjustment for minimal role.  I
3   decline to find that the defendant's role warrants a further
4   two-level downward adjustment given the totality of your
5   involvement.

6          Further, I find that the offense was calculated to
7   influence, affect, or retaliate against government conduct,
8   as evidenced by the communique issued afterwards describing
9   the arson and horse release as efforts to stop the BLM's
10  quote, illegal and immoral, unquote, practice of rounding up
11  wild horses that eventually ended up in the slaughterhouse.

12          The question remains whether this court can
13  consider this offense a violation of § 844(f)(1), a federal
14  crime of terrorism, in light of the Patriot Act's 2001
15  amendment, requiring that arson of government property must
16  include a substantial risk of harm or death before it may be
17  considered as a federal crime of terrorism.

18          It is difficult to find that there was a
19  substantial risk of harm because of the remoteness of the
20  corral.  Thus, the sole issue is whether the 2001 amendments
21  apply to this offense, even though the offense was -- the
22  offense conduct was completed prior to the amendments.

23          I have been unable, given the time constraints of
24  last week, to conclusively resolve this issue after
25  conducting a significant amount of research, particularly in

1   the context of grouped offenses and the slight overlap

2   between the effective date of the Patriot Act and the 2000

3   version of the guidelines.

4          Under the circumstances, I will err on the side of

5   the defendant and decline to impose the enhancement based on

6   the uncertainty of whether defendant's offense of conviction

7   is identified by statute as, quote, a federal crime of

8   terrorism.

9          Ultimately, however, it does not affect my

10  sentencing decision.  I have the discretion to depart where

11  the guidelines do not adequately take into account

12  aggravating circumstances of the offense conduct.  Here, the

13  communique issued after this offense stated that the arson

14  was, quote, in opposition to the Bureau of Land Management's

15  wild horse holding facility and the BLM's action of rounding

16  up thousands of wild horses and burros to clear public lands

17  for grazing cattle.  The communique warned, "In the name of

18  all that is wild, we will continue to target industries and

19  organizations that seek to profit by destroying the earth."

20         Therefore, Subsection 3A1.4 does not adequately

21  take into account defendant's intent to frighten,

22  intimidate, and coerce government conduct and retaliate

23  against government conduct.  I exercise my discretion under

24  5K2.0 to depart upward by 12 levels, resulting in a base

25  offense level of 30, which is the resulting offense level

1    had the enhancement applied.

2              Acceptance of responsibility.

3              Based on the agreement of the parties, defendant

4    will receive a three-level downward adjustment for

5    acceptance of responsibility, resulting in an adjustment --

6    in an adjusted offense level of 27.

7              Criminal history category.

8              The defendant has 0 criminal history points,

9    resulting in a criminal history category of I.  However,

10   under 3A1.4, defendant's criminal history category is

11   established at VI.

12             The resulting guidelines range with an offense

13   level of 27 and a criminal history score of VI is 130 to 162

14   months.

15             The government's motion for substantial

16   assistance, then.

17             MR. PEIFER:  Yes, Your Honor.  We ask the court to

18   depart downward 13 levels to level 14 with category VI.

19   That would be 37 to 46 months, and we ask for a 37-month

20   sentence.

21             THE COURT:  Thank you.

22             MR. FEINER:  Judge, I would wait until you were

23   done, but I wonder if it wouldn't be more appropriate to

24   bring this to your attention right now.

25             Unless I'm missing something, if the terrorism

1   enhancement isn't imposed, his criminal history category
2   would be I, not VI.
3           THE COURT:  Oh, good point.  What's the range
4   then?
5           MR. PEIFER:  70 to --
6           MR. FEINER:  It would be level 27, 70 to 87.
7           THE COURT:  70 to 87.
8           MR. PEIFER:  So that would require just a
9   six-level downward departure.
10          THE COURT:  Is that right, Mr. Purdue?  Would you
11  double-check that?
12          MR. PURDUE:  Level 21.
13          THE COURT:  Your motion, then, Mr. Peifer, just so
14  I have it clearly for the record, if his criminal history
15  category now is a I, the guidelines range at 27 for the
16  offense level, and I for the criminal history is 70 to 87
17  months.
18          Your motion.
19          MR. PEIFER:  We would move for a downward
20  departure of six levels to offense level 21, category I,
21  which would be 37 to 46 months, again, asking for a 37-month
22  sentence.
23          THE COURT:  That motion will be allowed.
24          Downward departures.
25          Although, as in the previous cases, I have the

1    discretion to increase the departure for substantial
2    assistance or depart downward for other reasons or depart
3    upward for other reasons, I'm declining to do so in this
4    case.  The departure of the government more than adequately
5    recognizes your cooperation, and in fact, I question -- I
6    have my -- I have my own analysis about perhaps what this
7    sentence might have been had you not been part of the
8    overall plea agreement, given the unique nature of your
9    criminal history, your own additional contacts, both here
10   and in Canada, with the law, as well as what I believe to be
11   your incredible intelligence and your ability to have
12   understood the nature and consequences of these acts.

13        So all said and done, I think on balance, in order
14   to underscore and support the resolution of these cases, I
15   will follow the recommendation and hope that you are one of
16   the individuals in this case that goes on to appreciate and
17   live life knowing that you are given more opportunity to do
18   things that will make a positive difference in the world
19   than the incredible destruction that you caused.

20        Therefore, with regard to -- so I have taken a
21   look at the advisory guidelines range.  I have also
22   considered the factors in 18 U.S.C. § 3553, which I have
23   addressed those unique circumstances of your own.  I have
24   also looked at the obligations of sentencing, punishment,
25   deterrence, rehabilitation, community safety, and noted

1   that -- the importance of maintaining the plea agreement in
2   this particular case.

3               All that being said, with regard to Case 06-60069,
4   Count 1, you are committed to the Bureau of Prisons for
5   confinement for a period of 37 months.

6               With regard to Case 06-60120, you are committed to
7   the Bureau of Prisons for confinement for a period of 37
8   months, to be served concurrently with the sentence imposed
9   in 6 -- 06-60069.

10             Next, you shall pay full restitution to the victim
11   identified in the presentence report in the amount of
12   $122,497.60, jointly and severally with Joseph Dibee, and
13   your interest shall be waived. Dibee, Dibee. Is it Dibee
14   or Dibee?

15             THE DEFENDANT: Dibee.

16             THE COURT: Dibee. Upon release from confinement,
17   you will serve a three-year term of supervised release,
18   subject to the standard conditions of supervision adopted by
19   this court and upon the following special conditions:

20             First, you shall cooperate in the collection of
21   DNA as directed by your probation officer, if required by
22   law.

23             Next, you shall pay full restitution to the victim
24   identified in the presentence report in the amount of
25   $122,497.60, jointly and severally with Mr. Dibee in Case

1   06-60011.

2          If there is any unpaid balance at the time of your

3   release from custody, it should be paid at the maximum

4   installment possible and not less than $200 a month.  That

5   amount will be negotiated when you are released and once you

6   are employed, and the probation officer will have the

7   ability to provide whether or not you are working in your

8   full capacity to pay the restitution, because this

9   obligation will continue for some time.

10          If deported, you shall not enter the United States

11   without the approval of the Department of Homeland Security

12   and without prior notification to the U.S. attorney and the

13   U.S. probation office for the District of Oregon.

14          I'm not -- I'm also going to say -- it goes

15   without saying, but you are not to commit any new federal

16   law violations, whether they are state, federal, or local

17   violations.

18          I'm not imposing a fine.  I'm making the finding

19   you don't have financial resources nor an appreciable

20   earning ability to pay the fine, and you have a substantial

21   restitution obligation which will be your first obligation.

22          However, you are required to pay the fee

23   assessment in the amount of $200.

24          You entered into this plea agreement waiving all

25   or part of your appeal rights.  If you wish to file a notice

1   of appeal, you may do so. It must be done within ten days

2   of this date. If you can't afford to do so, contact the

3   clerk's office. It will be done for you and done for free.

4           Other recommendations, counsel.

5           MR. FEINER: Your Honor, we would ask for an

6   initial designation to FDC SeaTac. However, we are

7   concerned that this sentence might not be one that can be

8   served there just because of its term.

9           So if that is not possible, then we would ask that

10  the designation be to Sheridan, and it would have to be the

11  prison there, not the camp, because as a resident of Canada,

12  he would not be eligible for the camp.

13          THE COURT: We will include those recommendations

14  in the order.

15          And did I miss anything, counsel?

16          MR. PEIFER: No, Your Honor.

17          THE COURT: Anything else to be dismissed?

18          MR. PEIFER: He's charged in the superseding

19  indictment, so we'd ask that he be dismissed as far as that

20  indictment is concerned.

21                  (Counsel conferred.)

22          MR. PEIFER: The Portland case, he just mentioned,

23  is before Judge King, and I can simply submit a dismissal

24  order before him or we could do it here too as a part of the

25  plea agreement.

1          THE COURT:  We can just do it as part of the plea

2    agreement.

3          MR. PEIFER:  Thank you.

4          THE COURT:  And then it's one set of paperwork --

5          MR. PEIFER:  Right.

6          THE COURT:  -- and nobody has to be responsible

7    for it.

8          Anything else?

9          MR. FEINER:  Nothing, Your Honor.  Thank you.

10         THE COURT:  Good luck.

11         THE CLERK:  Court is in recess.

12         *(The proceedings were concluded this*

13         *29th day of May, 2007.)*

1          I hereby certify that the foregoing is a true and

2    correct transcript of the oral proceedings had in the

3    above-entitled matter, to the best of my skill and ability,

4    dated this 17TH day of August, 2007.

5

6

7    _____

     Kristi L. Anderson, Certified Realtime Reporter

8

9                                          

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25